```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MARYLAND
2                            NORTHERN DIVISION

3

4        IN RE: MUTUAL FUNDS
         INVESTMENT LITIGATION
5
         _____/
6

7                         MDL No. 1586
                          Thursday, October 21, 2010
8                         Baltimore, Maryland

9


10     Before:  Honorable Catherine C. Blake, Judge
                Honorable J. Frederick Motz, Judge
11


12
       Appearances:
13
                On Behalf of Plaintiffs:
14                   As Liaison Counsel For Plaintiffs:
                     John B. Isbister, Esquire
15                   In Invesco, Pilgrim Baxter, MFS Subtracks:
                     Chad Johnson, Esquire
16                   For Fund Derivative Plaintiffs:
                     Mark C. Rifkin, Esquire
17                   In Excelsior, Alliance, Alger Subtracks:
                     Michael Yarnoff, Esquire
18                   In Scudder (Deutsche) Subtrack:
                     Glen L. Abramson, Esquire
19                   In Federated, Nations/Bank of America Subtracks:
                     U. Seth Ottensoser, Esquire
20                   In Strong, OneGroup, Columbia Subtracks:
                     Clifford S. Goodstein, Esquire
21                   In Janus Subtrack:
                     Mark C. Molumphy, Esquire
22                   In Putnam Subtrack:
                     Richard Wayne, Esquire
23                   In RS Subtrack:
                     Richard A. Acocelli, Esquire
24                   In Allianz Dresdner Subtrack:
                     Chet B. Waldman, Esquire
25
```

1

2          For Fund Derivative Plaintiffs:
            Adam Prussin, Esquire
3           Timothy N. Mathews, Esquire
          On Behalf of Plaintiff Lo Monte:
4           Theodore Bechtold, Esquire

5         On Behalf of Defendants:
            In Invesco Subtrack:
6           Mora Monaghan, Esquire
          In MFS Subtrack:
7           William H. Paine, Esquire
          In Deutsche Subtrack:
8           Patrick Conner, Esquire
          In Federated Subtrack:
9           Jack B. Cobetto, Esquire
          In Putnam Subtrack:
10          Peter Simshauser, Esquire
          In Alger Subtrack:
11          Stewart D. Aaron, Esquire
          In Alliance Subtrack:
12          George A. Schieren, Esquire
          In Janus Subtrack:
13          Mark A. Perry, Esquire

14

15   (NOTE: Only counsel who verbally participated
          have been listed.)
16

17

18

19

20   Reported by:
     Mary M. Zajac, RPR
21   Room 5515, U.S. Courthouse
     101 West Lombard Street
22   Baltimore, Maryland 21201

23

24

25

1          (Proceedings at 10:04 a.m.)

2          MR. ISBISTER:  Good morning, Your Honors.  John

3     Isbister, plaintiffs' administrative chair.  I would like to take

4     a few minutes to give some introductory remarks to set the stage

5     for what we're doing today.

6          It was six and a half years ago, April 2nd, 2004, in

7     this courtroom, that Your Honors, Judge Davis, and Judge Stamp

8     greeted a room full of lawyers to Baltimore and to this MDL.

9     There were far more lawyers here then than there are today.

10    There were defense lawyers on the right, and every seat was

11    taken.  And there were also many people also on a teleconference.

12         Judge Motz, at that time you characterized an MDL as a

13    large enterprise.  And despite the many lawyers from across the

14    country in the room then, I do not think anyone could have

15    appreciated the true scale of the litigation that was to come.

16    Some numbers might help.

17         Hundreds of cases were transferred to this district

18    from across the country for coordinated pretrial proceedings,

19    each with multiple parties.  Those cases were organized into 18

20    different subtracks, one of which went away fairly quickly, each

21    with unique parties, unique issues, but also various shades of

22    overlap.

23         There have been over 7300 separate papers and pleadings

24    filed in these cases.  We have had hundreds of teleconferences

25    and hearings.  The Court has issued 22 decisions that were

1    reported in the Federal Reporter and there are almost three times

2    that many additional decisions that are reported in the

3    electronic media.

4          There have been three appeals and three decisions from

5    the Fourth Circuit in these cases and one of those cases is

6    pending before the Supreme Court, and Mr. Perry will be arguing

7    that on December 7th.  None of the appeals will affect the

8    settlements that are before the Court today.

9          Recently, 27 million individual notices about the

10   settlements have been mailed to the members of the class.  Today,

11   counsel are here to ask the Court to give final approval to

12   settlements in 16 of the subtracks, with a total settlement value

13   of over 300 million dollars.  And counsel in those subtracks will

14   shortly discuss the merits of each of those settlements.

15         Before we get to that, I want to say something both on

16   my own behalf and on behalf of my colleagues.  We are all very

17   grateful to Your Honors and the Court for the manner in which you

18   have presided over and handled these cases.  The cases were hard

19   fought and involved many novel and difficult issues.  While there

20   were many issues that, as I said, overlapped, there were also

21   unique aspects to each of the cases.  This presented a challenge

22   for the parties, but also placed a tremendous load on your court,

23   your staffs and the courthouse.

24         We appreciate the wisdom and diligence that Your Honors

25   have brought to every issue that was presented to you and we

1    thank you for your even temperament and pragmatism that you

2    applied to every dispute.

3            Our plan for today, unless Your Honors request

4    differently or the circumstances indicate a change is

5    appropriate, would be to present each of the subtracks one at a

6    time.  We've prepared an agenda with the order in which the

7    settlements will be presented.  And within each subtrack, the

8    plan is for lead class counsel to present opening remarks,

9    followed by any other counsel in the subtrack who wished to

10   speak.  We will then ask any objectors in the subtrack who wish

11   to speak to also speak.

12           Now, as of this point, I do not know, is there any, are

13   there any objectors in the courtroom who would like to speak to

14   the Court today?

15           (No response.)

16           MR. ISBISTER:  Your Honor, the record should reflect

17   that no one has responded.  So unless the Court has any questions

18   or comments, we're prepared to start the subtrack presentations.

19           I would ask any counsel who speaks to introduce

20   themselves.  Ms. Zajac knows many of you but it's been a while

21   since she was in this case and has forgotten some names.

22           Your Honor, first let me introduce Mr. Chad Johnson

23   from the Bernstein, Litowitz, Berger & Grossman firm, lead class

24   counsel in the Invesco subtrack.

25           MR. JOHNSON:  Good morning, Judge Blake, Judge Motz.

1    Chad Johnson of Bernstein Litowitz.  We're proud to be able to

2    seek final approval of the settlement pertaining to the Invesco

3    subtrack.  And then I'll get to the Pilgrim Baxter and the MFS

4    subtracks after that, if that's all right.

5         In Invesco, if approved, this settlement would resolve

6    all of the investor class, the ERISA class, and the derivative

7    claims as well.  The investor class in this subtrack, the Courts

8    will know that the lead plaintiff has been the City of Chicago

9    Deferred Compensation Plan.  And here today we have Karen Dorf,

10   who is corporation counsel for the City of Chicago.  She has

11   been, and her office has been deeply involved in overseeing the

12   prosecution of this case from day one to the moment.

13        She also submitted, the Court is aware, a declaration

14   related to this matter in favor of the settlement and the other

15   aspects of relief that we seek.

16        The settlement in this subtrack amounts to total

17   recovery of over 20 million dollars.  That's 20,455,400 in cash,

18   plus interest that has accumulated on that.  The sources of

19   recovery for this amount are detailed in our papers.  We would

20   also intend to distribute an additional $11,490,000, plus

21   interest, obtained by the New York Attorney General's Office in

22   its settlement with the Canary defendants.

23        We respectfully submit, as detailed in our papers --

24   and I don't mean to repeat everything that's there, but I'll

25   highlight at least a few points.  We respectfully submit that the

1    settlement here meets all standards of fairness and adequacy.  As

2    far as fairness is concerned, and we go into great detail about

3    this, the posture of the case here was such that Motions to

4    Dismiss had been ruled upon.  There had been much contentious

5    fact discovery.  There was motion practice regarding standing and

6    the like.  We were up against extraordinarily sophisticated

7    defendants and defense counsel.

8         This settlement was the result of protracted, hard

9    fought, always professional, but hard fought negotiations based

10   on an extensive investigation that was undertaken by us and other

11   counsel in the case, a review of voluminous and detailed

12   information from and about the Invesco subtrack defendants.

13        And then as part of the fairness evaluation, experience

14   of counsel is relevant.  Our firm has over 25 years of experience

15   in this area.  It's not just my firm that supports this

16   settlement, but also counsel for the ERISA plaintiffs, the

17   derivative plaintiffs, and again, the lead plaintiff here, a

18   sophisticated institutional investor, which is exactly what

19   Congress wanted to have leading these types of cases.  And again,

20   Ms. Dorf and her office have been very involved in overseeing

21   this case.

22        As far as adequacy is concerned, there are very

23   significant risks in this case, as the Court is well aware, risks

24   related to establishing liability.  It's essentially

25   unprecedented to have these types of claims regarding market

1    timing.  The defenses here included many, many viable, we thought

2    we would ultimately prevail but these were viable defenses at

3    least, relating to an ability to establish scheme liability, duty

4    to disclose, scienter, lack of standing and the like.

5          There were also very significant risks associated with

6    establishing damages.  There were very contentious fights, always

7    professional, but disputes over the extent of whether there were

8    damages at all and over whether there was scienter that could be

9    tied to any damages, if there were damages, and also over how

10   set-offs, if any, should be applied based on payments made by

11   these defendants to the regulatory authorities.  These were

12   extraordinarily complicated issues.  The Court certainly was

13   introduced to these issues along the way.

14         There were also real risks of obtaining class

15   certification.  And even the Court itself noted there could be

16   manageability concerns with handling 14 separate mutual funds as

17   part of one subtrack.  Of course, if there were no settlement

18   here that we were presenting for the Court's approval, there

19   would be the reality of further litigation, and who's to say how

20   much longer that would take.  But I don't think anyone could

21   credibly say that would be an easy undertaking that would

22   necessarily turn around in very short order.  This is an

23   extraordinarily complicated case.

24         As far is the investor reaction is concerned, in the

25   context of this case and the notice and the size of the class,

1    the investor reaction here is definitely positive.  To put this

2    in context, just for this subtrack alone, more than 2.15 million

3    notices were sent out to class members.  There was an

4    extraordinarily robust publication notice program that was

5    undertaken.  We put in place a web site for the settlement, which

6    has been used quite, quite frequently.  In fact, we already have

7    more than 150,000 hits on that settlement web site.

8         We've had in place for sometime a toll-free telephone

9    hot line for class members.  And that's received over 15,000

10   phone calls.

11        There are objections that have been presented to the

12   Court and we have, we have noted that.  There are 21 objections

13   and 62 requests for exclusion from the class.  But again, in the

14   context of a program involving everything I've noted, including

15   the 2.15 million notices sent out, it should also be noted that

16   claims and class members are moving forward with the claim

17   process.  In fact, in this subtrack alone, we already have over

18   51,000 claim forms submitted, which is rather significant,

19   especially considering that the deadline isn't even upon us.

20   That's in December.  And in our experience and the experience of

21   the claims administrator, the bulk of the claims actually come in

22   closer to the claims deadline than now.

23        So in light of those facts and in the context of the

24   case law as it pertains to investor reaction, we respectfully

25   submit that this is a very positive reaction to the settlements.

1    There are also, I should note, no objections or opt-outs by large

2    institutional investors, and perhaps that's in part a reflection

3    of the fact that the case was overseen by one, who was looking

4    out for the interests of other investors.

5            JUDGE MOTZ:  Is that true in all subtracks?  Is that

6    true in all subtracks, that there are no opt-outs who are large

7    institutions?  In yours?

8            MR. JOHNSON:  In ours.  In ours, that's true, Your

9    Honor.  I can't speak for all 16, but in ours that's true.

10           JUDGE BLAKE:  If I might ask just two quick things.

11   Have we managed to get the teleconference working?  Should we

12   just reflect, for the record, that there are other people that

13   wanted to listen in, not speak?  Great.  That's been worked out.

14           And if you could just address -- and I understand it's

15   not my subtrack, but there may be some similar things later on --

16   the people where there have been objections or difficulties on an

17   individual level.  I believe that you've taken some actions to

18   try to help people who seem to be having difficulty with claim

19   forms and so forth.  At some point, if you would speak to that.

20           MR. JOHNSON:  Absolutely, Your Honor, and this is a

21   perfectly appropriate time to address that.  There have been

22   objections and questions and so on raised with regard to the

23   claims process in this subtrack and others.  And they have, I

24   think to be precise, in the Invesco subtrack, there have been 12

25   objections that relates to the claims process, which tend to

1    focus on the requirement that class members fill out a claim

2    form.  I want to respond now, if it's all right, to that point.

3            The approach that we used here, Your Honor, and Judge

4    Motz, of course, is based on our experience in the area, as well

5    as consultation with the claims administrator, which has years of

6    experience in this area, consultation with defense counsel.  And

7    we also conferred with the firms that acted as the administrators

8    for the SEC Fair Fund distributions.

9            It is typical in securities class actions for class

10   members to have to provide some shareholding information.  In

11   fact, it's typical for them to have to provide much more detailed

12   information than was required here.  And this is a tested and

13   reliable approach.

14           But here, we simplified the requirements to make it

15   very easy for class members to participate in the settlement.

16   It's far less demanding than what is required in a typical class

17   action settlement.

18           We have a very short claim form which only requires

19   yearly holding information, not documents for each transaction,

20   as is common in settlements in the securities class action area.

21   In fact, instead of just talking about this at a conceptual

22   level, I thought perhaps the Court and everyone might benefit by

23   looking at what we're talking about.  And we have an example that

24   was filed on the docket by a class member.  We didn't ask them to

25   do it.  It's perfectly fine that they did it.  And, of course,

1    when we saw that, we forwarded it to the claims administrator.

2    But it is on the docket to this point.

3         I thought that if we could show you what this involved,

4    it might take it from the conceptual level to the factual level.

5    Would it be all right if I approached?

6         JUDGE MOTZ:  Sure.

7         MR. JOHNSON:  Now, this happens to be a form from the

8    MFS subtrack.  But there's nothing different about the format of

9    this claim form for the Invesco subtrack, for the Pilgrim Baxter

10   subtrack, so on.  It's just that it so happens this class member

11   filed her claim form in the MFS subtrack because that's where she

12   had investments.

13        What you see here is very basic identifying information

14   is required.  This class member filled that out simply.  And then

15   there's, after that on Pages Two and Three, to the extent that a

16   class member held shares in the funds, we ask that they identify

17   the number of shares and provide whatever reasonable

18   documentation is available.  And again, that doesn't mean one

19   thing in particular.  It could include a lot of different types

20   of examples.

21        But for folks who don't happen to have anything, for

22   instance, but have an understanding that they did during the

23   relevant time period own shares in a mutual fund, we have set up,

24   and the defendants have set up with us, a procedure that allows

25   class members to call in on a 1-800 number, and to the extent

1    that the, that representatives for the fund families have

2    information on the person, they will provide that to them so that

3    they can then use it as part of filling out the claim form, which

4    they then have to sign still, and they still have to provide

5    their identifying information and the like.

6          And it just so happens this form was filled out using

7    that process.  And we know that because the very last page of it

8    is the type of information that gets forwarded, in this case by

9    MFS, by the MFS representatives, to the person who phoned in.

10   And they can just attach this and use it as the basis for filling

11   out the form and provide the information that will allow them to

12   complete this.  Again, it's a simplified form, which then allows

13   them to participate in the settlement.

14         So for folks who don't have documentation, there is a

15   process.  And if we receive a, we or the claims administrator,

16   receive a form that's not filled out adequately, individual

17   efforts are made to reach out to each one of those people, or

18   could be a company, whatever it is, and do everything in their

19   power to assist with this.  So I've been very specific and tried

20   to be.  But the general point is, every realistic effort is made

21   to help class members participate here without imposing on them

22   unreasonable burdens, while still following a basic process that

23   allows for some confirmation that they are class members and the

24   like.

25         So that's, that's what's being done, at least in the

1    three subtracks that I'll be addressing.  And the process has

2    worked.

3          Again, I note just in this subtrack alone, already

4    51,000 claim forms have been submitted.  I should also note that

5    for anyone who wants to, they can fill out a claim form on the

6    Internet.  So they don't even have to do it by paper, if they

7    prefer.  It's their choice.  Either way they get treated, of

8    course, the same.

9          It's worked more broadly, too, when considering that

10   this is the same process that's used in Invesco, Pilgrim Baxter,

11   MFS.  In those three we've seen already over 180,000 claim forms

12   submitted.  So again, this process is one that isn't just

13   theoretically manageable, but it's actually working as we speak.

14         There are trading, there are trade-offs.  There are

15   competing interests and so on that we seek to strike a balance

16   among.  And in fact, one of the objections that was put forward

17   in the Invesco subtrack illustrates this.

18         One of the objectors argues that the claims shouldn't

19   be based just on year end holdings, but should be based on

20   detailed information regarding holdings over the course of the

21   year.  And that argument is not frivolous.  We understand the

22   point.  But of course, if that were the approach taken, it would

23   require even more detailed information from class members and

24   elsewhere.

25         So there are competing interests.  Again, we sought to

1   strike an appropriate balance and we believe that under the case

2   law we clearly did that.

3         And I also want to respond to another concern that was

4   raised in some objections about whether there is some financial

5   incentive and something about this claims process that would

6   reward lawyers or defendants if claims aren't submitted and the

7   like.  And I want to be crystal clear about this.

8         There are no circumstances under which counsel obtained

9   any benefit from undistributed or leftover funds, nor will any

10  leftover funds revert to any defendants.  And this is the same in

11  all of the subtracks, I believe in all the subtracks you'll hear

12  about today, but at least in the subtracks that I'll be speaking

13  about.

14        Instead, in connection with the plan of allocation, if

15  there's court approval, there will be an initial distribution on

16  a pro rata basis.  And following that initial distribution, the

17  claims administrator will use reasonable efforts to have the

18  authorized claimant's cash their distribution checks.  Believe it

19  or not, sometimes even after people have filed claims and checks

20  go out, they don't get cashed for any number of reasons.  And

21  efforts will be made to see to it that those checks are cashed by

22  the class members.

23        And after that initial distribution, if it would be

24  cost effective to do so, the claims administrator will conduct a

25  further distribution of any remaining funds in the net settlement

1     fund.  And if after that it's, again, cost effective to do so,

2     another distribution would be made.  At the point where it

3     becomes not cost effective to do so, the remaining funds, which

4     presumably would be de minimis amounts, would be then distributed

5     to the funds themselves where current investors have an interest.

6     They would not be distributed to plaintiffs' counsel or

7     defendants or anywhere else.  And they would be distributed to

8     those funds in proportion to the alleged dilution losses found by

9     our independent damages expert in this area.

10            JUDGE BLAKE:  So that the current investors in the

11    funds would benefit?

12            MR. JOHNSON:  Exactly.  Now, I don't want to overstate

13    the size of that benefit because it only would happen if we're

14    down to the point where it wouldn't be cost effective.

15            JUDGE BLAKE:  Sure.

16            MR. JOHNSON:  But that's where it would go.  Now, we've

17    also put in a fee and expense reimbursement request.  And for our

18    work over the last six plus years on this case, and in light of

19    the positive results obtained, plaintiffs' counsel, meaning my

20    firm as investor class lead counsel, the court-appointed ERISA

21    counsel and court-appointed derivative counsel, seek

22    reimbursement of our litigation expenses and a collective fee of

23    15%.  The fee here is approved and supported by the, and it was

24    negotiated with the lead plaintiff, City of Chicago.

25            We respectfully submit that the fee request is fair and

1    reasonable and, indeed, modest under the circumstances.  This

2    percentage is certainly below or at the very low end of the range

3    of fees typically awarded in this circuit and elsewhere.  And

4    when measured against the lodestar, it also seemed to be modest,

5    we submit.

6          The requested fee would provide what amounts to a

7    negative multiplier of 0.42 on the total lodestar for plaintiffs'

8    counsel, which doesn't even account for the ongoing work that we

9    are doing now and will continue to do in overseeing the claims

10   administration process.  And that is real work.  We have multiple

11   people in our office helping to make sure that this process goes

12   smoothly and that we're very responsive to class members and

13   their inquiries.

14         JUDGE BLAKE:  And you would anticipate that taking,

15   what, about a year plus to finish the entire?

16         MR. JOHNSON:  I think the question is how many

17   subsequent distributions get made.  That's hard to predict.  But

18   it will take, it will take some time because of the size of the

19   class.  It will.  And we have, you know, my colleague here, Jerry

20   Bien-Willner, we have two other lawyers and other professionals

21   who are fielding calls, responding to e-mails, doing everything.

22   And also overseeing the claims administration process that's

23   being handled by the Garden City group and so on.  So that will

24   take some time, it just will, because of the size of the class.

25         JUDGE MOTZ:  Again, if you'd just address, for the

1    record, the fee is for both class counsel investors class and the

2    derivative?

3         MR. JOHNSON:  Right.  The investor class, the ERISA

4    class, and the derivatives.  And I note as well in it subtrack,

5    just like in every one that's going to be discussed today,

6    administrative counsel, Mr. Isbister's firm, has put in a request

7    for 1.25%, which lead plaintiff has known about, signed off on

8    and so on.  And I'm not here to address that.  But that's a part

9    of it, too.

10        But to your question, Judge Motz, yes.

11        JUDGE MOTZ:  I knew the answer but I just thought the

12   record should reflect it.

13        MR. JOHNSON:  Yes.  Absolutely correct.  I don't know

14   if we're going to hear from him further, but I would note that,

15   like in every other subtrack, there are objections, I'd almost

16   describe them as purported objections because of standing issues,

17   because by Theodore Bechtold.  He submitted objections in the

18   Strong subtrack, apparently on behalf of a client, and suggests

19   the Court should apply those objections to the other subtracks,

20   despite the fact that he doesn't have a client in this subtrack

21   or others.  And we submit that this is improper.

22        We point out in the papers, this is a pursuit of his

23   and he's been recognized by other courts as a serial objector.

24   He tried hard, the record's clear on that, to find clients in

25   this subtrack and others, but he doesn't have anyone who has a

1   stake in this subtrack and the others that I'll speak about.

2   Because of that, and also because his objections lack merit and

3   we respond to those on the merits in our papers, we respectfully

4   submit that those objections are misplaced.

5           With that, I'll sum up by respectfully requesting, with

6   the full support and involvement of the lead plaintiff here, the

7   City of Chicago, that the Court approve the settlement, the plan

8   of allocation and the expense and fee requests submitted.

9           JUDGE MOTZ:  Okay.  I think the record should reflect

10  that although this is formally one of my subtracks, obviously

11  Judge Blake and I have worked together on all of these together

12  and there are overlapping issues.  So unless there's some reason

13  that you can think of I shouldn't do it, I will approve the

14  settlement.

15          Are there any objectors here still?

16          (No response.)

17          JUDGE MOTZ:  I would have thought Mr. Isbister told me.

18  I assume there are no objectors here?

19          (No response.)

20          MR. ISBISTER:  Your Honor, I have greeted people as

21  they came in.  None are objectors.

22          JUDGE MOTZ:  And I don't need to hear from them.  Is

23  there any defense counsel who wants to be heard in this subtrack?

24          MS. MONAGHAN:  Your Honor, I'm Mora Monaghan.  We don't

25  have anything to add to plaintiffs' counsel's presentation.  But

1    if there are any questions, we can answer them.

2            JUDGE MOTZ:  Thank you.  I'll approve it.

3            MR. JOHNSON:  Thank you.

4            MR. RIFKIN:  Good morning, Your Honors, again.  Mark

5    Rifkin on behalf of the fund derivative plaintiffs.  It's our

6    pleasure to be here as well.  And I won't add to the Court's

7    burden today.  I know we're going to try to get through as many

8    of these as possible.

9            I simply wanted to confirm that when Your Honor

10   indicated he was going to approve the settlement, that you meant

11   all of the settlements that are being proposed in the subtrack.

12           JUDGE MOTZ:  I mean all of the settlements.

13           MR. RIFKIN:  Yes, okay.  We will be here, obviously,

14   throughout the day to answer any questions the Court may have in

15   the derivative cases in particular.  But since you've already

16   indicated you're going to approve this one, I'm happy to sit down

17   and we'll move on to another case.

18           JUDGE MOTZ:  That's fine.  Thank you.

19           MR. RIFKIN:  Thank you, Your Honor.

20           JUDGE MOTZ:  Let me ask a practical matter.  The

21   difficult conceptual standing issue which remains has sort of

22   been worked out by the settlements, I gather?

23           MR. RIFKIN:  Yes.

24           JUDGE MOTZ:  In a way it's a wonderful market solution

25   to a difficult conceptual issue.

1          MR. RIFKIN:  It is, and we are grateful to have been

2     able to work through all of our difficulties over a long and

3     arduous period of time.  But yes, the settlements resolve all of

4     the issues.

5          JUDGE MOTZ:  And I mention that just because it's been

6     a fair issue among, between, among the plaintiffs from the

7     get-go.  But as I understand the structure of the settlements,

8     one of the ways it works out is the, one of the things, as a

9     practical matter, is reversions go back to the funds and current

10    investors, which to a large extent is a settlement on behalf of

11    the people whom you say should be benefited.

12         MR. RIFKIN:  Correct.  And of course as we point out in

13    our papers, many of the people who were contemporary shareholders

14    at the time of the market timing were long time members who are

15    still members of the funds.  So as the SEC did in essentially

16    doing the same sort of thing, with the remainder going back to

17    the funds, we think that the allocation here is a reasonable one

18    the way it's been proposed.  And we were glad to be able to

19    participate side by side with the class plaintiffs.

20         JUDGE MOTZ:  It's true, I gather, in all the

21    settlements.

22         MR. RIFKIN:  All but two.

23         JUDGE MOTZ:  All but two.

24         MR. RIFKIN:  And just to preview them now.  Nations

25    Fund is a bit different and Columbia is a bit different.  And I

1    will actually be speaking to both of them but we'll get to them

2    in turn.

3              All the others are identical.  All the others are

4    identical.

5              JUDGE MOTZ:  Thank you very much.

6              JUDGE BLAKE:  I think the record should also reflect,

7    of course, that counsel very thoroughly briefed these requests

8    for not only earlier that we dealt with for preliminary approval,

9    but for final approval.  So obviously we've both had the chance

10   to study those and understand what you were proposing before

11   today.

12             JUDGE MOTZ:  Perhaps the record should also reflect we

13   had pre-meetings both before the preliminary hearing and this

14   hearing to try to make it efficient, in which any concerns that

15   we might have we let you, we might have, any we form in the

16   interim we certainly will raise.  But I think it's been an

17   efficient process.

18             MR. RIFKIN:  And this allocation issue that we've now

19   discussed addresses one of the Court's concerns and we're

20   grateful to be able to do that.

21             JUDGE MOTZ:  Thank you.

22             MR. RIFKIN:  Thank you very much, Your Honors.

23             JUDGE MOTZ:  Excuse me.

24             MR. MATHEWS:  Good morning, Your Honor.  Tim Mathews

25   from Chimicles and Tikellis also on behalf of fund derivative

1    plaintiffs.  I just wanted to make sure the record was clear.

2    Mr. Rifkin mentioned two cases where the distribution was a

3    little bit different.  I just wanted to make sure it was clear

4    that in one group, in Strong, there are some minor variations as

5    well.  And we'll get to those later.  Thank you.

6           JUDGE MOTZ:  Thank you.

7           MR. JOHNSON:  Thank you.

8           JUDGE MOTZ:  That's number one.  Mr. Rifkin's eloquence

9    has not changed my mind.

10          MR. JOHNSON:  And I just note there will be the

11   administrative point of actually entering the orders, which we've

12   put in front of the Court already.  And I note those already,

13   those can weigh down a desk.  But we appreciate the Court.

14          JUDGE BLAKE:  Should we ask -- yes, obviously, we've

15   looked at those.  Some of them appropriately did not have all the

16   numbers filled in, pending our discussion and approval of the

17   percentages and whether it might be helpful at the conclusion of

18   the entire proceeding, depending on what's been decided, to

19   submit those final form --

20          MR. JOHNSON:  We'll be happy to.

21          JUDGE BLAKE:  -- of order so we can make those

22   appropriate findings formally.

23          MR. JOHNSON:  We'll be happy to, Your Honor.

24          JUDGE MOTZ:  Obviously, the easiest way would be to

25   refile everything.  I just don't know, if it's easier, can we do

1    that since it's all electronic?

2         MR. JOHNSON:  I think we can do that.  As Mr. Isbister

3    notes to me, by the conclusion of the discussion of 16 tracks,

4    maybe we can come back to that administrative issue, if that's

5    all right?

6         JUDGE BLAKE:  Yes.

7         MR. JOHNSON:  Then I'll move on to Pilgrim Baxter, the

8    Pilgrim Baxter subtrack, if that's all right.  And here as well

9    we seek final approval of the settlement in this subtrack.  This

10   subtrack involved investor class claims, derivative claims.  It

11   didn't happen to involve ERISA claims.  This is detailed in our

12   papers as well, but just to be clear about that.

13        For this subtrack, the lead plaintiff has been the Ohio

14   Public Employees Deferred Compensation Plan, overseen, in large

15   part, by the --

16        JUDGE MOTZ:  Let me ask just one question.  I don't

17   want to throw you off.  And we probably ought to stick to the

18   schedule.  But some people walked in who might be objectors.  I

19   don't know, out of courtesy to them, I don't know if there's some

20   way we could take that out of order or not.  But it may be best

21   that we just stick to the --

22        MR. ISBISTER:  Your Honor, I've met each of the people

23   as they've come in.  The young lady in the jury box is just a

24   grand juror who's sitting here to pass her time off.  She waits

25   to do her duty.

1          But I've greeted the people as they come in.  They are

2     not objectors.  They're here to listen.  I believe --

3          JUDGE MOTZ:  That's fine.  I'd rather stick to the

4     schedule which you all planned.  As a matter of courtesy, if

5     somebody came in, and not to make them stay here the whole time,

6     but if they want to stay here to be educated or to listen, that's

7     great.

8          MR. JOHNSON:  So along with the Ohio Public Employees

9     Deferred Compensation Plan, the Ohio Attorney General's Office

10    has also been overseeing our prosecution of this case.  And here

11    today we have Matthew Lampke, who's right back here.  He is

12    Assistant Section Chief for the Ohio Attorney General's Office.

13    He submitted a declaration in this matter supporting the

14    settlement and the other relief that we seek.

15         The recovery here totals $31,538,600 in cash, plus

16    interest.  The sources of recovery are again detailed in our

17    papers, plus we've intended to distribute another 5.73 million

18    plus interest obtained by the New York Attorney General's Office

19    in connection with this settlement with the Canary defendants.

20         Similarly with the Invesco settlement, the posture of

21    the case was such that the parties had more than adequate facts

22    and understanding of the details of the claims, the facts, and so

23    on.  So after Motion to Dismiss rulings, after motion practice

24    regarding standing issues, after some fact discovery, again, very

25    sophisticated defendants and defense counsel, protracted, hard

1    fought negotiations based on extensive investigation and review

2    of voluminous information.  Oversight, again, by the lead

3    plaintiff and the Ohio Attorney General's Office, again, from day

4    one to the present.

5            As far as adequacy is concerned, the same types of

6    risks were present in this subtrack relating to risk of

7    establishing liability, risks of establishing damages, risks

8    related to class certification, and of course all the risks that

9    would be present if the case were not settled and the time that

10   it would take to take this case to trial.

11           JUDGE MOTZ:  Anybody who wants to be heard on this can

12   be heard.  The fact of the matter is, I've been well briefed and

13   we are not unfamiliar with the litigation.  There were abundant

14   risks and abundant opportunities for almost eternal delay in

15   these cases.  And we're quite aware of that.

16           If anybody wants to add to that at some point, they're

17   free to do it.  But there are obviously able counsel involved on

18   all sides.  Both of us are very grateful for the way it has been

19   litigated.  It's been, I think you said, it's been very

20   aggressively litigated but very professionally litigated.  And

21   there's no question about the comments of counsel in any subtrack

22   or that there were abundant risks on both sides in each subtrack.

23           MR. JOHNSON:  And I won't repeat, unless there's some

24   reason to, the points about the claims process, because they do

25   apply throughout these three subtracks at least.  And here as

1   well, the process is working.  We already have over 19,500 claims

2   submitted in connection with the Pilgrim Baxter subtrack.

3           The points about the plan of allocation are the same

4   here, too.  There's no, there's no potential for money to go to

5   the plaintiffs' counsel or defendants or elsewhere.  It will be

6   distributed on similar concepts and the like.

7           We also have a fee and expense reimbursement request.

8   It's the same percentage.  It's 15% that we're seeking

9   collectively.  It's our firm, derivative counsel.  Again, no

10  ERISA aspect to this case.

11          And this is a request that's supported and was

12  negotiated in detail, frankly, with Ohio and the Ohio Attorney

13  General's Office, and they support the request.

14          The multiplier here would be a negative one.  It would

15  develop in a multiplier of 0.72.  Again, that doesn't account for

16  the ongoing work we have now and will have.

17          The same points apply about Mr. Bechtold's objections.

18  I don't mean to skip over things if there's a reason to go into

19  further details.  But I do want to be efficient about this and

20  respect the Court's time.

21          So with that, we'll respectfully request that with the

22  lead plaintiff's support, that the settlement, the plan of

23  allocation, and the fee and expense reimbursement requests are

24  approved.

25          JUDGE MOTZ:  I think, again, the answer is implicit.

1    Since you do have a representatives here of sophisticated

2    clients, I gather that you, we have to decide whether to award

3    them, but there is no objection to the requests made by Mr.

4    Isbister's firm?

5           MR. JOHNSON:  Correct.  Yes.  That's right.

6           JUDGE MOTZ:  Your clients have been --

7           MR. JOHNSON:  They were apprised of it from the

8    beginning and the like.  So that's right.  That's right.

9           JUDGE MOTZ:  Any objectors here in this subtrack?  Are

10   there any defendants who would like to be heard from?

11          (No response.)

12          JUDGE MOTZ:  Not hearing any objection from my

13   colleague, I will approve the settlement, including the request

14   for attorney's fees.

15          MR. JOHNSON:  Thank you, Your Honor.  We'll move on to

16   MFS, if that's all right.

17          JUDGE MOTZ:  It's your neighborhood.  Didn't you have a

18   neighbor in your office building you were concerned about?  Not

19   you, but somebody in the back row there.  No, right there.  I

20   remember MFS had its problems along the way.  Go ahead.

21          MR. JOHNSON:  Well, with MFS, Your Honor, we're also

22   presenting what we believe is a very, very positive settlements

23   for investors.  The lead plaintiff -- just one step back.

24          In the MFS subtrack, it involves the investor class,

25   the ERISA class, and the derivative claims.  So this will resolve

1     all those, again.  Pilgrim Baxter didn't happen to have ERISA

2     claims, this subtrack does.

3          For the investor class, the lead plaintiff, like in

4     Invesco, has been the City of Chicago Deferred Compensation Plan.

5     Again, Ms. Dorf is here and she presented a declaration.  The

6     total recovery is over 75 million dollars, $75,042,250 plus

7     interest.  And we would intend to distribute an additional 2.19

8     million, plus interest obtained by the New York Attorney General

9     in its settlement with Canary.

10         The factors relating to the background of the

11    litigation are very, very similar and I won't belabor them here,

12    recognizing they're in the papers, and so on, as part of the

13    record.  If the Court's all right with that.

14         And the claims process is as we discussed already.  In

15    fact, we looked at what happened to be an MFS claim form just as

16    an example.  And here, this is a huge class with 7.2 million,

17    over 7.2 million notices having gone out.  We're seeing

18    significant claims coming in.  So we already have over 108,000

19    claims already submitted in connection with the MFS subtrack.

20    And that's terrific.  We expect many more before the deadline.

21         There are no objections to the plan of allocation.  If

22    necessary, I can go over that.  But the points remain as detailed

23    in our papers.  Very similar concept.  Of course, no plaintiffs'

24    counsel, defendant, others benefit from unclaimed funds or

25    undistributed funds.

1          As far as fee and expense reimbursement requests, it's

2     again the same percentage that we're seeking here, a collective

3     fee of 15%.  Same point holds for Mr. Isbister's request of 1.25.

4     The lead plaintiff is well aware of that and signed off on it.

5          We again respectfully submit that this is fair and

6     reasonable.  We acknowledge that this request would result in a

7     modest multiplier of 1.67 on the total lodestar for plaintiffs'

8     counsel.

9          A few things worth noting that.  That doesn't account

10    for the ongoing work we're doing and will be doing.  And we

11    believe that it's, under the case law, an entirely appropriate,

12    and again, modest multiplier in light of the results obtained and

13    the complexity of the issues that were a part of this case.  And

14    without repeating the things already said, I would, based on the

15    papers and the record before the Court, respectfully request,

16    with the support of the lead plaintiff, that the settlement, the

17    plan of allocation, and the fee and expense reimbursement request

18    be approved.

19         JUDGE MOTZ:  Any objectors here in this subtrack?  Any

20    defense counsel who would like to be heard from?  Yes, sir.

21         MR. PAINE:  Hello, Your Honors.  I just wanted to say

22    --

23         JUDGE MOTZ:  I guess you'd better identify yourself for

24    the record.

25         MR. PAINE:  Bill Paine for MFS.  I just wanted to say

1    two things.  The first was to amplify a point that Mr. Johnson

2    made a minute ago when he showed you the example of the MFS claim

3    form.  The last page of that document, which is filed as Document

4    3502 in that track, is the form that MFS prepares upon request of

5    shareholders, their brokers, to make it easy for people to fill

6    out these forms.

7         Through the end of September, we had prepared 118,000

8    of them.  So I think that tells you something both about the

9    efficacy of the notice program and about the relative ease that

10   the notice plan can be complied with.  Call up on the phone an

11   800 number, you'll get an operator, and you'll get a form.

12        The second thing I wanted to say was, sort of the last

13   time I may be in Baltimore forever, was I really do want to say

14   how much I appreciate it personally and how much my client

15   appreciated all the help that you've given us over the last few

16   years, and how much, really, I've enjoyed interacting with you

17   over that period of time.  So thank you very much.

18        JUDGE MOTZ:  Well, we both enjoyed it, too.  As I

19   indicated before, there were unique issues in here and you all

20   handled them very, very well, and we appreciate it.

21        MR. PAINE:  Thanks a lot.

22        JUDGE MOTZ:  But come on back.  Come on back next year

23   for the American League playoffs.  Then we'll both be happy.

24        MR. ISBISTER:  And hopefully we'll be hosting.  Your

25   Honor, we're now going to turn to --

1          JUDGE MOTZ:  Well, let me say that, again, hearing no

2     objection, I approve it.  And I think now might be a time for me

3     to mention, because we do have a positive multiplier on the

4     lodestar, that I am glad that there have been sophisticated

5     investors involved and I appreciate you all having been involved.

6     I think that, I mean, that is an important check.

7          At various stages, I think I've used the term Ma and Pa

8     Investors because mutual funds do tend to have, in addition to

9     sophisticated investors, a lot of people who, that's their life

10     savings and that's the way, at least, their equity portion of

11     their life savings.  There has been and continues to be on our

12     part a concern that they be protected.

13          I think the fee requests in here that have been made,

14     certainly in the three subtracks so far, are modest.  They are

15     respectful of the view not only of the lead plaintiffs, but also

16     of the Ma and Pa investors.

17          The fact of the matter is this was difficult litigation

18     and has been, has been difficult litigation with very complex

19     issues that required, that require experienced and sophisticated

20     counsel to work out.  And I have absolutely no problem with the

21     multiplier here.

22          MR. JOHNSON:  Thank you, Your Honor.  And not to

23     belabor the point, but it has been a true honor to appear before

24     this court and to represent these clients and the classes in

25     connection with this very complicated litigation.  Thank you very

1     much.

2              JUDGE MOTZ:  Thank you.

3              JUDGE BLAKE:  Been very glad to have you.

4              MR. ISBISTER:  Next, Your Honor, we will be moving to

5     Judge Blake's subtracks.  And we'll start with the Excelsior

6     subtrack.  And allow me to introduce the Court to Michael Yarnoff

7     from the Barroway Topaz firm, lead plaintiff's counsel for the

8     class, to their subtrack.

9              JUDGE BLAKE:  All right.

10             MR. YARNOFF:  Good morning, Judge Blake, Judge Motz.

11    Michael Yarnoff from Barroway Topaz on behalf of the plaintiffs

12    in the Excelsior subtrack.  This subtrack is also a derivative

13    action as well, so it's an investor class and a derivative class

14    in this case.

15             The settlement -- obviously, our papers are voluminous

16    in this case and you have those.  So I'm not going to belabor a

17    lot of the points here.

18             The settlement in this case was for $3,632,600.  And it

19    was three-million-five-hundred from Excelsior, 73,000 from Bank

20    of America, 14,000 from Bear Stearns, and 45,000 from Canary.

21             The two points I think that were made by Mr. Johnson

22    that I can go over to with regard to the notice program here, we

23    did a similar type notice program.  Proof of claim forms were

24    sent out.  Over 200 note -- I'm sorry -- 200,000 notices were

25    sent out.  And we did set up a web site.  And there were over

1  400,000 hits on the web site.

2           And in this case, in Excelsior, 80% of the shareholders

3  approximately are U.S. Trust members.  And what we did for those

4  U.S. Trust -- so 80% of the population that could submit claim

5  forms, we set up a separate number for them.  So if they couldn't

6  find their documentation or didn't have their documentation, they

7  could call a separate number and speak to somebody and get that

8  documentation to them.

9           So you basically have at least 80% of the class that we

10  can get the documentation to and then the other 20%, obviously,

11  if they had questions or concerns, they could call.  We did

12  receive some phone calls.  Everyone that called was assisted.  So

13  we don't have anyone out there that I know of that has requested

14  documentation or said they don't have documentation and want to

15  submit a claim form that hasn't been able to submit a claim form.

16           JUDGE BLAKE:  I appreciate that.  As you know through

17  earlier conversations that we've had, that's been a major concern

18  for both of us, to make the process as easy as possible.  We

19  recognize you've got to balance it because you don't have all

20  that information yourself immediately at your fingertips.  But

21  it's got to be easy for people to find and to be able to submit a

22  valid claim.  That's been very important.  And I appreciate what

23  you have done.

24           MR. YARNOFF:  Including the 200 -- I know Mr. Johnson

25  touched on all these things, I don't want to again delay this,

1    but we also did the global publication.  All 16 tracks did the

2    global publication.  Our firm spearheaded that global publication

3    so we're very familiar with it.  It was very successful.  Got out

4    to many different publications.  And we believe, you know, class

5    members that invest in mutual funds could have or would have seen

6    in these global publications the notice about the class actions.

7         JUDGE BLAKE:  And just for the record, that included

8    the Internet and I think some banner ads and so forth?

9         MR. YARNOFF:  Yes.  It was all over the Internet.  It

10   was in People magazine.  It was in the New York Times, I believe,

11   different newspapers throughout the country.  And we tried to

12   target people that we believed would own, you know, these types

13   of mutual funds.  And that's why I say People magazine was an

14   important one because it's sort of the common person, as Judge

15   Motz said, that, the Mom and Pops that may own these mutual

16   funds.

17        So the notice program was robust.  It's been very

18   successful, as I said.  You know, we've got many hits on the web

19   site.  So far we've gotten over 2500 proof of claims back so far

20   where the notice program, only 200,000 notices went out.  That's

21   a pretty good percentage right now.  And obviously the date for

22   submission of proof of claims doesn't expire until the beginning

23   of December.  So we have plenty of time.

24        As most claims administrators would tell you, many of

25   the claims, a good percentage of the claims come in very late

1    because people basically put it on their desk and say, I'm going

2    to fill that out, I'm going to fill that out, and all of a sudden

3    the date approaches and they finally fill it out.  So you see an

4    uptick in proof of claims as the claim period comes to an end.

5          With regard to the fee request in this matter, we're

6    requesting 20%.

7          JUDGE BLAKE:  One other thing to be clear, for the

8    record, before you get to that.  I believe it's the same as has

9    been mentioned in the other subtracks.  To the extent there is

10   any money where the checks are uncashed or you can't get it out

11   to the claimants, it's going back to the funds.

12         MR. YARNOFF:  I apologize.  That's absolutely correct,

13   Your Honor.  So we will do distributions.  If there's money

14   available to do a second distribution, we will.  If it's not

15   economically feasible, then the money will revert back to the

16   fund, according to our expert's calculation as to how the funds

17   were damaged.

18         And that will be true in the other two subtracks that I

19   will speak about later on, which is Alliance and Alger, same

20   thing.

21         JUDGE BLAKE:  Okay.

22         MR. YARNOFF:  Just before I speak about the fees, as I

23   said, 200,000 notices went out.  The global publication.  We have

24   only six exclusions, request for exclusions, and we only have one

25   objection, which was filed by an individual class member, Vincent

1    Rinando.  And basically, his, his complaint was that he's going

2    to get a small piece of the pie.  Obviously, his investment was

3    small.  So in relation to his investment, yes, obviously, his

4    return is going to be somewhat small.

5           But I can say to the Court that our expert who looked

6    at the dilution damages in this case found approximately five

7    million.  So, you know, in terms of theoretical damages, our best

8    case scenario going forward, even if everything, you know, in

9    terms of liability came true for us, we're talking about a 73%

10   recovery on the theoretical damages, which I have to submit is

11   phenomenal.  You don't see those types of high percentages in

12   many cases at all.

13          So I think Mr. Rinando's objection, although I

14   appreciate his concerns about his small recovery, I think it is

15   meritless if you look at the big picture of this case and the

16   settlement value.

17          JUDGE BLAKE:  In terms of the six, the opt-outs or

18   exclusions.

19          MR. YARNOFF:  I'm sorry.  It was six.

20          JUDGE BLAKE:  Six?

21          MR. YARNOFF:  Six, yes.

22          JUDGE BLAKE:  Right.  Yes.  Of those six, were any of

23   them large institutions?

24          MR. YARNOFF:  No.  They were all individuals.  All

25   individuals.  That's all I have with regard to the settlements.

1    The plan of allocation, I know Mr. Johnson touched on this, but,

2    you know, we retained experts to do an analysis and to distribute

3    the money appropriately.  You know, I believe the plan of

4    allocation is fair and reasonable based on the damages to the

5    different funds that were affected in this case.  And we have no

6    objections to the plan of allocation.

7           With regard to the fee request, as I mentioned before,

8    we are requesting 20%.  That's a negative multiplier of .38 in

9    this matter.  Also, Mr. Isbister is requesting 1.25% for liaison

10   counsel, which we have received no objections to, either.  We

11   received no objections to the fee request based on the case law.

12   And I can get into that if you want.  But based on the case law

13   and the complexity and the duration of this litigation and the

14   fact that the lodestar is a negative lodestar cross-check, that

15   20% is fair and reasonable in this case.

16          JUDGE BLAKE:  No.  That's obviously, I've looked at

17   that and your 20% is not unreasonable.  But particularly in

18   connection with the lodestar cross-check, knowing the amount of

19   work that you've done and still have to do, it's reasonable.

20          MR. YARNOFF:  Thank you very much.  And that includes

21   the derivative counsel as well.

22          JUDGE BLAKE:  Yes.

23          MR. YARNOFF:  I have nothing further, unless you have

24   any questions.

25          JUDGE BLAKE:  Nothing further for you.  Is there anyone

1   else that wants to be heard regarding Excelsior?  Other counsel

2   or any objectors?

3            (No response.)

4            MR. YARNOFF:  Judge Blake, just so I'm clear.  With

5   regard to the orders, so do you want us to fill in the sort of

6   blank spaces and then resubmit them to the Court?  Because we

7   have copies here if you wanted to handwrite it.  But it's

8   obviously --

9            JUDGE MOTZ:  Whichever way is easiest for you all.

10  Take it up with Mr. Isbister.  We might as well do it the same in

11  every case.

12           MR. YARNOFF:  It probably is easier for us to fill them

13  out and resubmit them.

14           JUDGE BLAKE:  I knew there were down to the wire some

15  last small changes to the expenses as you were figuring them out.

16  So it's probably best to just get that cleared up in the order.

17           MR. YARNOFF:  That's correct.  Okay.  Great.  Thank you

18  very much.

19           JUDGE BLAKE:  Thank you.

20           MR. ISBISTER:  Next in the lineup is the

21  Scudder/Deutsche Bank track.  Speaking for the class plaintiffs

22  is Glen Abramson from the Berger and Montague firm.

23           MR. ABRAMSON:  Good morning, Your Honors.  Glen

24  Abramson from Berger and Montague on behalf of the investor class

25  in the Scudder subtrack.

1          Today we're seeking approval of five settlements

2    totaling just under 14 million dollars.  The total settlement,

3    the amount is $13,966,000 in cash, plus interest.  I'd like to

4    point out, and I know this is similar for some of the other cases

5    as well, but for some of those earlier settlements, in addition

6    to the cash payment that's made in the settlement, we also

7    received cooperation from some of the earlier settling defendants

8    in the form of document discovery and interviews with relevant

9    parties so that we could continue to pursue our claims against

10   the remaining defendants.

11         The Scudder case is the first of four cases that I

12   personally refer to as the fully litigated cases.  By that I mean

13   those are the four cases that went through complete fact and

14   expert discovery.  There was full summary judgment briefing and

15   argument.  There was full class certification briefing and

16   argument.  And in addition, there were, in the Scudder subtrack,

17   three motions in limine filed to exclude plaintiffs' proposed

18   experts, one damages expert and two liability experts.

19         The cases, the Scudder case was settled after three

20   amended complaints were filed.  There were multiple Motions to

21   Dismiss.  There was Motions to Dismiss -- excuse me -- Motions to

22   Dismiss with respect to standing and, as I mentioned, those full

23   briefings on those other matters.

24         The settlement includes, the bulk of the settlement is

25   12.8 million dollars from the Scudder/Deutsche defendants, which

1    was reached only after five years of very hard fought litigation.

2    There were numerous negotiating sessions.  There was a two-day

3    mediation that was ultimately held.

4              And in addition, I would point out that the settlement

5    with the Scudder/Deutsche defendants came after Judge Motz's

6    opinion had been issued on the Putnam and Janus summary judgment

7    motions, dismissing those cases on summary judgment in large

8    part.

9              JUDGE BLAKE:  I think you all, in fact, contacted me as

10   I was getting to draft my rulings.

11             MR. ABRAMSON:  Yes.  That's correct, Your Honor.

12             JUDGE MOTZ:  You were spared.

13             JUDGE BLAKE:  I thought there was going to be another

14   question.  Appreciated the call.

15             MR. ABRAMSON:  One other highlight of the settlement I

16   would like to point out is that the settlement also includes

17   $850,000 from the UBS defendants, which was made possible after a

18   second amended complaint was filed, adding individual brokers

19   from UBS who had made market timing arrangements with the

20   Scudder/Deutsche defendants.  The original complaint only named

21   the UBS parent entity.  And while that entity survived the

22   initial Motion to Dismiss, the second amended complaint, when

23   UBS's parent entity was named, Your Honor dismissed those claims,

24   the 10(b) claims against UBS, but kept UBS in on the 20(a)

25   control person liability claims because the individual brokers

1    had been added as named plaintiffs.

2              I wanted to point that out for the Court.  And that

3    settlement was $850,000, as I said.

4              To address some of the points that the Court has asked

5    about earlier today.  The net settlement fund will be distributed

6    in the Scudder case without the requirement of submission of

7    proofs of claim or filling out of claim forms or documentation.

8    It happens in the Scudder case that, after consultation with the

9    IDC and the administrator for the SEC Fair Fund, we felt that we

10   had the transactional data, as well as enough other information

11   about all of the class members, that we could do a calculation

12   similar to the one done by the SEC and the claims administrator

13   of the regulatory settlements, we could do that calculation

14   ourselves and then distribute money to class members based on

15   those calculations, without the requirement of filling out claim

16   forms.  That's something where we just felt, after analysis, that

17   we had that information in this case and we were able to do that.

18   Certainly, if we didn't have that information, we would have done

19   an identical process to those used in the other tracks.

20              JUDGE BLAKE:  Sure.

21              MR. ABRAMSON:  As in the other tracks, there will be

22   multiple distributions, if that is appropriate and cost

23   effective.  And any remainder will go to the settling funds in

24   this case.

25              A few final points on the settlement.  There were over

1    1.3 million notices sent out.  We've received one objection.  The

2    objection that we received to the settlement is really not an

3    objection to the settlement, nor to the fees and expense request,

4    nor to the plan of allocation.  The objector has an unrelated

5    issue with Deutsche Bank itself.  And she, I spoke with Ms.

6    Revaul personally.  She wanted her issue to be heard and for the

7    Court to be aware of it.  She is a class member.  She has a

8    separate issue with Deutsche Bank that's unrelated.

9         While we sympathize with her situation, we don't

10   believe her objection has any merit and we would ask the Court to

11   overrule that objection.

12        JUDGE BLAKE:  Yes.  I've looked at it.  Obviously,

13   whether or not it has any merit relating to the unrelated

14   mortgage issue, I would not get into.  But she did not seem to be

15   directly challenging this settlement itself.  As you said, she

16   has an unrelated issue, which is really separate.

17        MR. ABRAMSON:  That's correct, Your Honor.  And we

18   also, I want to make clear for the record, we would take no

19   position on the merits of that other issue with Deutsche Bank as

20   well.

21        There were two letters sent to the Court by a single

22   class member, Mr. Terrell, indicating that he wished to

23   participate in the settlement and asking for additional

24   information about whether or not he could participate in the

25   settlement.  The claims administrator has written a letter to Mr.

1    Terrell, informing him that, based on records they have, he is,

2    in fact, a class member, and sending him a copy of the long form

3    notice and also giving him information on the web site and phone

4    numbers to contact if he had any additional questions, and also

5    informing him of the distribution process and how that worked.

6         I want to be clear, for the record.  I don't have any

7    information about the nature or size of his holdings and,

8    therefore, it's quite possible, based on our plan of allocation,

9    that he may not receive a distribution from the settlement.

10   However, he is a class member and he is entitled to participate

11   in the settlement, which he has indicated he would like to do.

12        My last comment on the settlement is that we also

13   received an informal letter from Mr. Bechtold purporting to raise

14   some issues with the settlement.  As has been mentioned

15   previously, Mr. Bechtold does not have a client who is a Scudder

16   class member.  He has filed no formal objection with the Court.

17   And while we address the merits of the argument that Mr. Bechtold

18   makes, specifically with respect to Scudder, in our papers, he

19   does not have any standing nor are his arguments, nor do they

20   have merit in and of themselves.  And therefore we would ask the

21   Court to overrule that purported objection.

22        JUDGE BLAKE:  Would you like to say anything about the

23   class representatives in this?

24        MR. ABRAMSON:  Certainly, Your Honor.  The class

25   representative in this case, the lead plaintiff, is the Post

1    Retirement Health Insurance Plan and Trust, which is a small

2    institutional investor.  However, it is an adjunct of a much

3    larger institutional investor, the Steelworkers Pension Plan,

4    which is a Taft-Hartley pension plan.

5           The general counsel, Mr. Hoffman, who submitted his

6    declaration in support of the settlement and fees and

7    reimbursement of expenses, is also the general counsel of the

8    steelworkers Pension Plan and he has extensive experience in

9    securities class actions.  And the Steelworkers Pension Plan has

10   been appointed lead plaintiff many times.  The Post Retirement

11   Health Insurance Plan and Trust, this is the first time they've

12   been appointed lead plaintiff.  But there is a sophisticated

13   institution overseeing this litigation, and fully supports the

14   settlements that have been reached here.

15          JUDGE BLAKE:  Thank you.

16          MR. ABRAMSON:  Turning to the fee and expense request

17   of plaintiffs' counsel.  Plaintiffs' counsel here, there is a

18   class case and there's a derivative case.  There's no ERISA case

19   in the Scudder subtrack.  Plaintiffs' class and derivative

20   counsel are seeking a fee that's 28% of the settlement fund.  In

21   addition, plaintiffs' liaison counsel, Mr. Isbister, is seeking

22   the same 1.25% of the settlement fund.

23          We recognize that the 28% fee request in this case is

24   at the high end of the range that has been requested in these

25   cases.  And there are several reasons for that, which I'd like to

1    point out to the Court.

2            The first is that the lodestar and hours in the Scudder

3    subtrack are the highest of any subtrack.  Again, that's a

4    function of several things.  The first is that this was a case

5    that went through full fact and expert discovery and through

6    summary judgment and class certification briefing and the motion

7    in limine briefing.

8            In addition, or I should say the multiplier based on

9    the 28% fee request is 0.35.  It's a negative multiplier.  It's

10   in line with the other subtracks.  In fact, it's half of the

11   average, if you look at all of the subtracks.

12           One of the reasons that the hours were necessary in

13   this particular case is that Scudder, the reason we call them the

14   Scudder/Deutsche defendants is because there was a, there was a

15   Scudder mutual fund family and there was a Deutsche Bank mutual

16   fund family, that were two separate mutual fund families for 80%

17   of the class period.  In the middle of 2002 the two separate

18   mutual fund families merged and carried on as one from that point

19   onward.  But because they were two separate fund families up

20   until that point, we essentially were litigating two cases.

21           While there was certain overlap certainly, it's a

22   situation where there were two market timing committees, for

23   example, two sets of employees involved with dealing with market

24   timing.

25           JUDGE BLAKE:  Actually, you don't have to persuade me

1    that you needed to put in a lot of time and did put in a lot of

2    time on this subtrack.

3         MR. ABRAMSON:  Thank you, Your Honor.  I do want to

4    point out that we fully support Mr. Isbister's requested fee of

5    1.25% in this case.  Due to the nature of this case going through

6    summary judgment and class certification, Mr. Isbister provided

7    excellent advice and counsel that we are very grateful for.  And

8    so I want to make sure to note that we fully support his fee in

9    this particular case as in the other cases.

10        JUDGE BLAKE:  One thing I might mention and I'm sure

11   it's not, it's true in all the subtracks, I'm sure.  But in

12   regard to attorneys' fees and expenses, I just recall you making

13   a particular point, that counsel were also careful to keep down

14   the cost of things like travel and hotels and so forth.  I mean,

15   that's inevitable that there would be some.  But I think you

16   noted attempts to not abuse that, keep it at a reasonable level,

17   and I appreciate that.

18        MR. ABRAMSON:  Thank you, Your Honor.  That's correct.

19   As we note in our papers, there were over 50 depositions and most

20   of those depositions were attended by only one attorney on the

21   plaintiffs' side, for example.

22        JUDGE BLAKE:  Thank you.

23        MR. ABRAMSON:  In addition, we're requesting

24   $1,042,076.40 in expenses.  This is less than the $1,050,000 in

25   expenses that we listed in the notice.  I note, for the record,

1    that there is a discrepancy between our initial request in our

2    papers filed on September 14th and our supplemental filing in

3    October.

4            JUDGE BLAKE:  I know there were --

5            MR. ABRAMSON:  Thank you.  Finally, in addition, we're

6    requesting $16,413.60 for reimbursement of the lead plaintiff's

7    time over six years of this litigation.

8            Unless the Court has any further questions, we submit

9    on our papers.

10           JUDGE BLAKE:  I thank you very much.  Are there any

11   other counsel that would like to be heard from in this regard?

12           MR. CONNER:  Patrick Conner for the Deutsche

13   defendants, Your Honor.  If I may have permission to speak from

14   the gallery, I'll be brief.

15           One quick note.  And that is the last request for

16   exclusion that was received in our settlement class from Koch

17   Industries, K-O-C-H for the benefit of the court reporter, came

18   in late.  It came in after the deadline.  So Deutsche would

19   request that that request for exclusion be considered untimely

20   and Koch be considered a member of the class.  Otherwise, I don't

21   have anything to add.

22           JUDGE BLAKE:  All right.  I'll take a look at that.

23   Anyone else?  Any objectors in the Scudder subtrack that are

24   present?

25           (No response.)

1          JUDGE BLAKE:  All right.  Thank you very much.

2     Appreciate it.  And I do anticipate approving the final order.

3          MR. ISBISTER:  Your Honor, next up is the Federated

4     subtrack.  And Mr. Seth Ottensoser from the Bernstein Liebhard

5     firm, lead plaintiffs' class counsel, will speak on behalf of

6     that settlement.

7          MR. OTTENSOSER:  Good morning, Your Honors.  Seth

8     Ottensoser on behalf of the plaintiffs in the Federated subtrack.

9     As we set forth in our preliminary approval and in our final

10    approval papers, this case took some interesting turns.

11    Initially, after we filed this case, there was an eight million

12    dollar restitution fund set up by Federated.  We challenged that

13    eight million dollar restitution fund in our amended complaints.

14    We alleged that the wrongdoing went beyond what was being covered

15    by Federated's experts in their reports.

16          Ultimately, after the amended complaint went in and

17    after the Motions to Dismiss were pending, Federated went ahead

18    and settled with regulators for 72 million dollars.  At that

19    point, we were caught between a rock and proverbial hard place

20    given that investors were now being compensated many times over.

21          So we decided to use our time and effort to do some

22    further positive enhancements, although we've always taken the

23    position that our amended complaint and the allegations in there

24    that were expanded beyond initial complaints had something to do

25    with the regulatory settlements, although that would be disputed

1   by Federated.

2          We went ahead and, again, in this ever changing

3   landscape, we negotiated some additional benefits for

4   shareholders.  And that leads us to today, where we're proposing

5   several settlements.  One is 1.824 million.  I know we had in the

6   papers 1.84.  It's 1.824 million dollars, plus interest, to be

7   paid to approximately 4,000 Federated shareholders who may have

8   been subject to late trading and may not necessarily have been

9   compensated by the Fair Fund given its size.

10          Now the program for these 4,000 shareholders is

11   different than most.  It's not essentially a common fund.  It's a

12   process by which shareholders were given individual notice, told

13   how much money each one would get if they put in their claim

14   forms.  If the amount was under a thousand dollars, they

15   automatically got that amount.  If there was over, there was an

16   ADR process set up by which the plaintiffs could put in

17   documentation to try to get the money up and above the thousand

18   dollars.

19          At this point, we have about 350 claims that have been

20   put in.  The claims process doesn't end until sometime in

21   December.  And we only have one opt-out at this point.

22          JUDGE BLAKE:  But you've sent notice to all 4,000 and

23   told them that this is what you can get if you send in your form.

24   You just haven't gotten more than 300 or so back yet?

25          MR. OTTENSOSER:  Right.  We fielded plenty of phone

1    calls, a couple hundred phone calls, from investors who received

2    notices both directly and indirectly, from the, from various

3    class members.

4           So in terms of the process that was set up to share

5    among the money, again, it's being done on an individual basis,

6    customized notice to each plaintiff involved.

7           We also have another subclass, and that is for

8    $1,557,000, plus interest, for Canary and BofA.  And this is

9    different in the sense that since we're not dealing with huge

10   amounts of money, the money itself is going to be distributed to

11   the funds at issue that were hurt.

12          Now, this process was done in conjunction with the

13   independent trustees of Federated.  We spent many, many hours

14   dealing with counsel, outside counsel to these trustees,

15   presenting them with damage analyses and proposed allocations

16   that should go to the funds.  Ultimately, the independent trustee

17   was satisfied with the, with the allocation.  And ultimately

18   whatever we recover, minus attorney's fees and expenses and the

19   like, will go to these funds.

20          This will be a little bit later, but the independent

21   trustee was also aware of how much money we were going to seek

22   percentage-wise and expense-wise for the amounts at issue for the

23   allocations to the funds.

24          We also have a class for equitable relief, and that is

25   going to inure benefits going forward to Federated shareholders

1   to help prevent market timing and late trading to happen again.

2   Notably, anyone who's in that class, they do not give up their

3   monetary claims.  If they'd like to go ahead and sue Federated,

4   if they think that the many times over distributions isn't good

5   enough, then they can feel free and go ahead and sue Federated.

6   I don't think Federated's lawyers would appreciate that

7   invitation.  But to the extent people believe that they haven't

8   been compensated, they're happy to go out.

9          Now, one of the things we did here was we had various

10  class representatives for each of these subclasses.  We have

11  someone out of the 4,000 shareholders who is representing those

12  shareholders.  We have someone who bought with Canary and BofA

13  who is there.  So at the end of the day we wanted to make sure we

14  had representation for the various sub-groups so that there would

15  be representation throughout.

16         The lead plaintiff is an investment partnership.  They

17  were also overseeing the litigation.

18         We've set forth in our papers earlier for preliminary

19  approval our notice program, which was a little bit unique in

20  this case, but given the circumstances, we believe it made sense.

21  We published numerous times in the USA Today and The Wall Street

22  Journal.  This was something we did in addition to the global

23  publication.  I believe at the end there were two publications in

24  The Wall Street Journal for the Canary/BofA and separately for

25  the Federated settlements, and also two for the USA Today, which

1  leads me to the fact that I think the only people who read USA

2  Today are either in hotels or in prisons because we got a couple

3  of prisoners to object to our settlement even though, as this

4  Court knows based on our Motion to Dismiss, they didn't own

5  Federated stock and they had problems with their own RDAP program

6  in their prisons, which has nothing to do with Federated or what

7  we're doing.

8          JUDGE BLAKE:  No.  It's the kind of correspondence that

9  we see a lot more often.

10          MR. OTTENSOSER:  Right.  As it stands today, I think

11  notice of appeal was filed and the Fourth Circuit sua sponte

12  rejected part of the appeal.  And hopefully, if funds aren't put

13  up by the other prisoners, and I don't think that they really

14  want to do this, there won't be any further objections.

15          But again, like I said earlier, based on the notice

16  program, we fielded several hundred phone calls ourselves.  There

17  is a claims administrator, Tillman & Associates.  They've

18  garnered a bunch of phone calls, too.  And there haven't been any

19  negative, hasn't been any negative sentiment vis-a-vis the

20  settlement.

21          I think there was also an article in The Baltimore Sun

22  that came out that talked about our settlement and had a quote

23  from me in there.  So anyone in the Baltimore area would have

24  seen that and called us as well.

25          JUDGE MOTZ:  No comment.

1          MR. OTTENSOSER:  In terms of fees, we're seeking

2     $500,000 from the Federated settlement.  That money is not coming

3     from the 1.824 million.  It's being paid separately from

4     Federated.  Our lodestar is well in excess of that.

5          Even though the settlement may look simple, it wasn't

6     simple to get to this point.  We briefed the amended complaints,

7     the Motions to Dismiss, and then spent countless hours, myself

8     and my associate, Stephanie Beige, who's here, just dealing with

9     independent trustees, Federated's counsel, Bank of America's

10    counsel, Canary's counsel.  This was a labyrinth to go through to

11    get to where we are today.

12         So in terms of the $500,000, that would include the

13    expenses on the Federated side and it's a negative multiplier.

14    With the Canary/BofA, we're seeking, with Mr. Isbister, 30%.

15    Again, that is a high percentage, but relative amounts of

16    $233,250.  Again, it's a negative multiplier to what we spent.

17    And we kept our time separately for Canary and BofA, given the

18    way we were running the settlement.

19         The independent trustees, again, they're the ones that

20    negotiated with us for the allocation to the funds.  They're

21    happy, or they didn't object.  They knew what we were seeking and

22    we told them beforehand.  They haven't said anything negative

23    towards that.

24         So overall, I would recommend that the Court approve

25    the settlement and the fees.  And I'm here to answer any

1    questions.

2             JUDGE BLAKE:  Okay.  I think you've answered them so

3    far.  Is there anyone else?  Any other counsel that wants to be

4    heard?

5             MR. COBETTO:  Jack Cobetto from Reed Smith from the

6    Federated defendants.  I have nothing to add.  Be happy to answer

7    any questions.

8             JUDGE BLAKE:  No.  I thank you.  I think this was an

9    unusual, an unusual settlement.  And I appreciate your point that

10   the investors, whether or not it was because of the amended

11   complaint, but for whatever reason, that there was a substantial

12   increase in the compensation to them.  And I think this

13   additional relief is fair and helpful.

14            MR. OTTENSOSER:  Thank you, Your Honor.

15            JUDGE BLAKE:  Appreciate it.

16            JUDGE MOTZ:  Let's take a short recess.

17            MR. ISBISTER:  Your Honor, let me just note, the phone

18   line will remain open during this break.

19            JUDGE MOTZ:  Oh, that's right.

20            (Brief recess.)

21            JUDGE BLAKE:  You can be seated.  Yes.

22            MR. ISBISTER:  Yes, Your Honor.  To continue, let me

23   now introduce Cliff Goodstein from the Milberg firm, who will

24   speak on behalf of the plaintiffs in the Strong subtrack.

25            JUDGE BLAKE:  Thank you.

1          MR. GOODSTEIN:  Good morning, Your Honors.  Clifford

2    Goodstein, Milberg, LLP.  I'm here to present the Strong

3    settlement for your approval.  This is a settlement that covers

4    claims brought in the class case, in the derivative case, and in

5    the ERISA case.

6          Unlike some of the other funds here, however, Strong is

7    no longer in business, which changed some of the mechanisms of

8    the case and the settlement.  Among other things, the derivative

9    case was dismissed, and we tried to work into the plan of

10   allocation for the class case a way for those who would have

11   recovered under the derivative recovery to recover as part of the

12   class.

13         The other difference is that there will be no remainder

14   going to the funds as there is in most of the other cases.  In

15   this case, the remainder will be going to a charity, subject to

16   court approval as Your Honor asked at the preliminary approval

17   hearing.  We have not decided on that charity.  We're considering

18   perhaps some public service charity based either in Baltimore or

19   Milwaukee, where many of the Strong fund holders are based.  We

20   will bring that to your approval at an appropriate time, when we

21   know how much we're dealing with.

22         I don't want to repeat most of what is in my papers or

23   in prior presentations this morning regarding the risks of the

24   litigation.  That said, I do believe this was an excellent

25   settlement.  It was a relatively high proportion of the dilution

1    damages that our damages expert found to be available.  It was a

2    difficult settlement to structure, particularly because, as I

3    said earlier, Strong is no longer in business.  So we had to

4    figure out a way to craft a settlement that would fold in both

5    the derivative claims and the ERISA claims.  But I believe we've

6    done so successfully.

7            JUDGE BLAKE:  You had the two situations.  There are a

8    number of claimants who did not have to submit a proof of

9    claim --

10            MR. GOODSTEIN:  Correct.

11            JUDGE BLAKE:  -- if they held directly with Strong.

12            MR. GOODSTEIN:  Strong gave us their trading records

13    for the class period.  So in sending out notice, if we had the

14    trading records, we told the member they do not need to file a

15    proof of claim form.  We gave them an opportunity to go online,

16    using an individually specified claim control number to check to

17    make sure that what we believe to be their balances in the Strong

18    fund match up with their records.  And we gave them a process for

19    challenging it if they believe that what we have is in error.  So

20    far that seems to have worked out very well.

21            As far as those who did not hold directly through

22    Strong but held through an omnibus account, we've had some

23    concerns regarding their ability to do proof of claim forms where

24    they've contacted us.  One of the things we've done is we've told

25    them who of the brokerages gave us their name and address.  So

1    we've been able to say to them, we got your name from Charles

2    Schwab, for example.  Charles Schwab will have your trading

3    records since they gave us your name in the first place.  And

4    that seems to have been successful as far as dealing with the

5    number of people who have called either the claims administrator

6    or my firm directly.

7           You know, as it is, we have sent notice to over two and

8    a half million people.  We've had considerable web site action.

9    We've had considerable phone calls.  We've even had some press

10   coverage.  I know I was interviewed by one of the local Milwaukee

11   publications.  I think there have been a couple other things.

12   Particularly in Milwaukee, where a large portion of the Strong

13   fund holders are based, there's been additional coverage in

14   addition to what, either with mail notice or publication notice.

15          That said, we have, I believe, five objections

16   altogether.  I can go through them.  I don't know I have much

17   more than to say what's in my papers.

18          JUDGE BLAKE:  No.  I think you, I think I've read all

19   of them and I believe that you've addressed them adequately in

20   your papers.

21          MR. GOODSTEIN:  Okay.  I believe Mr. Bechtold is here

22   now so he may be speaking.  Our papers, you know, discuss Mr.

23   Bechtold's history with respect to my firm and discuss what we

24   believe to be discrepancies between what Mr. Bechtold represents

25   and what his client's interests are.  I'll speak to the merits

1    after Mr. Bechtold has a chance to speak.

2         I just, the last issue is the issue of our fee.  We

3    have asked for a 20% fee.  The settlement total is slightly over

4    a million three five, plus -- 13 million 600 plus interest.  I

5    misread my decimals.

6         JUDGE BLAKE:  Right.

7         MR. GOODSTEIN:  And which would be 20%, which

8    represents a significant negative multiplier based on our

9    lodestar check.  If you don't have any further questions, I --

10        JUDGE BLAKE:  No.  Let me see if, first, if any other

11   counsel that have been involved in this subtrack want to be heard

12   from?  Okay.  And if Mr. Bechtold is here and would like to be

13   heard from.

14        MR. BECHTOLD:  Good morning.  I recognize the issue of

15   standing on some of the other objections that I filed for other

16   cases would be problematic.

17        JUDGE BLAKE:  More than problematic, don't you think?

18        MR. BECHTOLD:  I realize that.  But I wanted to make

19   sure that the objections we raised basically apply to most of

20   these cases.  Documentation issues are a problem for a lot of

21   people because the records are 10 or 12 years old.  And the --

22        JUDGE BLAKE:  Now, your particular client, Ms. LoMonte.

23        MR. BECHTOLD:  Yes.

24        JUDGE BLAKE:  Does not have to file a proof of claim

25   form, is that right?

1          MR. BECHTOLD:  I don't believe so.  When I spoke to Ms.

2     LoMonte, she couldn't locate any of her records.  She was going

3     to try and track it back through tax filings and other things.

4     She didn't have any actual account statements.

5          JUDGE BLAKE:  Right.  But this is in the Strong.  Am I

6     correct that she's -- Mr. Goodstein, address that.

7          MR. GOODSTEIN:  With our reply papers, we submitted an

8     affidavit from the Garden City Group, the claims administrator.

9     According to their records, they have sent notice to Ms. LoMonte

10    at her home in Wisconsin and that notice informed her that she

11    did not have to file a proof of claim form.

12         JUDGE BLAKE:  Thank you.

13         MR. BECHTOLD:  We can just proceed to the objections to

14    the legal fees, which I described in my letter objecting.  If

15    these firms had a real contingent risk, it might justify getting

16    a large percentage, 20 to 28%.

17         When I was looking over these settlement papers, it

18    seemed like a lots of firms in cases unlike Mr. Ottensoser

19    mentioned, a fully litigated case where they actually did some

20    real work, a lot of these cases were already basically halfway

21    home.  The government did a lot of the work.  And the firms came

22    in and did some work to justify their fees.

23         We felt that a lower percentage was fair, but also that

24    they should get a percentage of their net after the expenses were

25    taken out and after the administrative liaison counsel's expenses

1    were taken out, that that would give the class members more

2    recovery, which we thought was fair given the circumstances,

3    particularly in light of the fact that the government did so much

4    of the work in this case.

5          JUDGE BLAKE:  How many of the papers in this case have

6    you studied over the six and a half years that this has been

7    litigated, Mr. Bechtold?

8          MR. BECHTOLD:  I haven't done that much, actually.

9          JUDGE BLAKE:  You, I think, might have your opinion on

10   that changed if you carefully looked at what actually had been

11   accomplished by the government and what additional work.  In

12   fact, I think you might find that we made it fairly clear right

13   from the beginning that we were looking for additional value,

14   additional work to be done.

15         MR. BECHTOLD:  There's some additional work.  I'm not

16   disputing the fact that they found other places to where these

17   mutual fund market timing activities had some effect.  I'm not

18   disputing that at all.  That's why we didn't object to the

19   settlements because I don't know how much work they actually, I

20   don't know actually what was there because I'm not working with

21   their experts.  I didn't even go into that.

22         This is basically a question of contingent risk, with

23   the question of the settlements with the government particularly.

24   These cases were pretty much, the companies admitted to the

25   conduct.  It was all recognized that this went on and they had

1    various legal escape hatches they wanted to use but they had -- I

2    don't believe when these cases were signed up, anybody had any

3    doubt that they would be settled.

4              JUDGE BLAKE:  All right.  Focusing just on the Strong

5    case, would you tell me how you got your client?

6              MR. BECHTOLD:  I had a web site on the Internet and I

7    posted a couple of comments in one of the local media reports

8    announcing the Strong fund, and I spoke to her.  She said she

9    looked at my web site.  And I told her the basic, the most likely

10   outcome we could get was reduction of legal fees.  I said I had

11   some other issues with the documents, with the notice.  But I

12   said the main thing I thought we could accomplish was is that the

13   class members could get some more money out of it.  And she said

14   that was fine with her and I could go ahead with my objections,

15   and that she would see that she was a class member.  And she

16   said, I'll try and find my paperwork, and she hasn't gotten back

17   to me with that yet, but she was going to go through her old tax

18   records and see if she could document it.

19              As we now learned, she's one of the lucky ones that

20   doesn't have to provide the paperwork.

21              JUDGE BLAKE:  Right.

22              MR. BECHTOLD:  But so many of these people, I believe a

23   lot of the defendants could provide more.  Some of the cases they

24   don't need any.  Some of them, they've come after the fact, after

25   the notices went out, and said, now we can help you document it

1    better.

2              One of the cases, Columbia, had a whole list of --

3              JUDGE BLAKE:  You don't have -- well, it's not my

4    subtrack.  Do you wish to hear on Columbia?

5              JUDGE MOTZ:  No.

6              MR. BECHTOLD:  The internet postings indicate other

7    ways that they can prove their claim, whereas the claim forms

8    they were sent all said, you need documents, you must have

9    documentation or else you're not going to get anything.

10             JUDGE BLAKE:  Okay.

11             MR. BECHTOLD:  And if there is, in fact, a recognition

12   by these companies, by the companies that these people are

13   entitled, I think they should be given notice and an opportunity

14   to participate, because they don't follow up, they don't look at

15   the Internet.  They're not looking at news stories, particularly

16   out of the Milwaukee area.

17             JUDGE BLAKE:  All right.

18             MR. BECHTOLD:  Even without standing, I think a lot of

19   these objections have validity to some of the other funds in the

20   other cases.

21             JUDGE BLAKE:  Thank you, sir.  Mr. Goldstein.

22             MR. GOLDSTEIN:  Just to clarify.  As Your Honor

23   indicated, we were always aware in this case that we needed to

24   find new sources of money beyond what the government had

25   collected.  And the fact, the plan of allocation as well as the

1    settlement here are all devoted toward recovery not by, not for

2    timing by Dick Strong and Canary, which were the subject of the

3    SEC recovery, but rather what might be called under-the-radar

4    timing or other timing arrangements that were not part of the

5    recovery, verified recovery.

6              JUDGE BLAKE:  All right.  Thank you.  Anything else

7    anybody wants to say regarding Strong?

8              MR. ISBISTER:  Just, Your Honor, the fee that's been,

9    that my firm is seeking, that's been mentioned in many of the

10   presentations, was specifically noticed in all 27 million

11   individual notices that went out, as well as the publication

12   notices.  The only objection was from Mr. Bechtold in this

13   subtrack.  I believe we respond to that in our papers.

14             Unless you have any questions, I will rest on the

15   arguments we've made there.

16             JUDGE BLAKE:  No.  Let me be clear, that in general the

17   issues that Mr. Bechtold or anyone else might raise, issues such

18   as notice or attorney's fees or unnecessary documentation, these

19   are things that we certainly agree are issues that we have been

20   concerned about from the beginning.  I think counsel have been

21   concerned about them from the beginning.  And the reason that we

22   are coming to the conclusions that we are on these final

23   approvals is because you've addressed those concerns.  And we

24   have pressed you on those concerns.

25             In particular, regarding, you know, may hear from you

1    further on it, but I would say in response to Mr. Bechtold's

2    point that Mr. Isbister's services as liaison counsel essentially

3    amounted to administrative work, had he seen what the Court has

4    seen, I would hope he would not even raise that point.

5            I think it's clear to me that Mr. Isbister, your work

6    and that of your firm particularly in this kind of situation

7    where we have 16 or more separate subtracks, you've just provided

8    an invaluable service in more than just administration, but

9    coordination, substantive work, to bring this all, so many of

10   these subtracks to a successful conclusion, that it certainly

11   could not be called mere administrative work.  And I think a

12   reasonable recovery is certainly something you're entitled to.

13           MR. ISBISTER:  Thank you very much, Your Honor.

14           JUDGE MOTZ:  Ditto.

15           MR. GOODSTEIN:  Just one other administrative issue.

16   We have made a couple of minor changes to the final order that we

17   submitted.  I can either e-file it or hand it up to you,

18   whichever you prefer.

19           JUDGE BLAKE:  Again, if you want to check with Mr.

20   Isbister, and we'll do it all the same way.  I think probably

21   e-filing will be the best way to go.

22           MR. GOODSTEIN:  Thank you, Your Honor.

23           JUDGE MOTZ:  And perhaps, although I don't think Mr.

24   Bechtold has standing to raise the issues, I mean, I certainly

25   didn't know all these cases were going to be settled and not all

1    of them have been.  Not all of them.  There have been issues

2    along the way.

3           Even if there was a hope that the cases were going to

4    be settled after the wrongdoing was acknowledged, there was a lot

5    of lawyering work needed to figure out who was liable, frankly to

6    figure out who was entitled to recover.  That standing issue was

7    always there.  This has not been a case in which -- if I thought

8    this was a case in which lawyers were simply coming in and taking

9    the cream off the government's work, my attitude towards these

10   settlements and the attorney's fees being requested would be

11   entirely different.

12          As Judge Blake said, we are not, we have not been

13   insensitive.  I don't think counsel have been insensitive to the

14   concerns.  But this is a case which has been hard fought on many

15   different levels, including some denials of wrongdoing, but even

16   on other levels where the complexities of the issues involved

17   have been immense.

18          MR. ISBISTER:  The next subtrack in the batting order

19   is Janus.  Here all the way from California is Mark Molumphy.

20          MR. MOLUMPHY:  Good morning, now afternoon, Your Honor.

21   I'm Mark Molumphy, Cotchett Pitre & McCarthy, for the lead

22   plaintiff Malone Powers, in the Janus track.

23          I'm pleased to report that the settlements we've

24   reached resolve all claims in the investor class action and

25   derivative claims against the Canary and Bank of America

1    defendants.  There are some remaining claims in the derivative

2    case that are going forward, I believe are on appeal with respect

3    to the Janus defendants, but that's it.

4         The settlements collectively provide a cash settlement

5    of approximately 2.6 million, precisely 2,604,700.  In addition,

6    we will be distributing $150,000 from the New York Attorney

7    General settlement.

8         My client in this case, Malone Powers, is an investment

9    advisory firm with hundreds of individual Ma and Pa clients in

10   Janus funds that collectively own tens of thousands of Janus

11   shares.  And I think because of that, Malone Powers has taken a

12   very active role in this case from its inception.  In fact, this

13   is one of the few cases that was, proceeded all the way through

14   factual discovery, expert discovery.  A representative of Malone

15   Powers was deposed by Mr. Perry in this case, participated in

16   responding to document requests and interrogatories on behalf of

17   hundreds of clients that held Janus shares, which was a massive

18   undertaking, and ultimately participated and approved the

19   settlements in this case.

20        For the reasons explained before, we believe the

21   settlements are fair and adequate, the case was one of those that

22   was actively litigated.

23        The Janus case, as Your Honors would understand, was at

24   the forefront of several common cross-track issues, such as those

25   dealing with approved, arranged versus not arranged timers,

1    flight damages, the SEC set-off amount.  And all those issues

2    were actively litigated and decisions were made by Your Honor in

3    the Janus track, although back to the Motion to Dismiss through

4    the summary judgment.

5        With respect to the settlements themselves, a

6    comprehensive direct mail notice was made to over two million

7    class members.  I would submit that the reaction has been

8    overwhelmingly positive.  In addition, we obviously had the web

9    and publication notice.  To date we've received, as of yesterday,

10   over 30,000 claim forms.  And obviously, we have another couple

11   months to go.  Only four of the approximately two million class

12   members have submitted objections.

13       I would note that none of the objections relate to the

14   settlement amounts.  Rather, they deal with the documentation

15   requirements that we've discussed previously.  I think I've

16   addressed those in my brief.  But obviously, if the Court has any

17   questions, I can go through that more.

18       There was one objection to the attorney's fees in this

19   case submitted by one objector.  The fees we're asking or are

20   seeking approval for are 20%, which would include the class and

21   derivative counsel.  That would equal about $520,000.  As a

22   lodestar cross-check, my firm alone has spend over 3.8 million

23   dollars in lodestar through the preliminary approval stage, which

24   works out to over 10,000 hours.  So it's, we believe, a

25   significant negative lodestar.

1          JUDGE MOTZ:  I guess that's something like .08%, I

2     think.

3          MR. MOLUMPHY:  Right.  Obviously, the case changed

4     throughout the proceedings.  The SEC's settlements obviously had

5     a lot to do with it.  Your Honor, we pursued actively alternative

6     theories that we thought would add value to the class.  Some

7     succeeded, some did not.  But I think that active litigation

8     assisted us in negotiating settlements.

9          The costs we are seeking reimbursement are $621,133.06,

10    which again include both class and derivative counsel.  The vast

11    majority relate to expert fees, Dr. Vellrath.  My firm was

12    involved with Dr. Vellrath throughout this case, he's also

13    located in the Bay area, both on the Janus issues as well as

14    cross track issues.  So that's why the cost amount is

15    significant, but we feel reasonable, in this case.

16         We also attempted at all times to keep our costs down.

17    When we took depositions, only one attorney would go.  There was

18    just a lot of documents involved.  Depositions were taken in this

19    case and it was actively litigated.  Thank you.

20         JUDGE MOTZ:  And anybody want to be heard on the Janus?

21    This certainly is a subtrack which proves there was risk.  And

22    there was, and you all really took a bath on it.  I'm obviously

23    familiar with the issues, having issued a couple opinions.

24         MR. MOLUMPHY:  At the end of the day my clients are the

25    class members and they're getting a recovery.  That's what we do

1    this for.

2           JUDGE MOTZ:  Exactly.  Thank you.

3           MR. ISBISTER:  Next, Your Honors, the Putnam subtrack

4    and Rick Wayne from the Strauss and Troy firm will speak for the

5    class plaintiffs.

6           MR. WAYNE:  Good afternoon, Your Honors.  Rick Wayne

7    from Strauss and Troy on behalf of the Putnam subtrack.  Our

8    client in this case and the lead plaintiff was the Ohio Tuition

9    Trust Authority.  We also had, were involved in a case that was

10   fully litigated, and it was dismissed on the Motion For Summary

11   Judgment.

12          Following that, we were successful in dealing with the

13   chief mediator of the Fourth Circuit to help us resolve that

14   case.  And he did a very good job, Tom Ball, and helped us get

15   our case resolved.

16          I think our case also shows the risk that's involved in

17   these types of cases.

18          JUDGE MOTZ:  Absolutely.

19          MR. WAYNE:  In accordance with the preliminary approval

20   order entered by this court, we issued a notice.  We've set that

21   forth in our papers.  We've submitted two affidavits relating to

22   the notice process here.  It was a robust process.  There was

23   direct notice to all the individual plaintiffs that had lawsuits.

24   There was a one side setup.  There was publication in The New

25   York Times, The Wall Street Journal, People magazine.  The note,

1    the settlement was all over the PR Newswire.

2            We've also submitted the declaration of Mr. Cirami from

3    Garden City that confirms the publication notice as well.  We

4    think that in the case the notice complies with Rule 23 as well

5    as the PSLRA.

6            In the notice it indicated that any objections to the

7    settlement or to any of the fee, the expense requests, there's no

8    fee requested, there's only an expense request, any objections

9    needed to be filed by September 21st and any requests for

10   exclusion on the same date.  We received two requests for

11   exclusion, both from very small shareholders.  They're in our

12   papers.  One had about a $14,000 loss.  And the other one is an

13   individual that has a case in Vermont, which is also a small

14   loss.  Those are the two opt-outs that we had.  And we had no

15   objections to the settlement or to the fee request here.

16           The total value of the settlement is three million and

17   two-hundred-twenty-five dollars, and $500, plus the notice cost.

18   Putnam's putting in 2,500,000 and they're also paying the notice

19   cost.  Bank of America, which was a cross-track settlement, is

20   the class settlement and the fund derivative plaintiffs, is

21   $170,500.  Prudential settlement was $450,000.  And Canary

22   defendants settled for 105,000, plus there's an additional

23   $210,000 that comes from the State of New York, Attorney

24   General's claim.

25           JUDGE MOTZ:  And Canary, of course, cooperated.  That

1    should be added.  I think that's been -- is that right?

2            MR. WAYNE:  Yes.  Yes.  In terms of the plan of

3    allocation that's included in our papers as well as the notice,

4    there's not going to be a claim form here.  The money is going to

5    be distributed consistent with the report done by the independent

6    examiner, Professor Tufano.  That's how it's going to go.  It's

7    going to go pro rata to the funds that actually lost money.

8    There's not a claims process here.  It's going to go into the

9    funds, the current funds, based upon the losses that were

10   suffered by each of those funds.

11           As we indicated in our papers, unless the Court has

12   questions, we think that we've set forth all the standards why

13   this settlement should be approved as fair, reasonable and

14   adequate to the class as a whole.

15           As I indicated, there were no form of objections.  We

16   also received an informal letter from Mr. Bechtold.  We think

17   we've responded to his comments in our reply.  We don't think

18   his, his comments have any merit.  And we also don't believe he

19   has any standing because he doesn't, he doesn't represent a

20   shareholder here.

21           Again, we think the settlement should be fair, is fair,

22   reasonable and adequate, should be approved by the Court.

23           With respect to the request for expenses, again, as I

24   indicated, and there's an inconsistency because there's some

25   money coming back from the MDL Litigation Fund and we can clean

1    that up in the final papers, but it was about $4900 that we get

2    back that we think comes off what we've asked for.  We've asked

3    for expense of $1,572,390.28.  That includes a payment to the

4    Ohio Attorney General of $1600 for their, roughly $1600 for their

5    work in this case.

6         We've also asked for some of the expenses of OTTA,

7    which is about $24,000.  And there's also a request from Mr.

8    Isbister's office that we fully support as well, because he was

9    very helpful in terms of moving this case along.

10        As I indicated, there were no objections to the fee

11   request.  This case was highly contested.  There were over 50

12   fact depositions taken.  There were over 10 expert depositions

13   taken.  There were hundreds and hundreds of thousands of

14   documents that were reviewed in this case.

15        And I request, Your Honors, based upon the value of the

16   settlement, the risk to the class, the lack of any objection, the

17   approval of the settlement by the lead plaintiff in this case,

18   that the settlement be approved as fair, reasonable and adequate,

19   and the expense request be approved as well.

20        JUDGE MOTZ:  Anybody else want to be heard?  I will

21   approve it.  Oh, somebody is.  I'm sorry.  Somebody did want to

22   be heard.

23        MR. PRUSSIN:  Good afternoon.  I'm Adam Prussin from

24   Pomerantz Haudek.  We represent the derivative plaintiffs.  This

25   is not a commentary on the settlement that's proposed now.  It's

1    just to alert the Court to something you probably recognized

2    already, which is that the derivative claims have not been

3    settled.  The class has settled its claims.  The derivatives have

4    not.

5            MR. WAYNE:  That's correct, Your Honor.

6            JUDGE MOTZ:  Where does that leave me now in terms of

7    what I should be doing?

8            MR. PRUSSIN:  You should approve their settlement.

9    That's all.

10           (Laughter.)

11           JUDGE MOTZ:  No.  In terms of litigating your claims.

12           MR. PRUSSIN:  Well, that's a matter that's up in the

13    air.  You know, given what's happened in the case, which has been

14    catastrophic, there may or may not be further developments in the

15    matter.  That's under advisement right now.

16           JUDGE MOTZ:  Should I ask you all to provide me with a

17    status report in, maybe by Friday, after January, you know, or

18    the second week in January, the second Friday in January, as to

19    where things stand?  I just don't want to lose track of it.

20           MR. PRUSSIN:  Sure.  Second Friday in January?  Fine.

21           JUDGE MOTZ:  Whatever that is.  Just give me a letter,

22    look, we're not going to pursue it or earlier, or else we are,

23    please set a scheduling conference.  That's all I need to know,

24    just a short letter.

25           MR. PRUSSIN:  Thank you.

1    JUDGE MOTZ:  Thank you.  Anybody else want to be heard?

2    Somebody did?  Did I talk them out of it?

3    MR. SIMSHAUSER:  Peter Simshauser, Skadden, Arps, with

4    the Putnam defendants.  We support the settlement.  Thank you,

5    Your Honor.

6    JUDGE MOTZ:  Thank you.  I'll approve this settlement

7    and I'll hear from the derivatives by mid-January.

8    MR. ISBISTER:  Next, Your Honor, the Nations Fund/Bank

9    of America settlement.  And Mr. Ottensoser, who spoke to the

10   Court before, will be addressing this.

11   MR. OTTENSOSER:  Good morning or good afternoon, Your

12   Honors, again.  We worked in conjunction with the Labaton

13   Sucharow firm from day one in the Nations Fund case.  Mr.

14   Sucharow couldn't be here today so I'm going to present the

15   arguments.

16   We represented an individual plaintiff who owned the

17   convertible securities fund.  And Mr. Sucharow's firm represents

18   RDM Design Management, which is an institutional investor, which

19   deals with pension plans and other retirement matters.

20   This case was unique in its own right in that Bank of

21   America was named as a defendant in many of the cases and many of

22   the mutual fund timing incidents.  And that's because they

23   allegedly enabled timers to have access to other, to other

24   accounts and to other mutual fund families.  But there was one

25   family in particular that was sort of lost in the shuffle in all

1    this and that was the Nations Funds investors, mutual fund

2    investors themselves, who also suffered mutual fund market timing

3    and trading.

4           So this case from the outset, there was a settlement

5    reached between the government and Bank of America for 375

6    million dollars.  The issue was that there was no plan of

7    allocation for that settlement, and each of the mutual fund

8    families were scrambling to get access and get parts of that

9    money for their own mutual fund families.

10          We had met with defendants BofA's lawyers and they

11   showed us analyses that show that the market timing dilution

12   damages were 21 million dollars.  We argued that the damages

13   should be more than that because there were other damages that

14   should be looked at.

15          Ultimately, we agreed to a settlement where we and the

16   Bank of America defendants would recommend to the IDC that the

17   IDC pay at least 60 million dollars to the Nations Bank

18   shareholders.  And if the 60 million dollars wasn't reached,

19   Nations Bank, BofA would then make up the difference up to 60

20   million or we'd be permitted to walk away from the settlement.

21          So in that course we hired our own experts.  We

22   developed our own analyses.  We met with the independent trustees

23   and their advisers to Nations Fund.  We had multiple meetings

24   with Professor Hamermesh, who's the IDC.  And early on in this

25   case we actually came to the courthouse here to meet with Judge

1    Davis, to tell him what we were doing, to make sure that given

2    the Fair Fund and what we were doing, this would be a settlement

3    that could be achieved at the end of the day.

4           So at various stages, we came back and reported to the

5    Court.  I believe at one point Mr. Hamermesh himself was here

6    before the Court, explaining what we had done.  And at that time

7    he said that our work and our analyses were helpful to his final

8    analyses.

9           So after making our presentations, working with our

10   experts, doing our discovery and everything and the like,

11   Professor Hamermesh ultimately awarded 89 million dollars to the

12   Nations shareholders, which was four times the amount that

13   ultimately was being presented to us by the Bank of America

14   defendants.  Remind you that the Wachtell Lipton firm, state of

15   the art experts, pretty good analyses.  But again, we brought our

16   creativity to bear, arguing that the damages should be far in

17   excess of that.  When we argued to Professor Hamermesh during our

18   presentations that the damages should be more, we argued in

19   excess of 60 million dollars.

20          So once Professor Hamermesh came through with his

21   analyses, there was no longer the need for Bank of America to

22   insure that the 60 million would be paid up.

23          We have gone on an extensive notice program.  Bank of

24   America has paid for it.  We've sent out in excess of 750,000

25   notices in this case.  As the Court knows, there's been a couple

1    of letters from various individuals, none of which, in my view,

2    would amount to a serious objection.  One person wrote about how

3    Nations had managed their money after a car accident and there

4    were problems.  Someone wrote about their leases and thought

5    Nations Bank could do something about it.  And of course there

6    was Mr. Bechtold, who we've dealt with already today, I think has

7    left.

8         I believe there are 13 valid exclusions at this time.

9    And importantly, the money went out in 2009.  So all the

10   shareholders in the Nations funds, they know what they're getting

11   under the settlement because the 89 million dollars was divided

12   up amongst them and that money went out.  So they got their money

13   in 2009.  They got our notice which explained the settlement and

14   what we did and how we contributed to getting the ultimate

15   benefit.  And in that light, no one's written back and had any

16   serious objection to what we had done and how the settlement is

17   going to be going forward.

18        We've also told the shareholders about the Canary

19   settlement, which there will be no need for claim forms.  It's

20   going to be distributed in the same pro rata basis as the Fair

21   Funds.  And that equals $1,050,000.

22        Again, as I said earlier this morning, each settlement

23   needed to be, or litigation needed to be dealt with in the

24   context of how it was found.  So again, the class certification

25   here will cover all Canary, all Nations Bank funds from '98 to

1  2003.  Notice was sent across the board.  And there have been, in

2  my view, no valid objections.

3       We are seeking attorney's fees in this case of 6.25

4  million and expenses up to 750,000.  These amounts were

5  negotiated arm's length after the substantive terms of the

6  settlement were made.  But importantly, these amounts are not

7  being paid out of the Fair Fund or any amounts that were going to

8  shareholders.  They're agreed to be paid to separately by Bank of

9  America.  So there's no dilution in any way to what the

10  shareholders got.

11       I believe Judge Bennett of this district approved the

12  fee in the Tyson case under similar circumstances, in May of this

13  year, where he noted that the payment was being made by the

14  defendants up and above the amounts of the settlement so there

15  was no diminishment in any way.

16       We've submitted a lodestar cross-check which

17  demonstrates that the fees here are reasonable.  This settlement

18  covers the ERISA case, the derivative case, the securities fraud

19  case, the fiduciary subclass.  There were also cases out there

20  under RICO.  All these cases are being dismissed here, coming

21  together.  There are no outliers.  There's no one coming in to

22  object from these various constituencies.

23       Ultimately, we submitted everyone's time in excess of

24  10,000 hours and a lodestar of 5.4 million.  So if you look at

25  the multiplier in this case it's a 1.2 multiplier, which < is a

1    positive multiplier but not an exceedingly positive multiplier

2    that would be unique in these situations.

3            Also, if you look at the benefit, and we see the

4    benefit of the bridge between the 21 million that Bank of America

5    had come up with and the at least 60 million that we were sure we

6    would have gotten either through Professor Hamermesh or

7    separately through BofA, we're talking about a 16% percentage of

8    that benefit.  Again, that 16% is not coming from that amount,

9    but being paid separately by the defendants.  I think that's one

10   of the reasons why the shareholders haven't come forward and

11   objected to our fees, is because the fees are not affecting them

12   in any way.

13           Finally, with respect to Canary, we're seeking 18% of

14   that amount.  We've also achieved significant non-monetary

15   corporate governance benefits in this case.  We've set those out

16   in our papers.  And our total expenses here were a little bit

17   north of $312,000.

18           Again, we think we did a great job here, a creative job

19   in the face of governmental action, but getting something which

20   we thought would be an increase, notwithstanding that government,

21   because we always had what we called our failsafe, which is if

22   Professor Hamermesh came up with different values.  And we had no

23   idea what values he would come up with at that time.  There was

24   very little opinions or science or literature at that point of

25   exactly how the fees and other damages would be allocated.

1          So at that point we felt that the 60 million pledge or

2     at least failsafe by BofA would give us the confidence that if

3     things didn't go the right way with Professor Hamermesh, that we

4     could walk away with at least 60 million dollars.  That's all I

5     have to say, Your Honor.

6          JUDGE MOTZ:  Anybody else want to be heard in this

7     subtrack?  Yes, sir.

8          MR. RIFKIN:  Your Honors, good afternoon again.  Mark

9     Rifkin on behalf of the fund derivative plaintiffs.  This is one

10    of those cases that fell slightly outside the usual framework in

11    terms of the distributions because, as Mr. Ottensoser described,

12    we negotiated with -- all three parties, the class plaintiffs,

13    the derivative plaintiffs, and Mr. Hamermesh, negotiated the

14    allocation of the Fair Funds recovery.

15         And we point out in our papers that Professor Hamermesh

16    allocated 63.4 million dollars of the Fair Funds recovery to a

17    return of fees paid to the investment adviser in the Nations

18    funds.  All of that money was effectively distributed to the

19    shareholders of the funds, not to the funds themselves, but to

20    the shareholders as part of the IDC process.  So it was a chance

21    for us to be both innovative and incredibly cooperative with the

22    government and with our colleagues on the class side of this

23    case.

24         This was, I believe, the first non cross-track

25    settlement in the case.  And it was at the point in time when the

1    risk was greatest to all of us.  And we came up with a mechanism

2    that I think provided an extremely efficient way of getting money

3    to the funds.

4           I should point out that there was a provision in the

5    settlement as well that if any of the money could not be

6    distributed, if there were a remainder that was left over after

7    Professor Hamermesh did his IDC distribution, then in that case,

8    like all the other funds, that remainder would be paid over to

9    the funds directly, not to the shareholders.

10          I should also point out very briefly that although this

11   case was the first of the non cross-track cases to settle, there

12   was still a combined lodestar of all the plaintiffs' counsel of

13   almost five and a half million dollars.  And that reflects the

14   complexity of all these cases from the very beginning, the

15   difficulty and the incredibly high risk to all of them.  Even the

16   earliest of the settling cases had an enormous amount of work

17   that was done, that needed to be done in order to prosecute them

18   effectively and efficiently.

19          I'm very good and very pleased to be able to join with

20   class plaintiffs to support this settlement.

21          JUDGE MOTZ:  Thank you, Mr. Rifkin.

22          MR. RIFKIN:  Thank you, Your Honors.

23          MR. OTTENSOSER:  I'm sorry.  I might want to note one

24   thing.  In terms of the ERISA settlement, there was an objection

25   to the release but that's been resolved.  I believe a

1     stipulation's been submitted to the Court.

2             JUDGE MOTZ:  The one in North Carolina.

3             MR. OTTENSOSER:  Withdrawn.

4             JUDGE MOTZ:  Again, I'm glad you mention that because

5     two issues that came up, one's going to come up later today in

6     another subtrack.  In terms of the transparency of this process,

7     I mean, I was very pleased to say it was just a carve-out with

8     the ERISA thing so their rights are fully preserved.

9             And the other issue has to do, that will come up later,

10    that it was discovered late in the game that notice hadn't gone

11    out to I think two and a half million people, a lot of people.

12    Excuse me.

13            MR. OTTENSOSER:  Thank you, Your Honor.

14            JUDGE MOTZ:  And the fact of the matter is, it's given

15    me great comfort in this approval process that there aren't a lot

16    of side deals.  Sometimes at the last minute you worry about

17    people making side deals because they want to preserve the

18    settlements because it's gotten that far.  That simply has not

19    happened in this case.  And this case has been absolutely,

20    everybody's had tremendous integrity and it's the way it ought to

21    be done, so I appreciate it.

22            MR. OTTENSOSER:  Thank you, Your Honor.

23            MR. ISBISTER:  Next, Your Honor, Mr. Goodstein will be

24    speaking on the OneGroup subtrack.

25            MR. GOODSTEIN:  Good afternoon, Your Honors.  Clifford

1  Goodstein from Milberg, LLP.  I apologize, but as a housekeeping

2  matter, it was pointed out to me that apparently Judge Blake did

3  not formally indicate her intent to approve the Strong

4  settlement.

5           JUDGE BLAKE:  I thought I did.  But if not, I certainly

6  do intend to approve it, subject to having the final order

7  submitted to me.

8           MR. GOODSTEIN:  Thank you, Your Honor.

9           JUDGE MOTZ:  And I intend to prove, if I didn't say it,

10  the Nations, the one that was just here.  Thank you.

11           MR. GOODSTEIN: The OneGroup settlement, we believe, is

12  an excellent settlement in light of --

13           JUDGE MOTZ:  I see some of the our citizens are

14  leaving.  Thank you for coming in this morning.

15           MR. GOODSTEIN:  It's an excellent settlement in light

16  of the amount of damages that were available after the SEC

17  recovery.  The settlement covers the class case, derivative case,

18  and the ERISA case, with total settlement in the amount of just

19  about 5.6 million dollars.

20           A couple things that make this case a little unusual.

21  It's a smaller fund so it was a smaller settlement as a general

22  matter.  In addition, because we were concerned that notice and

23  administration costs were going to eventually eat up the

24  settlement amount, we structured this so that it's a no

25  proof-of-claim settlement, that the distribution would be based

1    entirely on trading records supplied by OneGroup, which we think

2    will work in this situation and be a sensibly, economically

3    efficient way of resolving the problem we have.

4         This is also not a case where the derivative recovery

5    is simply the remainder.  We actually have set aside as part of

6    our plan of distribution $670,000 for the fund component of this

7    case.

8         You know, we have served notice.  Other than Mr.

9    Bechtold's quasi objection, there have been no formal objections

10   filed.  We believe that the class with the recovery and

11   settlement should be approved.

12        Our fee request is 20%, again, representing a

13   significant negative multiplier, while it's been a smaller case

14   since there's been a lot of leg work as far as working with the

15   multiple defendants and structuring the settlement appropriately.

16        JUDGE MOTZ:  Thank you.  Anybody else want to be heard

17   on this?  Mr. Rifkin or anyone?

18        (No response.)

19        JUDGE MOTZ:  Good.  I'll approve that, too.  Again, I

20   think --

21        MR. GOODSTEIN:  I'm sorry.  I didn't hear you.

22        JUDGE MOTZ:  I said I will approve this.  It seems to

23   me, this, again, is reflective of the common sense approach to

24   make things work and cost benefit analysis that should be part of

25   every MDL.  And certainly in terms of figuring out things are

1    going to get eaten up in administrative costs, let's figure out

2    another way to do it.  And then what's the impact upon that in

3    terms of what's going to the funds.  You all have approached that

4    practically and I thank you.

5              MR. GOODSTEIN:  Thank you, Your Honor.

6              MR. ISBISTER:  Next, Your Honor, the Alliance Bernstein

7    subtrack.  And Mr. Yarnoff from the Barroway Topaz firm will

8    again step forward to speak.

9              MR. YARNOFF:  Good afternoon.  Michael Yarnoff from

10   Barroway Topaz.  This settlement is in the Alliance subtrack.  It

11   is the investor class, the derivative class, and the ERISA class.

12   All three are part of this settlement.

13             The Alliance case is interesting, I believe, for a

14   number of reasons, obviously, one being the amount of the

15   settlement.  It is one of the most significant settlements of all

16   the mutual fund cases.  The settlement amount is $74,586,650.

17   One of the difficulties with this case was the fact that the

18   Alliance defendants had settled an SEC investigation and paid 250

19   million dollars, 150 million plus 100 million dollar fine.  So

20   the real difficulty in this case was to prove whether there was

21   additional damages because the Alliance defendants obviously

22   believed they had paid everything they needed to pay with regard

23   to the settlement.

24             What we were able to do with regard to the settlement,

25   and the papers reflect this, is the settlement with the

1    government was ten funds in a limited period of time.  I believe

2    it was about two and a half to about three year period of time.

3    What the Alliance settlement did was expand the number of funds

4    affected by the market timing and late trading to 19 funds.  And

5    also what the Alliance track did was we expanded the class period

6    an additional two years.  So the class period went from 1998

7    through 2003.

8              In working with our investigators and working with our

9    experts, we were able to expand this class in terms of the time

10   frame, as well as the funds affected by the allegedly market

11   timing and late trading.

12             JUDGE MOTZ:  Do you have a lead plaintiff in each fund?

13             MR. YARNOFF:  Yes.  There's two, there's two lead

14   plaintiffs.

15             JUDGE MOTZ:  For each fund?

16             MR. YARNOFF:  I'm sorry?

17             JUDGE MOTZ:  For each fund?

18             MR. YARNOFF:  Oh, for each fund?  No.

19             JUDGE MOTZ:  Just rehashing old, ancient history.

20             MR. YARNOFF:  No.  No.  And that obviously is one of

21   the issues --

22             JUDGE MOTZ:  That's obviously a risk.

23             MR. YARNOFF:  -- that the Court discussed.  And

24   obviously, I won't go through all the risks that have been

25   addressed throughout the day.  But all those risks existed with

1   regard to the Alliance track for sure.

2            JUDGE MOTZ:  Actually, it's a somewhat serious question

3   because this is the, and I know you will be addressing it, but

4   this is the one track in which there's a significant lodestar

5   positive multiplier.  At the appropriate time just address that.

6            MR. YARNOFF:  Yes, I have a number of points to address

7   on that issue.  And I think some of them will be overlapped with

8   regard to the settlement itself, the claims process and all those

9   things.  But I will have specific points to make on the, on our

10  fee application.

11           Just with regard to the settlement itself, getting back

12  to the settlement.  As I indicated before, it was approximately a

13  75 million dollar settlement.  And our papers reflect this.

14  Working with our expert consultants, we calculated theoretical

15  dilution damages of approximately 375 million.  So the

16  difficulties in this case was the fact that we were already

17  working with a, with defendants, and specifically one defendant,

18  that had paid a significant amount of money.  So in order to be

19  able to get the significant amount of money that we got in this

20  case, as I said before, we had to expand this class

21  significantly.

22           So the settlement reflects, if you reduce the amount of

23  the government settlement, which was 150 million, putting aside

24  the hundred million dollar fine that they also paid, you had

25  potential damages of only 225 million.  This settlement, if you

1    look at the numbers, 75 million dollar settlement, reflects

2    approximately a 33% recovery for class members.  And in our

3    papers, we address this issue.

4           There's been some specific studies that have been done

5    with regard to class action settlements, which suggest that class

6    action settlements add certain values, and this 75 million dollar

7    value, that the percentage of damages recoverable in those cases

8    is in the single digits, something like 2 to 8%.  And that's

9    reflected in our papers.

10          So, obviously, a settlement in this case of potential

11   damages of 33%, we submit to the Court, is extraordinary and

12   almost unprecedented in securities cases.

13          One of the other important factors of the settlement

14   was the settlement with the Alliance defendants.  We were able to

15   secure that settlement.  And what we were able to do was to

16   convince the defendants to fund that settlement immediately, as

17   opposed to waiting for preliminary approval.  That was a very

18   important aspect in this case because we had so many other

19   defendants that had not settled, and that a litigation and

20   negotiation with those other defendants obviously continued to

21   take place and took place over, you know, the next, you know, six

22   and a half years, but basically from the time of the Alliance

23   settlement, about three more years to settle with all the

24   additional defendants.

25          What we were able to do was get the defendants, the

1      Alliance defendants, to fund their 30 million dollars at the time

2      that we signed the MOU, which created a significant amount of

3      interest.  The interest rates were great a couple years ago.

4      Unfortunately, they aren't so great now.  But the fund has earned

5      interest of over three million dollars.  So we're now talking

6      about a fund that's not 75 million, we're talking about a fund

7      that's 78 million.  So we believe that's a significant,

8      obviously, significant for class members.

9              With regard to, and I know I discussed this before,

10     with regard to the derivative lawsuit, that any residual funds

11     will go back to the funds.  We'll do the same distribution

12     process, and I'll get into that in a little bit in a moment.  But

13     the same thing will take place.

14             We will do distributions and then ultimately if there

15     is monies left over, they will go back into the funds based on

16     our expert's calculation of what funds were damaged.

17             In addition to our settlement and the monies that will

18     be distributed from the settlements that we obtained, we will

19     also be distributing another 2.1 million dollars that the OAG

20     received from the Canary defendants.  And that will be

21     distributed as part of our distribution process.

22             With regard to the notice program, Alliance is a huge

23     fund consisting of multiple funds.  Obviously, 19 funds were

24     affected in this settlement.  So over five million notices have

25     gone out to potential class members.

1          Realizing that there was a huge class here, what we

2     established in terms of responding to inquiries -- and this was

3     part of the response when the Court, you know, had concerns in

4     terms of people being able to get their documentation -- what we

5     were able to do in the Alliance subtrack, and I don't know if it

6     was done in any other subtracks, was we were able to create a

7     portal on the web site.  So all a class member had to do was put

8     in their Social Security number and I believe their zip code, if

9     I'm correct, and they were able to obtain their documentation

10    with regard to filling out their proof of claim.

11         And that portal has been accessed nearly 45,000 times

12    right now.  And like I said before when I spoke on the Excelsior

13    subtrack, that we don't have a proof of claim date until

14    December, I believe December the 8th.  And obviously, as I said

15    before, many, many claims come in later.  So we're sure that

16    those numbers are going to increase dramatically, notwithstanding

17    the fact that 45,000 already have, have used a portal to gain

18    access to their documentation.

19         In addition, as of October 19th, we've already received

20    27,000 proof of claims.  And obviously, that number will only

21    increase as the deadline nears.  So there's been a positive

22    response in terms of the Alliance settlement.

23         With regard to objections and exclusions, in the

24    Alliance subtrack we have received 48 exclusions.  And again, as

25    Judge Motz, I think, asked before in one of the other subtracks,

1   none of these objections are from institutions.  They're all

2   individual people wanting to exclude themselves for, and most of

3   them don't give a reason, but just ask to be excluded.

4           With regard to objections, and this is, I believe, a

5   phenomenal credit to the settlement itself, is the fact that

6   we've only received two objections.  Alliance shares, Alliance

7   funds were not only held by individuals, but many institutions,

8   who freely object if they think something is amiss with regard to

9   the settlement and/or the fees.  And we received no objections

10  from any institutions.

11          We only received two objections from individual class

12  members.  One was from a James Dinsick.  And his general

13  complaint was that his dollar amount for his allocation is going

14  to be too low.  As I already stated to the Court, if you look at

15  the numbers, and you can slice and dice any way you want, but the

16  least slicing and dicing you can do is that this is a 33%

17  recovery on the potential damages in this case, which again is an

18  incredible result.

19          So an individual class member, obviously, is only going

20  to get their small, little piece of the pie.  But that doesn't

21  mean that the settlement itself as a whole is not fair and

22  reasonable.

23          We had one additional objection after the, I think,

24  original papers were filed and we responded to it in our

25  supplemental papers.  It was from a Helen Wood.  And her

1    objections were more or less with regard to, for the most part,

2    with regard to our expenses in the case.  And her big complaint

3    was that experts shouldn't be, shouldn't be reimbursed or

4    shouldn't come out of monies from the fund.  And obviously, the

5    case law all supports that experts that are hired and retained

6    and are useful in litigation, and obviously in this case --

7         JUDGE MOTZ:  And had you not had experts in this case,

8    there wouldn't have been any recovery at all.

9         MR. YARNOFF:  Again, the experts in this case, like you

10   said, Judge, if there weren't experts in this case, we probably

11   wouldn't be standing here today.  So that was, for the most part,

12   her objections.  And we responded to her objection in the papers.

13        We also received the informal letter from Bechtold, we

14   responded to.  Obviously, our initial position is he has no

15   standing.  The Court's already addressed that.

16        JUDGE MOTZ:  I think we all understand.  I don't think

17   he does have standing.  To the extent that he expressed concerns

18   from a public interest point of view, they're legitimate.  We've

19   been concerned about it.

20        MR. YARNOFF:  Right.  So I won't further rehash those

21   arguments.  So with regard to the settlement itself, I ask the

22   Court to approve the settlement and the plan of allocation.  With

23   regard to the allocation, we have not received any objections to

24   the plan.  So I ask at this point to have the settlement and the

25   plan of allocation approved.  And then I can move on to the fees.

1          JUDGE MOTZ:  Anybody want to be heard on the settlement

2     itself?

3          (No response.)

4          JUDGE MOTZ:  It's approved.  The fees.

5          MR. YARNOFF:  Your Honor, you already mentioned it, and

6     I think what's interesting about this case, and the reason we're

7     probably going to have more discussion on this case on the fees

8     than any of the other cases that are being heard today is the

9     fact that we are seeking somewhat of a multiplier based on our

10    20% fee request.  I have about six or seven points that I want to

11    make with regard to why we believe 20% is fair and why the

12    lodestar multiplier check is also fair and reasonable.

13         Number one is, is the amount of the recovery here.  And

14    I know I mentioned it with regard to the settlement itself.  But

15    I need to mention it again because I think it's just, it's so

16    important here where you're talking about a recovery of at least

17    33% of the potential damages, putting aside all of the liability

18    problems that we may have, the standing problems, everything

19    else.

20         To get a recovery of 33% at a settlement amount that we

21    have in this case of 75 million, as I said, and it's in our

22    papers, is supported by all the studies that are done on class

23    action settlements with regard to fee request and damages.  That

24    in this type of settlement of 75 million or more, you know,

25    percentages of recovery are in the 2 to 8 range of potential, 2

1 to 8% range of potential damages.  Here we have, you know,

2 three-fold, five-fold, seven-fold, wherever you want to go in

3 that range of 2 to 8%.

4   So with regard to the settlement itself, that obviously

5 corresponds with the fee request that we, that we're asking for

6 today and the fact that it was an extraordinary recovery here.

7   Secondly, and I think, Judge Motz, you addressed this

8 issue, I think early in the day in one of the other subtracks.

9 These weren't, you know, these were difficult cases.  Our case

10 was maybe more difficult by the fact that there was a, that there

11 was a settlement with the government; that it didn't make the

12 case easier as I believe, I don't know if it was Mr. Bechtold or

13 someone indicated, but it actually made trying to litigate and

14 resolve these cases even more difficult.

15   And the fact that these cases took approximately seven

16 years to get to this final stage is a testament not only to the

17 fact that these were difficult cases but the fact that, you know,

18 the lawyers had to do a lot of lawyering here to get to this

19 point.  And as we stand here today, we have done a lot of

20 lawyering and we're proud of the settlement.

21   A third point I would like to make is the actual, the

22 case law itself, and I know we didn't get into the facts of each

23 individual case, but if you want to look at precedent, there's

24 multiple cases out there, and we listed them in our papers and I

25 have a list of them again, I don't need to run through them, but

1    where 20% of a 75 million dollar recovery has been fair and

2    reasonable and a 3.3 multiplier that we're asking for here has

3    been, has been ruled fair and reasonable in multiple, multiple

4    cases in different jurisdictions, obviously for a different

5    number of reasons.  But just for precedential, you know, for

6    precedential factor, there are many cases and the case law does

7    support our 20% fee request here.

8         Also, the 20% fee request, which is a little unusual

9    here, in most other cases that you see with regard to securities

10   cases, is that it's also compensating derivative counsel.  So

11   three sets of lawyers, derivative counsel, class counsel, and

12   ERISA counsel, which is a factor that should be taken into

13   account with regard to the 20% fee request.

14        A fifth point I want to make is with regard to the

15   contingent nature of these cases.  Many times lawyers come into

16   courts and tell judges that, you know, these are risky cases and

17   that securities cases in general are very risky cases, and that

18   you don't always, the lawyers don't always make money.  And a lot

19   of times they lose money.  And many times you can present cases

20   and you can show them case law but sometimes it's a hollow

21   argument.

22        I think in this case we have a subset of cases right

23   here in this Court that show how contingent these cases really

24   are, where you have 16 cases before you and I believe only 3

25   cases are seeking a positive multiplier.  The other 13 cases are

1   all seeking a negative multiplier; specifically, two tracks that

2   our firm is lead counsel in, which is the Excelsior track that I

3   presented to Judge Blake already, and the Alger subtrack that I

4   will present after the Alliance presentation.

5          So you have right here before you the ability to see

6   that, that litigating securities class action cases, they're not

7   always winners.  And you can't, and what I want to stress here is

8   that you can't sort of fault the lawyers for getting a good

9   recovery and asking for a certain increase in multiplier where

10  there's many cases where, and as we presented here today, where

11  we come to the court and we're going to be losing money on these

12  cases.  So I think that's very important and it's highlighted by

13  the cases in this court today.

14         The final one is, and I mentioned it with regard to the

15  settlement itself, but we sent out five million notices.

16  Alliance funds are held by individuals, Mom and Pops, but also

17  institutions.  And institutions are not afraid to come to court

18  and object to fee requests if they believe that they are unfair

19  and unreasonable.

20         In this case, we've had no objections to the fee

21  request or the expense request.  And I think that that's

22  significant.  When you send out that type of notice program and

23  you get nobody coming to court objecting to your fees, it's a

24  loud response from the class that this is an exceptional

25  settlement.  And I present to the Court that it is an exceptional

1    settlement and that we are deserving of the 20% fee award.

2            I also want to mention, and Mr. Isbister, obviously,

3    will mention it, too, but we support his 1.25% request in this

4    case, also.  He's been invaluable to us in the Alliance subtrack

5    and, obviously, to all subtracks and to the Court.  So obviously,

6    we endorse his request as well.

7            JUDGE MOTZ:  Does anybody want to be heard on the fee

8    request?

9            (No response.)

10           JUDGE MOTZ:  Well, obviously, it is a dramatically

11   higher multiplier than any other of the subtracks.  But I am

12   fully persuaded under the circumstances it is reasonable so I

13   will approve it as well.

14           MR. YARNOFF:  Thank you very much, Your Honor.

15           JUDGE MOTZ:  One thing you alluded to.  I think I

16   probably said at the beginning I would like, at the beginning of

17   the proceedings when you all were here a long time ago is that, I

18   like, my goal for the MDL's is to get them trial ready or

19   finished within three years, is the maximum.  This, obviously,

20   has gone on a lot longer than that.

21           I think that's one of the reasons why Judge Blake and I

22   feel, we're so aware of the lawyering that went into the case,

23   not only in terms of recovering against the defendants, but also

24   the myriad of problems that had to be confronted in figuring out

25   how to do things.  That really was lawyering at its best.  It

1    wasn't like we just ignored this for six and a half years.  We

2    were in touch with all of you, I guess, in a way that supports

3    Mr. Isbister's request, too, because, I mean, it was a lot of

4    communication, and we gave what for us were an extraordinary

5    length of extensions to get things in because we just realized,

6    after talking to you all, how difficult the issues were in trying

7    to do the constructive side of the practice of law, figuring out

8    how to make what seemed to be a good idea work.

9           So I'm glad you mentioned that because it brought back

10   to my mind the reason for the delay is because it has been very,

11   very hard, which justifies the fee request.

12           MR. YARNOFF:  I appreciate that, Your Honor.

13           JUDGE MOTZ:  Should we break?  Want to go halfway

14   through Alger and then break?

15           MR. ISBISTER:  Your Honors, we've got about four

16   subtracks left.  If counsel could do about five minutes a

17   subtrack, we're done by 1:30.

18           MR. YARNOFF:  Alger will be very short.

19           JUDGE MOTZ:  But you're going to be, I don't want to

20   forget this detail.  I think the notices went out for today and

21   tomorrow.  And I, I have other proceedings because it looked like

22   we would be finished.  But I'm available, if somebody comes in

23   and wants to object, then I will be available to hear the

24   objections.

25           MR. ISBISTER:  Your Honor, I'll put on the record now

1    that we've worked out a process.  Mr. Wagner and I will be here

2    tomorrow by the courthouse, courtroom.  If anyone shows up who

3    wants to object, as opposed to just watch the proceedings again,

4    we will arrange to get in touch with counsel in that subtrack and

5    arrange on fairly short order a telephone hearing on that

6    objection.

7            JUDGE MOTZ:  That's fine.  So I guess we should say,

8    and I'm sure Judge Blake agrees, all of our statements of

9    approval are subject to somebody not coming in tomorrow with an

10   objection, in which case they'll be heard.

11           Excuse me.  Go ahead on Alger.

12           MR. YARNOFF:  Thank you, Judge Motz.  I'm here now

13   before you on the Alger subtrack.  And I'll be brief on the Alger

14   subtrack, not that it's any less important.

15           The Alger settlement was $4,828,800.  I think what's

16   significant about the Alger settlement, there's one, you know,

17   point that's significant, is that we were able to obtain $950,000

18   from Wilshire Associates, which was a small player in this

19   alleged scheme.  So we were very pleased with regard to getting

20   that type of contribution from Wilshire Associates.

21           Again, we did the same type of notice program that

22   we've done in the other cases, with the publication notice, the

23   web site.  We did not have a portal with regard to Alger because

24   it was a much smaller subtrack.  We sent out over 500,000

25   notices.

1          I failed to mention that this is just a derivative and

2     investor class case, and not an ERISA case.

3          Again, the deadline is December 8th.  For the proof of

4     claims, we received approximately 4,000 proof of claims so far.

5     We have received 15 requests for exclusions.  Again, no

6     institutions, all individuals.  And we received one objection,

7     which I don't know if you even classify it as an objection,

8     because it's moot now.  He was objecting for his inability to

9     exclude himself from the class because he wasn't able to find his

10    documentation.  We worked with him to find his documentation.  He

11    did.  We excluded him from the class.  Therefore, the one

12    objection that was pending, we submit is moot now because he has

13    properly excluded himself from the class.

14         Again, we worked with experts with regard to the plan

15    of allocation and that was all in our papers.

16         With regard to the fee request, again, as I stated

17    before, this is another one of these cases where there's a

18    negative multiplier.  It's a .43 negative multiplier.  We're

19    asking for 20%, plus our expenses of approximately $240,000.

20         The only difference with this case is we're also asking

21    for a very small stipend for the two plaintiffs, the individual

22    plaintiffs in this case, who both prepared for and sat for

23    depositions in this case, and also prepared documentation and

24    reviewed interrogatories and things like that.  So we're asking

25    for $1500 for Donna Gaffney and $1500 for Gerald Morin, which we

1    think is appropriate based on the time and the effort they spent

2    with regard to litigating this case in conjunction with the

3    attorneys.

4                   If you have any further questions.

5                   JUDGE MOTZ:  Anybody want to be heard on the Alger

6    subtrack?  Yes, sir.

7                   MR. AARON:  Your Honor, Stewart Aaron on behalf of the

8    Alger defendants.  Nothing to add, except to thank Your Honor,

9    both of Your Honors for all of your work on this case over the

10   years.

11                  JUDGE MOTZ:  We're going to miss you all.  Thank you.

12   I'll approve.

13                  MR. YARNOFF:  Thank you very much.

14                  MR. ISBISTER:  Next, Your Honor, the RS subtrack, and

15   Richard Acocelli will speak.

16                  MR. ACOCELLI:  Good afternoon, Your Honors.  Richard

17   Acocelli from Weiss and Lurie for the lead plaintiff, the Krouse

18   Group in the RS subtrack.

19                  I'm pleased to present the settlement in the RS

20   subtrack on behalf of the investor class.  There are no

21   derivative or ERISA actions pending in this subtrack.  So it's

22   only a class settlement.

23                  The settlement in this subtrack is between the RS

24   plaintiffs and Bank of America, Bear Stearns, and the Canary

25   defendants, for a total settlement amount of 2.83 million

1   dollars; 325,000 on behalf of Bank of America was contributed;

2   $1,050,000 on behalf of Bear Stearns; and 1.45 million on behalf

3   of the Canary defendants.  In addition, we would be distributing

4   2.91 million dollars allocated to the RS subtrack from the 30

5   million dollar Canary settlement with the New York Attorney

6   General's Office.

7          We have submitted detailed papers as to the adequacy

8   and fairness of our settlement and I'm not going to repeat the

9   detail that we've included there or what some of the folks have

10  mentioned here today.  I will just mention that we were indeed

11  one of the cases that was fully litigated.  We developed a full

12  factual record and faced fully briefed Motions For Summary

13  Judgment, as well as class certification, and hotly contested

14  Motions to Exclude our experts.

15         We feel the risk of proceeding was, against the

16  settlement defendants was particularly high, considering the

17  summary judgment motion.

18         JUDGE MOTZ:  Of course, I'm fully familiar with this

19  case because it was fully litigated -- because it was fully

20  litigated I am particularly familiar with this one, this and a

21  couple others, Janus.

22         MR. ACOCELLI:  The notice program was particularly

23  robust in this situation.  We sent out a detailed seven-page

24  notice to over 300,000 potential class members.  And we also had

25  a, maintained a claims web site that included most of the key

1    documents to the case, as well as a comprehensive

2    frequently-asked questions section.

3         The response was positive. We received one class

4    member objection from a Mr. Kim Bartel. Mr. Bartel, after a

5    conversation that I had with him during the course of the lead-up

6    to this hearing, has withdrawn his objection. He was really

7    mainly concerned with class actions and how they proceeded and

8    how attorneys received their fees. When I discussed with him

9    what we had attempted to accomplish and the work we had put into

10    this case and the complex nature of the issues, he, he decided to

11    withdraw his objection.

12         We had seven exclusions, which is, again, a relatively

13    small amount of exclusions. Six of them were from individuals.

14    One was from Fidelity Investments. Fidelity Investments

15    maintains omnibus accounts and within those omnibus accounts are

16    a number of retirement funds. There was a small retirement fund

17    who decided they wanted to opt out of the settlement. They

18    maintained only 185 shares. The rest of the retirement accounts

19    maintained in this particular Fidelity Investment Company were

20    staying in.

21         The plan of allocation --

22         JUDGE MOTZ: That's helpful to know. Though it looks

23    on the record that it was a major institutional investor who

24    wanted to be excluded, upon analysis that really wasn't the case.

25         MR. ACOCELLI: That's exactly right, which is why I

1    wanted to point it out, Your Honor.  Again, 185 shares is really

2    the equivalent of an individual investor.  And it's significant

3    that the rest of them decided to stay in, the rest of Fidelity's

4    omnibus accounts.

5         With regard to the plan of allocation, we had the

6    opportunity, after consulting with the transfer agent for the RS

7    Emerging Growth Fund, as well as the IDC for the distribution of

8    the SEC RS recovery, to do a direct distribution to the class.

9    We will make the calculations ourselves.  The class members are

10   not required to submit any documentation whatsoever, no claim

11   forms.  And if they're eligible, they will receive a

12   distribution.

13        We received no objections to the plan of allocation.

14   And we were mindful of attempting to reduce the burden on the

15   class for submitting documentation and proceeding with the plan

16   of allocation in the most efficient way possible.

17        As to our attorney's fees, we've requested 20% of the

18   entire settlement amount, which totals $566,000.  Of that, Mr.

19   Isbister's request is included.  And we, especially those of us

20   who fully litigated this case, recognize his enormous help and

21   his enormous assistance and service.

22        JUDGE MOTZ:  I didn't realize that.  I thought that was

23   separate.

24        MR. ISBISTER:  They are separate.  They are separate.

25        JUDGE MOTZ:  The 566 does not include yours?

1          MR. ISBISTER:  They are separate.

2          JUDGE MOTZ:  I think he's asking for another 35,375.

3          MR. ISBISTER:  Yes.

4          JUDGE MOTZ:  I think.  Still think it's okay?

5          MR. ACOCELLI:  Sorry.  When considering our percentage

6    request in connection with the lodestar cross-check, the lodestar

7    cross-check demonstrates the reasonableness.  It comes out to

8    zero point, a little more than 0.10.  Similarly, our request for

9    expense reimbursement of $471,152.

10          JUDGE MOTZ:  I'm sorry.  I thought it was -- again, it

11   does demonstrate the reasonableness.  I thought it was -- you're

12   right.  I thought it was 10%.

13          MR. ACOCELLI:  0.10?

14          JUDGE MOTZ:  Yeah.  Maybe I misheard you.  In any

15   event, it is reasonable.

16          MR. ACOCELLI:  I may have my figures wrong.  With

17   respect to the expense, request for expense reimbursement, we

18   have a request of $471,000, again, because we litigated this case

19   through.  They are heavily weighted towards expert expenses.  But

20   as I think Mr. Yarnoff noted, without the able talents of our

21   experts, we might not be standing here today.

22          JUDGE MOTZ:  They were necessary and they weren't

23   cheap.

24          MR. ACOCELLI:  Yes, agreed on both counts.  We have

25   also requested a modest reimbursement for the expenses of the

1    four individual lead plaintiffs who were deposed, produced

2    documents, and watched over the litigation throughout.  They have

3    described their involvement and the time they had spent in their

4    respective affidavits.

5              If I have nothing further --

6              JUDGE MOTZ:  No.  Unless somebody wants to be heard, I

7    will approve both the settlement and the fee requests.

8              MR. ACOCELLI:  Thank you, Your Honors.

9              MR. ISBISTER:  The penultimate --

10             JUDGE MOTZ:  Every time I say fee request, that

11   includes expense request.

12             MR. ISBISTER:  The penultimate presentation from Mr.

13   Goodstein in the Columbia subtrack.

14             MR. GOODSTEIN:  Good afternoon, again.  I promise this

15   is my last time up.  We are here for approval of the Columbia

16   settlement, plan of allocation, and fee.  This case does not

17   involve ERISA components, unlike some of the other cases.  Total

18   settlement is twelve-six plus a little more, million, plus

19   interest.

20             This case was a little trickier than some of the other

21   cases because in this case, unlike many of the other cases, the

22   SEC Fair Fund distribution attempted to remedy all the instances

23   of market timing, as opposed to specific instances in the SEC

24   findings.  So in theory, this may have been a case where we would

25   have no damages left to recover at all.  The fact that we were

1    able to recover as much as we were speaks as to what a fair and

2    adequate settlement this is.

3            Like the Strong case, this is also a case where we told

4    people who held directly at Columbia that they do not need to

5    file proofs of the claim.  We were relying on the trading records

6    supplied to us by Columbia.  As a result, we have had very few

7    objections.  Other than Mr. Bechtold, only the single objection

8    related to our fee, which he basically objected to any fee being

9    granted to us at all.  Seemed to be based on hostility toward

10   class actions generally as opposed to anything about this case in

11   specific.

12           While our client is an individual, we actually had some

13   institutional review as part of the settlement.  As I noted in

14   our reply brief after we put in our initial papers, I was

15   contacted by independent fiduciaries appointed by the Bank of

16   America 401(k) for Legacy Fleet and Fleet Boston Pension Plan.

17   As part of their obligations under ERISA, they had to review the

18   adequacy of the settlement on an independent basis.

19           So they reviewed our papers.  We had a telephone

20   conference call where they addressed questions to me regarding

21   the settlement itself, the plan of allocation, as well as our fee

22   request.  They seemed to have been satisfied with the answers as

23   they have not filed any objections to the settlement or to the

24   fee.

25           JUDGE MOTZ:  Anybody want to be heard?

1          MR. RIFKIN:  Very briefly, again.

2          JUDGE MOTZ:  Of course, yes.

3          MR. RIFKIN:  Just because --

4          JUDGE MOTZ:  This is not --

5          MR. RIFKIN:  This is another one of those that falls

6     outside of the routine box.  As Mr. Goodstein mentioned, because

7     of the unique fact in this case that the SEC settlement appears

8     to have fully compensated everyone, we thought it was appropriate

9     in this case to make an initial distribution to the funds.  So

10    1.5 million dollars of the settlement will be initially

11    distributed to the funds.  Then the balance of the settlement

12    fund will be distributed to all of the class members and will

13    continue to be distributed until it's no longer economically

14    feasible to do, at which point in time any remainder at that

15    point will then fall back to the default and will be distributed

16    to the funds.

17          JUDGE MOTZ:  Thank you.  And again, just what Judge

18    Blake and I both alluded to.  These cases look like they're,

19    everybody talk about them, the market timing and late trading

20    cases, they all, there was an incredible amount of individual

21    issues involved which required what we called the constructive

22    lawyering.

23          The other thing that occurred to me, it hasn't been

24    mentioned, even dealing with cross-track defendants, was an

25    incredibly difficult task, which required the expenditure of a

1     lot of time and effort and wisdom and skill.  I'll approve it.

2             MR. GOODSTEIN:  Thank you, Your Honor.

3             JUDGE MOTZ:  Which brings us to the one which I will

4     not approve.  Yet.

5             MR. ISBISTER:  The Allianz Dresdner subtrack and Mr.

6     Chet Waldman from the Wolf Popper firm will address that.

7             MR. WALDMAN:  Good afternoon, Your Honors.  I have the

8     privilege of going last.

9             Let me start out by noting that three months ago

10    approximately 1.3 million notices or summary notices were mailed

11    directly to members of the class in the Allianz Dresdner

12    subtrack.  Just this week, as Your Honor knows, more than another

13    200,000 summary notices --

14            JUDGE MOTZ:  That's what I meant before.  I didn't mean

15    two million.  I meant 200,000.

16            MR. WALDMAN:  Right.  200,000 more were directly mailed

17    out.  With respect to those new mailings, there will be a new

18    objection opt-out for those potential class members, which will

19    be approximately January 14th 2011.  So we still may get some

20    objections a little later.

21            But remarkably, to date, after the 1.3 million direct

22    notices, after notices were published in periodicals, newspapers,

23    and over the Internet, not a single class member has objected to

24    the settlement, to the fee application, to the plan of

25    allocation, to the class certification, or to the modest

1    plaintiff's award, or any other aspect of the settlement.

2            While one class member originally objected to one

3    aspect of the opt-out procedure relating to information that

4    potential opt-outs had to show in order to formally opt out, this

5    objection was withdrawn after that objector was actually focused

6    on how limited the opt-out requirements really were and the

7    purposes of those requirements.  So that has been formally

8    withdrawn with the Court.

9            Moreover, only 22 class members of potentially well

10   over a million have sought to opt out of the class, including

11   that one former objector.

12           Your Honor asked earlier whether there's any

13   institutional opt-outs.  There is one.  It is the same, it was

14   pronounced Koch Companies, that opted out of another settlement.

15   I can read you from their letter what they said very briefly.

16   But they said, I'll pronounce it Koch, spelled K-O-C-H, is in

17   receipt of a notice of class action settlement for the

18   above-referenced matter.  To the extent Koch owned or held any of

19   the securities of Allianz mutual funds, Koch does not wish to

20   participate in the settlement class and therefore requests

21   exclusion from same.  Furthermore, at this time, Koch has no

22   interest in pursuing any claims in connection with the underlying

23   issues.

24           So for whatever reason they seem to want to opt out.

25   But it's not to pursue claims.  It's not because they're saying

1    anything's wrong with this settlement in any way, shape or form.

2              I think the fact that there are so few opt-outs and no

3    objections by any class members speaks volumes as to the fairness

4    of, and the reasonableness of the settlement, the fee

5    application, the modest plaintiff's award, and the plan of

6    allocation.

7              Now, because we may have some future objections,

8    because they'll have another three months to object, if Your

9    Honor wishes I could get into a little more details about our

10   settlement and the fee application.  I will be done by 1:30 if

11   you allow me.

12             JUDGE MOTZ:  If you want to.  But I'm not sure that

13   there's any point at this point.  Based upon the papers, it looks

14   good to me.  And should we schedule, should we actually schedule

15   another fairness hearing in this case?

16             MR. WALDMAN:  I think pursuant to our conference call

17   what we decided, and obviously it's up to Your Honor, is we will

18   wait until that January 14th date or a few days after, see if

19   there's anybody who objects.

20             JUDGE MOTZ:  That's what I thought we had agreed.

21             MR. WALDMAN:  Right.  If that's it, that disposes of

22   everything.

23             I will mention one more point because it relates to

24   what Mr. Bechtold said about the contingent nature of the fee.

25   If these cases were so obvious that we should win, I would like

1    Your Honor to say something to my colleagues in the Franklin

2    Templeton case, who are on the phone, as to they should give up

3    and start paying us, rather than continue to fight.  That is the

4    lone case that is still going on.

5         JUDGE MOTZ:  I wouldn't mind that easier considering I

6    got it sitting on my desk upstairs.  But there you are.  Maybe

7    you have to get Judge Blake assigned to the case and she'll get a

8    call.

9              MR. WALDMAN:  As to that case, Your Honor --

10             JUDGE BLAKE:  Happy to have it.

11             MR. WALDMAN:  As to that case, Your Honor, you know

12   there's summary judgment motions pending partial and --

13             JUDGE MOTZ:  I am painfully aware of it.

14             MR. WALDMAN:  Thank you, Your Honor.

15             JUDGE MOTZ:  Thank you.

16             MR. ISBISTER:  Your Honor, let me just kind of address

17   the kind of administrative closing of this proceeding today.  And

18   then mindful, of course, that the Court always gets the last

19   word, Mr. Perry and I would also like to say something.  We've

20   had the pleasure of emceeing some of these hearings over the past

21   few years.

22             JUDGE MOTZ:  Seeing Mr. Perry, let me just -- what I

23   have left, I just want to make sure, assuming that there's no

24   objections tomorrow and all these things get approved, I know

25   I've got the derivative issue in the Putnam case, which I'm going

1    to get a report on in mid-January.

2              I've got maybe Mr. Perry's case coming back.  This is a

3    parent derivative case, which is now in the Supreme court.

4              MR. ISBISTER:  Parent class case.

5              JUDGE MOTZ:  Yes.  That's still alive.  There is still

6    alive, of course, Franklin Templeton.

7              MR. ISBISTER:  Then in the Janus derivative case, took

8    appeal to the Fourth Circuit.  And I believe the briefing on that

9    is going on.

10              JUDGE MOTZ:  Janus derivative.  Okay.  This is

11    derivative against the funds, not against the parents?

12              MR. PERRY:  The funds against the adviser, Your Honor.

13    The fund investors bringing a derivative case on behalf of the

14    funds against the adviser.  A regular derivative case like all

15    the others.

16              JUDGE MOTZ:  But in the Supreme Court, it's somebody

17    who owns Janus -- I just forget.

18              MR. PERRY:  I'm sorry, Your Honor.  Mark Perry.  Two

19    separate cases in Janus remain.  The Supreme Court case is the

20    equity investors in the parent company.

21              JUDGE MOTZ:  That's right.

22              MR. PERRY:  That's in the Supreme Court.  In the Fourth

23    Circuit is the fund investors' derivative claim.

24              JUDGE MOTZ:  Right.

25              MR. MATHEWS:  Your Honor, Tim Mathews from Chimicles &

1  Tikellis again. Just one more note. There's also the Franklin

2  fund derivative case which is currently stayed pending resolution

3  of the, either the Janus appeal or the class summary judgment

4  motion. And we're essentially just waiting for one or the other

5  to be resolved. Then we'll decide what to do with the stay in

6  the Franklin derivative case.

7          JUDGE MOTZ: So the Franklin Templeton --

8          MR. SCHIEREN: George Schieren, Gibson Dunn. There is

9  also the Alliance parent derivative case that is still alive.

10         JUDGE MOTZ: And what am I supposed to be doing with

11 that one?

12         MR. SCHIEREN: That's in the final stages of

13 resolution.

14         JUDGE MOTZ: Okay. Thank you. So what I have to pay

15 attention to right now is Franklin Templeton Motion For Partial

16 Summary Judgment.

17         MR. ISBISTER: Yes, Your Honor. Okay. Mechanically,

18 to close the proceedings and the open issues. Plaintiffs'

19 counsel will go home and, with respect to the 15 settlements that

20 you have approved, we'll prepare orders that fill in the blanks

21 consistent with their applications and your approval. Assuming

22 that there are no objections tomorrow that would change those

23 decisions, by the close of business tomorrow new orders will be

24 e-filed so that Your Honors can electronically approve those. If

25 there are problems, let us know and we will address them.

1          Mr. Perry.

2          MR. PERRY:  Your Honors, Mr. Paine and Mr. Aaron

3     alluded to this, but most of the defense lawyers took our own

4     advice and stayed in our seats today.  I did not want the Court

5     to think that we were not as a group very appreciative of the

6     time and attention the Court has given us.  We have been here

7     many times.  I think I was the first defense lawyer to talk at

8     that April, 2004 hearing, so I'll take the opportunity to be the

9     last one today.

10         Some of us will be back probably on a few clean-up

11    matters but I don't think we'll be all together again.

12         We are very, very grateful to the Court for the

13    attention you've given us over all these years.  Thank you.

14         MR. ISBISTER:  Your Honors, again, a final note of both

15    reflection and thanks, and in particular thanks to the many

16    unseen people who labored very hard in the background on these

17    cases.

18         You know, when you cut a tree, you can see the passage

19    of time and the rings on the trunk or the tree.  And when I was

20    going through my files to do my affidavit in support of our

21    petition, I saw the passage of time in names and changes of

22    names.  Phillip Peisch, Julianne Johnston, Paul Pineau, Salleela

23    Sallahuddin, Sean Tonolli, Brett Tobin, Mushtaq Gunja, Jessica

24    Bodger, and of course Michael Wagner.  To those that don't know

25    these people, these are the judges' law clerks, some of them,

1    because I don't know all their names, who have been working on

2    these cases over these many years.  I had the privilege of

3    working with every one of them and can vouch that they are all

4    extraordinarily bright young lawyers and delightful people.  And

5    I thank you for giving us the opportunity, me in particular, the

6    opportunity to work with them.

7          You know, Judge Legg, when he would preside over the

8    Court's ceremony swearing in the law clerks in the summer, always

9    commented on the great public service that this court's law

10   clerks perform.  I agree and I thank them all for their service

11   and hard work on these cases.

12         JUDGE MOTZ:  If I could just, and you may be doing it,

13   if could I add, because you all wouldn't know, but the people in

14   our Clerk's Office, particularly Claudia Gibson.

15         MR. ISBISTER:  That's next.  I want to call out, you

16   know, the courthouse family and thank every one of them, for

17   welcoming and assisting all the lawyers from all around the

18   country for all the work that they did.  They helped us file, as

19   I said, over 7300 papers.

20         In the early days of this case, were also the early

21   days of the uniform use of the CM/ECF, and surely we all taxed

22   Ms. Gibson and all the people in her office, as well as the

23   people that have to deal with the papers, particularly people,

24   say, in your office.  I remember those days when we were filing

25   three sets of omnibus motions, individual motions by individual

1    defendants and motions in separate tracks, as well as oppositions

2    and replies.  Truly a tremendous amount of paper.

3           Our thanks, also, to people like Ms. Arrington, the

4    courtroom clerks, Pete Thompson, and the technical people for

5    enabling us to practice law from the privacy of their own office

6    while only a limited number of people had to be here.

7           Finally, I would like to make a special shout-out and

8    remembrance in the record for the late Fran Kessler.  Just a

9    truly wonderful person who made sure that hearings with an

10   incredible number of lawyers could happen and could happen

11   smoothly.

12          Your Honor, this truly was a very large enterprise.  We

13   are very pleased that we were able to be a part of it.  And thank

14   you, again, for your help in bringing it to a conclusion.

15          Thank you.

16          JUDGE MOTZ:  Well, we said it, we've alluded to it

17   throughout, you all have been extraordinary.  We often tell law

18   clerks, law clerk applicants, that one of the things that we've

19   been lucky enough over the past years to have had MDL's, we

20   mention this MDL particularly, we realize the stakes are so high,

21   the issues are difficult, but we really get to see the best

22   lawyers in the country.  And it makes a big difference.

23          You get people in a personal injury case quarreling

24   about who knows what.  And then you get a case here where you all

25   are professional, you're aggressive.  It's not like when we

1    appoint lead counsel, we know clients look for, defendants look

2    for good lawyers, so we don't have to worry about that.  But one

3    of the things I think we said early is we wanted people as lead

4    counsel in these cases who were aggressive because they had to

5    represent their clients well, but also were professional and

6    constructive.  And we certainly got that in this case and we're

7    very appreciative.

8            JUDGE BLAKE:  I obviously echo what Judge Motz has

9    said, and picking up in particular and appreciating the fact that

10   Mr. Perry's here.  It takes two, as you say.  You need good

11   professional representation on both sides of the aisle.  And

12   we've been focusing maybe a little bit on plaintiffs' counsel

13   because you're here and asking for approval and asking for fees.

14   But this could not have happened over the years without the very

15   professional, dedicated hard work of defense counsel as well.

16           We appreciate all of that, as well as our courthouse

17   family, all of them, including our wonderful court reporter.  And

18   thank you all very much for bringing almost all of this to a

19   good, successful, reasonable conclusion.

20           JUDGE MOTZ:  Stand adjourned.

21           (Conclusion of Proceedings at 1:23 p.m.)

22

23

24

25

1                       REPORTER'S CERTIFICATE

2

3           I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of In Re: Mutual

5    Funds Investment Litigation, Case Number(s) MDL 1586, on October

6    21, 2010.

7           I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10          In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2010.

12

13

14

15                            _____

                              Mary M. Zajac,
16                            Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

**$1,042,076.40** [1] - 47:24
**$1,050,000** [3] - 47:24, 78:21, 103:2
**$1,557,000** [1] - 51:8
**$1,572,390.28** [1] - 73:3
**$11,490,000** [1] - 6:20
**$13,966,000** [1] - 40:3
**$14,000** [1] - 71:12
**$150,000** [1] - 67:6
**$1500** [2] - 101:25
**$16,413.60** [1] - 48:6
**$1600** [2] - 73:4
**$170,500** [1] - 71:21
**$210,000** [1] - 71:23
**$233,250** [1] - 54:16
**$24,000** [1] - 73:7
**$240,000** [1] - 101:19
**$3,632,600** [1] - 33:18
**$31,538,600** [1] - 25:15
**$312,000** [1] - 80:17
**$4,828,800** [1] - 100:15
**$450,000** [1] - 71:21
**$471,000** [1] - 106:18
**$471,152** [1] - 106:9
**$4900** [1] - 73:1
**$500** [1] - 71:17
**$500,000** [2] - 54:2, 54:12
**$520,000** [1] - 68:21
**$566,000** [1] - 105:18
**$621,133.06** [1] - 69:9
**$670,000** [1] - 85:6
**$74,586,650** [1] - 86:16
**$75,042,250** [1] - 29:6
**$850,000** [2] - 41:17, 42:3
**$950,000** [1] - 100:17

**'**

**'98** [1] - 78:25

**0**

**0.10** [2] - 106:8, 106:13
**0.35** [1] - 46:9
**0.42** [1] - 17:7
**0.72** [1] - 27:15
**08%** [1] - 69:1

**1**

**1-800** [1] - 12:25
**1.2** [1] - 79:25

**1.25** [1] - 30:3
**1.25%** [5] - 18:7, 38:9, 45:22, 47:5, 98:3
**1.3** [3] - 43:1, 110:10, 110:21
**1.45** [1] - 103:2
**1.5** [1] - 109:10
**1.67** [1] - 30:7
**1.824** [3] - 50:5, 50:6, 54:3
**1.84** [1] - 50:6
**10** [2] - 59:21, 73:12
**10%** [1] - 106:12
**10(b** [1] - 41:24
**10,000** [2] - 68:24, 79:24
**100** [1] - 86:19
**101** [1] - 2:21
**105,000** [1] - 71:22
**108,000** [1] - 29:18
**10:04** [1] - 3:1
**118,000** [1] - 31:7
**12** [1] - 10:24, 59:21
**12.8** [1] - 40:25
**13** [3] - 59:4, 78:8, 96:25
**14** [2] - 8:16, 40:2
**14,000** [1] - 33:20
**14th** [3] - 48:2, 110:19, 112:18
**15** [2] - 101:5, 115:19
**15%** [3] - 16:23, 27:8, 30:3
**15,000** [1] - 9:9
**150** [2] - 86:19, 88:23
**150,000** [1] - 9:7
**1586** [2] - 1:7, 120:5
**16** [6] - 4:12, 10:9, 24:3, 35:1, 65:7, 96:24
**16%** [2] - 80:7, 80:8
**18** [1] - 3:19
**18%** [1] - 80:13
**180,000** [1] - 14:11
**185** [2] - 104:18, 105:1
**19** [2] - 87:4, 90:23
**19,500** [1] - 27:1
**1998** [1] - 87:6
**19th** [1] - 91:19
**1:23** [1] - 119:21
**1:30** [2] - 99:17, 112:10

**2**

**2** [4] - 89:8, 94:25, 95:3
**2,500,000** [1] - 71:18
**2,604,700** [1] - 67:5
**2.1** [1] - 90:19
**2.15** [2] - 9:2, 9:15
**2.19** [1] - 29:7

**2.6** [1] - 67:5
**2.83** [1] - 102:25
**2.91** [1] - 103:4
**20** [2] - 6:17, 60:16
**20%** [18] - 34:10, 36:6, 38:8, 38:15, 38:17, 59:3, 59:7, 68:20, 85:12, 94:10, 94:11, 96:1, 96:7, 96:8, 96:13, 98:1, 101:19, 105:17
**20(a** [1] - 41:24
**20,455,400** [1] - 6:17
**200** [2] - 33:24, 34:24
**200,000** [6] - 33:24, 35:20, 36:23, 110:13, 110:15, 110:16
**2002** [1] - 46:17
**2003** [2] - 79:1, 87:7
**2004** [2] - 3:6, 116:8
**2009** [2] - 78:9, 78:13
**2010** [3] - 1:7, 120:6, 120:11
**2011** [1] - 110:19
**21** [5] - 1:7, 9:12, 76:12, 80:4, 120:6
**21201** [1] - 2:22
**21st** [1] - 71:9
**22** [1] - 3:25, 111:9
**225** [1] - 88:25
**23** [1] - 71:4
**25** [1] - 7:14
**250** [1] - 86:18
**2500** [1] - 35:19
**27** [2] - 4:9, 64:10
**27,000** [1] - 91:20
**28%** [4] - 45:20, 45:23, 46:9, 60:16
**2nd** [1] - 3:6

**3**

**3** [1] - 96:24
**3.3** [1] - 96:2
**3.8** [1] - 68:22
**30** [2] - 90:1, 103:4
**30%** [1] - 54:14
**30,000** [1] - 68:10
**300** [2] - 4:13, 50:24
**300,000** [1] - 103:24
**325,000** [1] - 103:1
**33%** [5] - 89:2, 89:11, 92:16, 94:17, 94:20
**35,375** [1] - 106:2
**350** [1] - 50:19
**3502** [1] - 31:4
**375** [2] - 76:5, 88:15
**38** [1] - 38:8

**4**

**4,000** [5] - 50:7, 50:10, 50:22, 52:11, 101:4
**400,000** [1] - 34:1
**401(k** [1] - 108:16
**43** [1] - 101:18
**45,000** [3] - 33:20, 91:11, 91:17
**48** [1] - 91:24

**5**

**5.4** [1] - 79:24
**5.6** [1] - 84:19
**5.73** [1] - 25:17
**50** [2] - 47:19, 73:11
**500,000** [1] - 100:24
**51,000** [2] - 9:18, 14:4
**5515** [1] - 2:21
**566** [1] - 105:25

**6**

**6.25** [1] - 79:3
**60** [8] - 76:17, 76:18, 76:19, 77:19, 77:22, 80:5, 81:1, 81:4
**600** [1] - 59:4
**62** [1] - 9:13
**63.4** [1] - 81:16

**7**

**7.2** [2] - 29:16, 29:17
**72** [1] - 49:18
**73%** [1] - 37:9
**73,000** [1] - 33:19
**7300** [2] - 3:23, 117:19
**75** [8] - 29:6, 88:13, 89:1, 89:6, 90:6, 94:21, 94:24, 96:1
**750,000** [2] - 77:24, 79:4
**78** [1] - 90:7
**7th** [1] - 4:7

**8**

**8** [1] - 94:25
**8%** [3] - 89:8, 95:1, 95:3
**80%** [4] - 34:2, 34:4, 34:9, 46:16
**800** [1] - 31:11
**89** [2] - 77:11, 78:11
**8th** [2] - 91:14, 101:3

**A**

**a.m** [1] - 3:1
**AARON** [1] - 102:7
**Aaron** [3] - 2:11, 102:7, 116:2
**ability** [3] - 8:3, 57:23, 97:5
**able** [25] - 6:1, 21:2, 21:18, 22:20, 26:17, 34:15, 34:21, 42:17, 58:1, 82:19, 86:24, 87:9, 88:19, 89:14, 89:15, 89:25, 91:4, 91:5, 91:6, 91:9, 100:17, 101:9, 106:20, 108:1, 118:13
**above-referenced** [1] - 111:18
**ABRAMSON** [1] - 39:23, 41:11, 41:15, 42:21, 43:17, 44:24, 45:16, 47:3, 47:18, 47:23, 48:5
**Abramson** [3] - 1:18, 39:22, 39:24
**absolutely** [5] - 10:20, 18:13, 32:20, 36:12, 83:19
**Absolutely** [1] - 70:18
**abundant** [3] - 26:13, 26:14, 26:22
**abuse** [1] - 47:16
**access** [3] - 75:23, 76:8, 91:18
**accessed** [1] - 91:11
**accident** [1] - 78:3
**accomplish** [2] - 62:12, 104:9
**accomplished** [1] - 61:11
**accordance** [1] - 70:19
**according** [2] - 36:16, 60:9
**account** [6] - 17:8, 27:15, 30:9, 57:22, 60:4, 96:13
**accounts** [5] - 75:24, 104:15, 104:18, 105:4
**accumulated** [1] - 6:18
**accurate** [1] - 120:9
**achieved** [2] - 77:3, 80:14
**acknowledge** [1] - 30:6
**acknowledged** [1] - 66:4
**Acocelli** [3] - 1:23, 102:15, 102:17
**ACOCELLI** [8] - 102:16, 103:22, 104:25, 106:5,

106:13, 106:16, 106:24, 107:8
   **acted** [1] - 11:7
   **action** [11] - 11:17, 11:20, 33:13, 58:8, 66:24, 80:19, 89:5, 89:6, 94:23, 97:6, 111:17
   **actions** [7] - 10:17, 11:9, 35:6, 45:9, 102:21, 104:7, 108:10
   **active** [2] - 67:12, 69:7
   **actively** [4] - 67:22, 68:2, 69:5, 69:19
   **activities** [1] - 61:17
   **actual** [2] - 60:4, 95:21
   **Adam** [2] - 2:2, 73:23
   **add** [9] - 19:25, 20:6, 26:16, 48:21, 55:6, 69:6, 89:6, 102:8, 117:13
   **added** [2] - 42:1, 72:1
   **adding** [1] - 41:18
   **addition** [16] - 32:8, 40:5, 40:16, 41:4, 45:21, 46:8, 47:23, 48:5, 52:22, 58:14, 67:5, 68:8, 84:22, 90:17, 91:19, 103:3
   **additional** [17] - 4:2, 6:20, 29:7, 43:23, 44:4, 50:3, 55:13, 58:13, 61:11, 61:13, 61:14, 61:15, 71:22, 86:21, 87:6, 89:24, 92:23
   **address** [10] - 10:14, 10:21, 17:25, 18:8, 42:4, 44:17, 57:25, 60:6, 88:5, 88:6, 89:3, 110:6, 113:16, 115:25
   **addressed** [7] - 58:19, 64:23, 68:16, 87:25, 93:15, 95:7, 108:20
   **addresses** [1] - 22:19
   **addressing** [3] - 14:1, 75:10, 88:3
   **adequacy** [5] - 7:1, 7:22, 26:5, 103:7, 108:18
   **adequate** [6] - 25:21, 67:21, 72:14, 72:22, 73:18, 108:2
   **adequately** [2] - 13:16, 58:19
   **adjourned** [1] - 119:20
   **adjunct** [1] - 45:2
   **administration** [4] - 17:10, 17:22, 65:8, 84:23
   **administrative** [10] - 3:3, 18:6, 23:11, 24:4, 60:25, 65:3, 65:11, 65:15, 86:1, 113:17
   **administrator** [12] - 9:21, 11:5, 12:1, 13:15,

15:17, 15:24, 42:9, 42:12, 43:25, 53:17, 58:5, 60:8
   **administrators** [2] - 11:7, 35:24
   **admitted** [1] - 61:24
   **ADR** [1] - 50:16
   **ads** [1] - 35:8
   **advice** [2] - 47:7, 116:4
   **advisement** [1] - 74:15
   **adviser** [3] - 81:17, 114:12, 114:14
   **advisers** [1] - 76:23
   **advisory** [1] - 67:9
   **affect** [1] - 4:7
   **affected** [4] - 38:5, 87:4, 87:10, 90:24
   **affecting** [1] - 80:11
   **affidavit** [2] - 60:8, 116:20
   **affidavits** [2] - 70:21, 107:4
   **affixed** [1] - 120:10
   **afraid** [1] - 97:17
   **afternoon** [10] - 66:20, 70:6, 73:23, 75:11, 81:8, 83:25, 86:9, 102:16, 107:14, 110:7
   **agenda** [1] - 5:6
   **agent** [1] - 105:6
   **aggressive** [2] - 118:25, 119:4
   **aggressively** [1] - 26:20
   **ago** [5] - 3:6, 31:2, 90:3, 98:17, 110:9
   **agree** [2] - 64:19, 117:10
   **agreed** [4] - 76:15, 79:8, 106:24, 112:20
   **agrees** [1] - 100:8
   **ahead** [7] - 28:20, 49:17, 50:2, 52:3, 52:5, 62:14, 100:11
   **air** [1] - 74:13
   **aisle** [1] - 119:11
   **alert** [1] - 74:1
   **Alger** [14] - 1:17, 2:10, 36:19, 97:3, 99:14, 99:18, 100:11, 100:13, 100:15, 100:16, 100:23, 102:5, 102:8
   **alive** [3] - 114:5, 114:6, 115:9
   **allegations** [1] - 49:23
   **alleged** [3] - 16:8, 49:14, 100:19
   **allegedly** [2] - 75:23, 87:10
   **Alliance** [24] - 1:17, 2:11, 36:19, 86:6, 86:10,

86:13, 86:18, 86:21, 87:3, 87:5, 88:1, 89:14, 89:22, 90:1, 90:22, 91:5, 91:22, 91:24, 92:6, 97:4, 97:16, 98:4, 115:9
   **Allianz** [4] - 1:24, 110:5, 110:11, 111:19
   **allocated** [3] - 80:25, 81:16, 103:4
   **allocation** [33] - 15:14, 19:8, 21:17, 22:18, 27:3, 27:23, 29:21, 30:17, 38:1, 38:4, 38:6, 43:4, 44:8, 51:17, 54:20, 56:10, 63:25, 72:3, 76:7, 81:14, 92:13, 93:22, 93:23, 93:25, 101:15, 104:21, 105:5, 105:13, 105:16, 107:16, 108:21, 110:25, 112:6
   **allocations** [2] - 51:15, 51:23
   **allow** [3] - 13:11, 33:6, 112:11
   **allows** [3] - 12:24, 13:12, 13:23
   **alluded** [4] - 98:15, 109:18, 116:3, 118:16
   **almost** [6] - 4:1, 18:15, 26:14, 82:13, 89:12, 119:18
   **alone** [4] - 9:2, 9:17, 14:3, 68:22
   **alternative** [1] - 69:5
   **altogether** [1] - 58:16
   **amended** [8] - 40:20, 41:18, 41:22, 49:13, 49:16, 49:23, 54:6, 55:10
   **America** [16] - 1:19, 33:20, 66:25, 71:19, 75:9, 75:21, 76:5, 76:16, 77:13, 77:21, 77:24, 79:9, 80:4, 102:24, 103:1, 108:16
   **America's** [1] - 54:9
   **American** [1] - 31:23
   **amiss** [1] - 92:8
   **amount** [29] - 6:19, 38:18, 40:3, 50:14, 50:15, 68:1, 69:14, 77:12, 78:2, 80:8, 80:14, 82:16, 84:16, 84:18, 84:24, 86:14, 86:16, 88:18, 88:19, 88:22, 90:2, 92:13, 94:13, 94:20, 102:25, 104:13, 105:18, 109:20, 118:2
   **amounted** [1] - 65:3
   **amounts** [11] - 6:16, 16:4, 17:6, 51:10, 51:22,

54:15, 68:14, 79:4, 79:6, 79:7, 79:14
   **amplify** [1] - 31:1
   **analyses** [4] - 51:15, 76:11, 76:22, 77:7, 77:8, 77:15, 77:21
   **analysis** [4] - 38:2, 42:16, 85:24, 104:24
   **ancient** [1] - 87:19
   **announcing** [1] - 62:8
   **answer** [6] - 18:11, 20:1, 20:14, 27:25, 54:25, 55:6
   **answered** [1] - 55:2
   **answers** [1] - 108:22
   **anticipate** [2] - 17:14, 49:2
   **apologize** [2] - 36:12, 84:1
   **appeal** [5] - 53:11, 53:12, 67:2, 114:8, 115:3
   **appeals** [2] - 4:4, 4:7
   **appear** [1] - 32:23
   **Appearances** [1] - 1:12
   **applicants** [1] - 118:18
   **application** [4] - 88:10, 110:24, 112:5, 112:10
   **applications** [1] - 115:21
   **applied** [2] - 5:2, 8:10
   **apply** [4] - 18:19, 26:25, 27:17, 59:19
   **appoint** [1] - 119:1
   **appointed** [5] - 16:20, 16:21, 45:10, 45:12, 108:15
   **appreciate** [16] - 4:24, 23:13, 31:14, 31:20, 32:5, 34:16, 34:22, 37:14, 47:17, 49:2, 52:6, 55:9, 55:15, 83:21, 99:12, 119:16
   **appreciated** [3] - 3:15, 31:15, 41:14
   **appreciating** [1] - 119:9
   **appreciative** [2] - 116:5, 119:7
   **apprised** [1] - 28:7
   **approach** [4] - 11:3, 11:13, 14:22, 85:23
   **approached** [2] - 12:5, 86:3
   **approaches** [1] - 36:3
   **appropriate** [10] - 5:5, 10:21, 15:1, 23:22, 30:11, 42:22, 56:20, 88:5, 102:1, 109:8
   **appropriately** [3] - 23:15, 38:3, 85:15
   **approval** [26] - 4:11,

6:2, 8:18, 15:15, 22:8, 22:9, 23:16, 24:9, 40:1, 49:9, 49:10, 52:19, 56:3, 56:16, 56:20, 68:20, 68:23, 70:19, 73:17, 83:15, 89:17, 100:9, 107:15, 115:21, 119:13
   **approvals** [1] - 64:23
   **approve** [12] - 19:7, 19:13, 20:2, 20:10, 20:16, 28:13, 32:2, 54:24, 73:21, 74:8, 75:6, 84:3, 84:6, 85:19, 85:22, 93:22, 98:13, 102:12, 107:7, 110:1, 110:4, 115:24
   **approved** [16] - 6:5, 16:23, 27:24, 30:18, 67:18, 67:25, 72:13, 72:22, 73:18, 73:19, 79:11, 85:11, 93:25, 94:4, 113:24, 115:20
   **approving** [1] - 64:23
   **April** [2] - 3:6, 116:8
   **arduous** [1] - 21:3
   **area** [8] - 7:15, 11:4, 11:6, 11:20, 16:9, 53:23, 63:16, 69:13
   **argued** [2] - 76:12, 77:17, 77:18
   **argues** [1] - 14:18
   **arguing** [2] - 4:6, 77:16
   **argument** [5] - 14:21, 40:15, 40:16, 44:17, 96:21
   **arguments** [4] - 44:19, 64:15, 75:15, 93:21
   **arm's** [1] - 79:5
   **Arps** [1] - 75:3
   **arrange** [2] - 100:4, 100:5
   **arranged** [2] - 67:25
   **arrangements** [2] - 41:19, 64:4
   **Arrington** [1] - 118:3
   **art** [1] - 77:15
   **article** [1] - 53:21
   **aside** [3] - 85:5, 88:23, 94:17
   **aspect** [4] - 27:10, 89:18, 111:1, 111:3
   **aspects** [2] - 4:21, 6:15
   **assigned** [1] - 113:7
   **assist** [1] - 13:19
   **assistance** [1] - 105:21
   **Assistant** [1] - 25:12
   **assisted** [2] - 34:12, 69:8
   **assisting** [1] - 117:17
   **associate** [1] - 54:8

associated [1] - 8:5
Associates [3] - 53:17, 100:18, 100:20
assume [1] - 19:18
assuming [2] - 113:23, 115:21
attach [1] - 13:10
attempted [3] - 69:16, 104:9, 107:22
attempting [1] - 105:14
attempts [1] - 47:16
attended [1] - 47:20
attention [2] - 115:15, 116:6, 116:13
attitude [1] - 66:9
Attorney [11] - 6:21, 25:9, 25:12, 25:18, 26:3, 27:12, 29:8, 67:6, 71:23, 73:4, 103:5
attorney [2] - 47:20, 69:17
attorney's [7] - 28:14, 51:18, 64:18, 66:10, 68:18, 79:3, 105:17
attorneys [2] - 102:3, 104:8
attorneys' [1] - 47:12
authorities [1] - 8:11
Authority [1] - 70:9
authorized [1] - 15:18
automatically [1] - 50:15
available [6] - 12:18, 36:14, 57:1, 84:16, 99:22, 99:23
average [1] - 46:11
award [4] - 28:2, 98:1, 111:1, 112:5
awarded [2] - 17:3, 77:11
aware [9] - 6:13, 7:23, 26:15, 30:4, 43:7, 51:21, 63:23, 98:22, 113:13

**B**

background [2] - 29:10, 116:16
balance [4] - 14:15, 15:1, 34:19, 109:11
balances [1] - 57:17
Ball [1] - 70:14
Baltimore [7] - 1:8, 2:22, 3:8, 31:13, 53:21, 53:23, 56:18
Bank [24] - 33:19, 39:21, 43:5, 43:8, 43:19, 46:15, 54:9, 66:25, 71:19, 75:20, 76:5,

76:16, 76:17, 76:19, 77:13, 77:21, 77:23, 78:5, 78:25, 79:8, 80:4, 102:24, 103:1, 108:15
banner [1] - 35:8
Barroway [4] - 33:7, 33:11, 86:7, 86:10
Bartel [2] - 104:4
based [2] - 7:9, 8:10, 11:4, 14:19, 26:1, 30:14, 38:4, 38:11, 38:12, 42:14, 44:1, 44:8, 46:8, 53:4, 53:15, 56:18, 56:19, 58:13, 59:8, 72:9, 73:15, 84:25, 90:15, 94:9, 102:1, 108:9, 112:13
basic [1] - 12:13, 13:22, 62:9
basis [2] - 13:10, 15:16, 51:5, 78:20, 108:18
bath [1] - 69:22
batting [1] - 66:18
Baxter [8] - 1:15, 6:3, 12:9, 14:10, 24:7, 24:8, 27:2, 29:1
Bay [1] - 69:13
Bear [3] - 33:20, 102:24, 103:2
bear [1] - 77:16
Bechtold [19] - 2:4, 18:17, 44:13, 44:15, 44:17, 58:21, 58:24, 59:1, 59:12, 61:7, 64:12, 64:17, 65:24, 72:16, 78:6, 93:13, 95:12, 108:7, 112:24
BECHTOLD [12] - 59:14, 59:18, 59:23, 60:1, 60:13, 61:8, 61:15, 62:6, 62:22, 63:6, 63:11, 63:18
Bechtold's [4] - 27:17, 58:23, 65:1, 85:9
becomes [1] - 16:3
beforehand [1] - 54:22
beginning [8] - 28:8, 35:22, 61:13, 64:20, 64:21, 82:14, 98:16
Behalf [3] - 1:13, 2:3, 2:5
behalf [20] - 4:16, 18:18, 20:5, 21:10, 22:25, 33:11, 39:24, 49:5, 49:8, 55:24, 67:16, 70:7, 81:9, 102:7, 102:20, 103:1, 103:2, 114:13
Beige [1] - 54:8
belabor [3] - 29:11,

32:23, 33:16
below [1] - 17:2
benefit [7] - 11:22, 15:9, 16:11, 16:13, 29:24, 48:17, 78:15, 80:3, 80:4, 80:8, 85:24
benefited [1] - 21:11
benefits [3] - 50:3, 51:25, 80:15
Bennett [1] - 79:11
Berger [3] - 5:23, 39:22, 39:24
Bernstein [4] - 5:23, 6:1, 49:4, 86:6
best [6] - 24:20, 37:7, 39:16, 65:21, 98:25, 118:21
better [2] - 30:23, 63:1
between [7] - 21:6, 48:1, 49:19, 58:24, 76:5, 80:4, 102:23
beyond [2] - 49:14, 49:24, 63:24
Bien [1] - 17:20
Bien-Willner [1] - 17:20
big [3] - 37:15, 93:2, 118:22
bill [1] - 30:25
bit [8] - 21:25, 23:3, 51:20, 52:19, 80:16, 90:12, 119:12
BLAKE [66] - 10:10, 16:10, 16:15, 17:14, 22:6, 23:14, 23:21, 24:6, 33:3, 33:9, 34:16, 35:7, 36:7, 36:21, 37:17, 37:20, 37:22, 38:16, 38:22, 38:25, 39:14, 39:19, 41:9, 41:13, 42:20, 43:12, 44:22, 45:15, 46:25, 47:10, 47:22, 48:4, 48:10, 48:22, 49:1, 50:22, 53:8, 55:2, 55:8, 55:15, 55:21, 55:25, 57:7, 57:11, 58:18, 59:6, 59:10, 59:17, 59:22, 59:24, 60:5, 60:12, 61:5, 61:9, 62:4, 62:21, 63:3, 63:10, 63:17, 63:21, 64:6, 64:16, 65:19, 84:5, 113:10, 119:8
Blake [12] - 1:10, 5:25, 19:11, 33:10, 39:4, 66:12, 84:2, 97:3, 98:21, 100:8, 109:18, 113:7
Blake's [1] - 33:5
blank [1] - 39:6
blanks [1] - 115:20
board [1] - 79:1

Bodger [1] - 116:24
BofA [6] - 51:8, 52:12, 54:17, 76:19, 80:7, 81:2
BofA's [1] - 76:10
Boston [1] - 108:16
bought [1] - 52:12
box [2] - 24:23, 109:6
break [3] - 55:18, 99:13, 99:14
Brett [1] - 116:23
bridge [1] - 80:4
brief [4] - 48:14, 68:16, 100:13, 108:14
Brief [1] - 55:20
briefed [4] - 22:7, 26:12, 54:6, 103:12
briefing [5] - 40:14, 40:15, 46:6, 46:7, 114:8
briefings [1] - 40:23
briefly [3] - 82:10, 109:1, 111:15
bright [1] - 117:4
bring [2] - 56:20, 65:9
bringing [3] - 114:13, 118:14, 119:18
brings [1] - 110:3
broadly [1] - 14:9
brokerages [1] - 57:25
brokers [3] - 31:5, 41:18, 41:25
brought [4] - 4:25, 56:4, 77:15, 99:9
building [1] - 28:18
bulk [2] - 9:21, 40:24
bunch [1] - 53:18
burden [2] - 20:7, 105:14
burdens [1] - 13:22
business [3] - 56:7, 57:3, 115:23

**C**

calculated [1] - 88:14
calculation [4] - 36:16, 42:11, 42:13, 90:16
calculations [2] - 42:15, 105:9
California [1] - 66:19
Canary [18] - 6:22, 25:19, 29:9, 33:20, 51:8, 52:12, 54:17, 64:2, 66:25, 71:21, 71:25, 78:18, 78:25, 80:13, 90:20, 102:24, 103:3, 103:5
Canary's [1] - 54:10
Canary/BofA [2] - 52:24, 54:14

car [1] - 78:3
careful [1] - 47:13
carefully [1] - 61:10
Carolina [1] - 83:2
carried [1] - 46:18
carve [1] - 83:7
carve-out [1] - 83:7
Case [1] - 120:5
case [188] - 6:12, 6:12, 7:3, 7:11, 7:21, 7:23, 8:23, 8:25, 9:24, 10:3, 13:8, 15:1, 16:18, 20:17, 25:10, 25:21, 26:9, 26:10, 27:10, 30:11, 30:13, 33:14, 33:16, 33:18, 34:2, 37:6, 37:8, 37:15, 38:5, 38:11, 38:12, 38:15, 39:11, 40:11, 40:19, 42:6, 42:8, 42:17, 42:24, 44:25, 45:18, 45:23, 46:4, 46:13, 47:5, 47:9, 49:10, 49:11, 52:20, 56:4, 56:5, 56:8, 56:9, 56:10, 56:15, 60:19, 61:4, 61:5, 62:5, 63:23, 66:7, 66:8, 66:14, 67:2, 67:8, 67:12, 67:15, 67:19, 67:21, 67:23, 68:19, 69:3, 69:12, 69:15, 69:19, 70:8, 70:9, 70:14, 70:15, 70:16, 71:4, 71:13, 73:5, 73:9, 73:11, 73:14, 73:17, 74:13, 75:13, 75:20, 76:4, 76:25, 77:25, 79:3, 79:12, 79:18, 79:19, 79:25, 80:15, 81:23, 81:25, 82:7, 82:11, 83:19, 84:17, 84:18, 84:20, 85:4, 85:7, 85:13, 86:13, 86:17, 86:20, 88:16, 88:20, 89:10, 89:18, 92:17, 93:2, 93:5, 93:6, 93:7, 93:9, 93:10, 94:6, 94:7, 94:21, 95:9, 95:12, 95:22, 95:23, 96:6, 96:20, 96:22, 97:20, 98:4, 98:22, 100:10, 101:2, 101:20, 101:22, 101:23, 102:2, 102:9, 103:19, 104:1, 104:10, 104:24, 105:20, 106:18, 107:16, 107:20, 107:21, 107:24, 108:3, 108:10, 109:7, 109:9, 112:15, 113:2, 113:4, 113:7, 113:9, 113:11, 113:25, 114:2, 114:3, 114:4, 114:7, 114:13, 114:14, 114:19, 115:2,

115:6, 115:9, 117:20, 118:23, 118:24, 119:6
**cases** [84] - 3:17, 3:19, 3:24, 4:5, 4:18, 4:21, 7:19, 20:15, 23:2, 26:15, 37:12, 40:4, 40:11, 40:12, 40:13, 40:19, 41:7, 45:25, 46:20, 47:9, 56:14, 59:16, 59:20, 60:18, 60:20, 61:24, 62:2, 62:23, 63:2, 63:20, 65:25, 66:3, 67:13, 70:17, 75:21, 79:19, 79:20, 81:10, 82:11, 82:14, 82:16, 86:16, 89:7, 89:12, 94:8, 95:9, 95:14, 95:15, 95:17, 95:24, 96:4, 96:6, 96:9, 96:10, 96:15, 96:16, 96:17, 96:19, 96:22, 96:23, 96:24, 96:25, 97:6, 97:10, 97:12, 97:13, 100:22, 101:17, 103:11, 107:17, 107:21, 109:18, 109:20, 112:25, 114:19, 116:17, 117:2, 117:11, 119:4
**cash** [6] - 6:17, 15:18, 25:15, 40:3, 40:6, 67:4
**cashed** [2] - 15:20, 15:21
**catastrophic** [1] - 74:14
**Catherine** [1] - 1:10
**caught** [1] - 49:19
**ceremony** [1] - 117:8
**certain** [3] - 46:21, 89:6, 97:9
**certainly** [15] - 8:12, 17:2, 22:16, 32:14, 42:18, 44:24, 46:21, 64:19, 65:10, 65:12, 65:24, 69:21, 84:5, 85:25, 119:6
**CERTIFICATE** [1] - 120:1
**certification** [8] - 8:15, 26:8, 40:15, 46:6, 47:6, 78:24, 103:13, 110:25
**certify** [2] - 120:3, 120:7
**Chad** [3] - 1:15, 5:22, 6:1
**chair** [1] - 3:3
**challenge** [1] - 4:21
**challenged** [1] - 49:12
**challenging** [2] - 43:15, 57:19
**chance** [3] - 22:9, 59:1, 81:20
**change** [2] - 5:4, 115:22
**changed** [4] - 23:9,

56:7, 61:10, 69:3
**changes** [3] - 39:15, 65:16, 116:21
**changing** [1] - 50:2
**characterized** [1] - 3:12
**charity** [3] - 56:15, 56:17, 56:18
**Charles** [2] - 58:1, 58:2
**cheap** [1] - 106:23
**check** [11] - 32:6, 38:14, 38:18, 57:16, 59:9, 65:19, 68:22, 79:16, 94:12, 106:6, 106:7
**checks** [4] - 15:18, 15:19, 15:21, 36:10
**Chet** [2] - 1:24, 110:6
**Chicago** [5] - 6:8, 6:10, 16:24, 19:7, 29:4
**chief** [1] - 70:13
**Chief** [1] - 25:12
**Chimicles** [2] - 22:25, 114:25
**choice** [1] - 14:7
**Cirami** [1] - 71:2
**Circuit** [5] - 4:5, 53:11, 70:13, 114:8, 114:23
**circuit** [1] - 17:3
**circumstances** [7] - 5:4, 15:8, 17:1, 52:20, 61:2, 79:12, 98:12
**citizens** [1] - 84:13
**City** [8] - 6:8, 6:10, 16:24, 17:23, 19:7, 29:4, 60:8, 71:3
**claim** [41] - 9:16, 9:18, 10:18, 11:1, 11:18, 12:9, 12:11, 13:3, 14:4, 14:5, 14:11, 29:15, 31:2, 33:23, 34:4, 34:15, 34:22, 36:4, 42:7, 42:15, 50:13, 57:9, 57:15, 57:16, 57:23, 59:24, 60:11, 63:7, 68:10, 71:24, 72:4, 78:19, 84:25, 91:10, 91:13, 105:10, 108:5, 114:23
**claimant's** [1] - 15:18
**claimants** [2] - 36:11, 57:8
**claims** [66] - 6:7, 7:25, 9:16, 9:21, 9:22, 10:23, 10:25, 11:5, 12:1, 13:15, 14:18, 15:5, 15:6, 15:17, 15:19, 15:24, 17:9, 17:22, 24:10, 24:11, 25:22, 26:24, 27:1, 28:25, 29:2, 29:14, 29:18, 29:19, 35:19, 35:22, 35:24, 35:25, 36:4, 40:9, 41:23, 41:24,

41:25, 42:12, 43:25, 50:19, 50:20, 52:3, 53:17, 56:4, 57:5, 58:5, 60:8, 66:24, 66:25, 67:1, 72:8, 74:2, 74:3, 74:11, 88:8, 91:15, 91:20, 101:4, 103:25, 111:22, 111:25
**clarify** [1] - 63:22
**class** [146] - 4:10, 5:8, 5:23, 6:6, 6:7, 8:14, 8:25, 9:3, 9:9, 9:13, 9:16, 11:1, 11:9, 11:15, 11:16, 11:20, 11:24, 12:10, 12:14, 12:16, 12:25, 13:21, 13:23, 14:23, 15:22, 16:20, 17:12, 17:19, 17:24, 18:1, 18:3, 18:4, 21:19, 24:10, 26:8, 28:24, 28:25, 29:3, 29:16, 33:8, 33:13, 34:9, 35:4, 35:6, 36:25, 39:21, 39:24, 40:15, 42:11, 42:14, 43:7, 43:22, 44:2, 44:10, 44:16, 44:23, 44:24, 45:9, 45:18, 45:19, 46:6, 46:17, 47:6, 48:16, 48:20, 49:5, 51:3, 51:24, 52:2, 52:10, 56:4, 56:10, 56:12, 57:13, 61:1, 62:13, 62:15, 66:24, 68:7, 68:11, 68:20, 69:6, 69:10, 69:25, 70:5, 71:20, 72:14, 73:16, 74:3, 78:24, 81:12, 81:22, 82:20, 84:17, 85:10, 86:11, 87:5, 87:6, 87:9, 88:20, 89:2, 89:5, 90:8, 90:25, 91:1, 91:7, 92:11, 92:19, 94:22, 96:11, 97:6, 97:24, 101:2, 101:9, 101:11, 101:13, 102:20, 102:22, 103:13, 103:24, 104:3, 104:7, 105:8, 105:9, 105:15, 108:10, 109:12, 110:11, 110:18, 110:23, 110:25, 111:2, 111:9, 111:10, 111:17, 111:20, 112:3, 114:4, 115:3
**classes** [1] - 32:24
**classify** [1] - 101:7
**Claudia** [1] - 117:14
**clean** [2] - 72:25, 116:10
**clean-up** [1] - 116:10
**clear** [12] - 15:7, 18:24, 23:1, 23:3, 24:12, 36:7, 39:4, 43:18, 44:6, 61:12,

64:16, 65:5
**cleared** [1] - 39:16
**clearly** [1] - 15:2
**clerk** [1] - 118:18
**Clerk's** [1] - 117:14
**clerks** [2] - 116:25, 117:8, 117:10, 118:4, 118:18
**client** [9] - 18:18, 18:20, 31:14, 44:15, 59:22, 62:5, 67:8, 70:8, 108:12
**client's** [1] - 58:25
**clients** [9] - 18:24, 28:2, 28:6, 32:24, 67:9, 67:17, 69:24, 119:1, 119:5
**Cliff** [1] - 55:23
**Clifford** [3] - 1:20, 56:1, 83:25
**close** [2] - 115:18, 115:23
**closer** [1] - 9:22
**closing** [1] - 113:17
**CM/ECF** [1] - 117:21
**COBETTO** [1] - 55:5
**Cobetto** [2] - 2:9, 55:5
**code** [1] - 91:8
**colleague** [2] - 17:19, 28:13
**colleagues** [3] - 4:16, 81:22, 113:1
**collected** [1] - 63:25
**collective** [2] - 16:22, 30:2
**collectively** [3] - 27:9, 67:4, 67:10
**Columbia** [8] - 1:20, 21:25, 63:2, 63:4, 107:13, 107:15, 108:4, 108:6
**combined** [1] - 82:12
**comfort** [1] - 83:15
**coming** [12] - 29:18, 54:2, 64:22, 66:8, 72:25, 79:20, 79:21, 80:8, 84:14, 97:23, 100:9, 114:2
**comment** [2] - 44:12, 53:25
**commentary** [1] - 73:25
**commented** [1] - 117:9
**comments** [5] - 5:18, 26:21, 62:7, 72:17, 72:18
**committees** [1] - 46:22
**common** [5] - 11:20, 35:14, 50:11, 67:24, 85:23
**communication** [1] - 99:4
**Companies** [1] - 111:14
**companies** [3] - 61:24,

63:12
**company** [2] - 13:18, 114:20
**Company** [1] - 104:19
**compensated** [4] - 49:20, 50:9, 52:8, 109:8
**compensating** [1] - 96:10
**Compensation** [4] - 6:9, 24:14, 25:9, 29:4
**compensation** [1] - 55:12
**competing** [2] - 14:15, 14:25
**complaint** [9] - 37:1, 41:18, 41:20, 41:22, 49:16, 49:23, 55:11, 92:13, 93:2
**complaints** [4] - 40:20, 49:13, 49:24, 54:6
**complete** [3] - 13:12, 40:13, 120:9
**complex** [2] - 32:18, 104:10
**complexities** [1] - 66:16
**complexity** [5] - 30:13, 38:13, 82:14
**complicated** [3] - 8:12, 8:23, 32:25
**complied** [1] - 31:10
**complies** [1] - 71:4
**component** [1] - 85:6
**components** [1] - 107:17
**comprehensive** [2] - 68:6, 104:1
**concept** [1] - 29:23
**concepts** [1] - 27:6
**conceptual** [4] - 11:21, 12:4, 20:21, 20:25
**concern** [3] - 15:3, 32:12, 34:17
**concerned** [10] - 7:2, 7:22, 8:24, 26:5, 28:18, 64:20, 64:21, 84:22, 93:19, 104:7
**concerns** [11] - 8:16, 22:14, 22:19, 34:11, 37:14, 57:23, 64:23, 64:24, 66:14, 91:3, 93:17
**conclusion** [6] - 23:17, 24:3, 65:10, 118:14, 119:19, 119:21
**conclusions** [1] - 64:22
**conduct** [2] - 15:24, 61:25
**conference** [3] - 74:23, 108:20, 112:16
**conferred** [1] - 11:7
**confidence** [1] - 81:2

**confirm** [1] - 20:9
**confirmation** [1] - 13:23
**confirms** [1] - 71:3
**confronted** [1] - 98:24
**Congress** [1] - 7:19
**conjunction** [3] - 51:12, 75:12, 102:2
**connection** [8] - 15:14, 25:19, 27:2, 29:19, 32:25, 38:18, 106:6, 111:22
**Conner** [2] - 2:8, 48:12
**CONNER** [1] - 48:12
**considerable** [2] - 58:8, 58:9
**considered** [2] - 48:19, 48:20
**considering** [6] - 9:19, 14:9, 56:17, 103:16, 106:5, 113:5
**consistent** [2] - 72:5, 115:21
**consisting** [1] - 90:23
**constituencies** [1] - 79:22
**constitute** [1] - 120:7
**constructive** [3] - 99:7, 109:21, 119:6
**consultants** [1] - 88:14
**consultation** [3] - 11:5, 11:6, 42:8
**consulting** [1] - 105:6
**contact** [1] - 44:4
**contacted** [3] - 41:9, 57:24, 108:15
**contemporary** [1] - 21:13
**contentious** [2] - 7:4, 8:6
**contested** [2] - 73:11, 103:13
**context** [5] - 8:25, 9:2, 9:14, 9:23, 78:24
**contingent** [5] - 60:15, 61:22, 96:15, 96:23, 112:24
**continue** [5] - 17:9, 40:9, 55:22, 109:13, 113:3
**continued** [1] - 89:20
**continues** [1] - 32:11
**contributed** [2] - 78:14, 103:1
**contribution** [1] - 100:20
**control** [2] - 41:25, 57:16
**conversation** [1] - 104:5
**conversations** [1] -

34:17
**convertible** [1] - 75:17
**convince** [1] - 89:16
**cooperated** [1] - 71:25
**cooperation** [1] - 40:7
**cooperative** [1] - 81:21
**coordinated** [1] - 3:18
**coordination** [1] - 65:9
**copies** [1] - 39:7
**copy** [1] - 44:2
**corporate** [1] - 80:15
**corporation** [1] - 6:10
**correct** [12] - 18:13, 21:12, 28:5, 36:12, 39:17, 41:11, 43:17, 47:18, 57:10, 60:6, 74:5, 91:9
**correspondence** [1] - 53:8
**corresponds** [1] - 95:5
**cost** [10] - 15:24, 16:1, 16:3, 16:14, 42:22, 47:14, 69:14, 71:17, 71:19, 85:24
**costs** [4] - 69:9, 69:16, 84:23, 86:1
**Cotchett** [1] - 66:21
**Counsel** [1] - 1:14
**counsel** [72] - 2:15, 4:11, 4:13, 5:8, 5:9, 5:19, 5:24, 6:10, 7:7, 7:11, 7:14, 7:16, 11:6, 15:8, 16:6, 16:19, 16:20, 16:21, 17:8, 18:1, 18:6, 19:23, 22:7, 25:25, 26:17, 26:21, 27:5, 27:9, 29:24, 30:8, 30:20, 32:20, 33:7, 38:10, 38:21, 39:1, 45:5, 45:7, 47:7, 47:13, 48:11, 49:5, 51:14, 54:9, 54:10, 55:3, 59:11, 64:20, 65:2, 66:13, 68:21, 69:10, 82:12, 96:10, 96:11, 96:12, 97:2, 99:16, 100:4, 115:19, 119:1, 119:4, 119:12, 119:15
**counsel's** [2] - 19:25, 60:25
**countless** [1] - 54:7
**country** [5] - 3:14, 3:18, 35:11, 117:18, 118:22
**counts** [1] - 106:24
**couple** [4] - 51:1, 53:2, 58:11, 62:7, 65:16, 68:10, 69:23, 77:25, 84:20, 90:3, 103:21
**course** [9] - 8:17, 11:4, 11:25, 14:8, 14:20,

14:22, 21:12, 22:7, 26:8, 29:23, 71:25, 76:21, 78:5, 103:18, 104:5, 109:2, 113:18, 114:6, 116:24
**Court** [60] - 3:25, 4:6, 4:8, 4:11, 4:17, 5:14, 5:17, 6:13, 7:23, 8:12, 8:15, 9:12, 11:22, 18:19, 19:7, 20:14, 23:12, 23:13, 30:15, 33:6, 37:5, 39:6, 42:2, 42:4, 43:7, 43:10, 43:21, 44:16, 44:21, 46:1, 48:8, 53:4, 54:24, 65:3, 68:16, 72:11, 72:22, 74:1, 75:10, 77:5, 77:6, 77:25, 83:1, 87:23, 89:11, 91:3, 92:14, 93:22, 96:23, 97:25, 98:5, 111:8, 113:18, 114:16, 114:19, 114:22, 116:4, 116:6, 116:12, 120:16
**COURT** [1] - 1:1
**court** [14] - 4:22, 15:15, 16:20, 16:21, 32:24, 48:17, 56:16, 70:20, 97:11, 97:13, 97:17, 97:23, 114:3, 119:17
**court's** [1] - 117:9
**Court's** [7] - 8:18, 20:6, 22:19, 27:20, 29:13, 93:15, 117:8
**court-appointed** [2] - 16:20, 16:21
**courtesy** [2] - 24:19, 25:4
**Courthouse** [1] - 2:21
**courthouse** [4] - 4:23, 76:25, 100:2, 117:16, 119:16
**courtroom** [4] - 3:7, 5:13, 100:2, 118:4
**courts** [2] - 18:23, 96:16
**Courts** [1] - 6:7
**cover** [1] - 78:25
**coverage** [2] - 58:10, 58:13
**covered** [1] - 49:14
**covers** [1] - 56:3, 79:18, 84:17
**craft** [1] - 57:4
**cream** [1] - 66:9
**create** [1] - 91:6
**created** [1] - 90:2
**creative** [1] - 80:18
**creativity** [1] - 77:16
**credibly** [1] - 8:21
**credit** [1] - 92:5

**cross** [12] - 38:14, 38:18, 67:24, 68:22, 69:14, 71:19, 79:16, 81:24, 82:11, 106:6, 106:7, 109:24
**cross-check** [6] - 38:14, 38:18, 68:22, 79:16, 106:6, 106:7
**cross-track** [5] - 67:24, 71:19, 81:24, 82:11, 109:24
**crystal** [1] - 15:7
**current** [4] - 16:5, 16:10, 21:9, 72:9
**customized** [1] - 51:6
**cut** [1] - 116:18

# D

**damage** [1] - 51:15
**damaged** [2] - 36:17, 90:16
**damages** [31] - 8:6, 8:8, 8:9, 16:9, 26:7, 37:6, 37:7, 37:10, 38:4, 40:18, 57:1, 68:1, 76:12, 76:13, 77:16, 77:18, 80:25, 84:16, 86:21, 88:15, 88:25, 89:7, 89:11, 92:17, 94:17, 94:23, 95:1, 107:25
**data** [1] - 42:10
**date** [7] - 35:21, 36:3, 68:9, 71:10, 91:13, 110:21, 112:18
**Davis** [2] - 3:7, 77:1
**days** [4] - 112:18, 117:20, 117:21, 117:24
**de** [1] - 16:4
**deadline** [6] - 9:19, 9:22, 29:20, 48:18, 91:21, 101:3
**deal** [2] - 68:14, 117:23
**dealing** [9] - 46:23, 51:9, 51:14, 54:8, 56:21, 58:4, 67:25, 70:12, 109:24
**deals** [3] - 75:19, 83:16, 83:17
**dealt** [3] - 22:8, 78:6, 78:23
**December** [7] - 4:7, 9:20, 35:23, 50:21, 91:14, 101:3
**decide** [2] - 28:2, 115:5
**decided** [7] - 23:18, 49:21, 56:17, 104:10, 104:17, 105:3, 112:17
**decimals** [1] - 59:5

**decisions** [5] - 3:25, 4:2, 4:4, 68:2, 115:23
**declaration** [6] - 6:13, 25:13, 29:5, 45:6, 71:2
**dedicated** [1] - 119:15
**deeply** [1] - 6:11
**default** [1] - 109:15
**defendant** [3] - 29:24, 75:21, 88:17
**defendants** [51] - 6:22, 7:7, 7:12, 8:11, 12:24, 15:6, 15:10, 16:7, 25:19, 25:25, 27:5, 28:10, 40:7, 40:10, 40:25, 41:5, 41:17, 41:20, 46:14, 48:13, 55:6, 62:23, 67:1, 67:3, 71:22, 75:4, 76:10, 76:16, 77:14, 79:14, 80:9, 85:15, 86:18, 86:21, 88:17, 89:14, 89:16, 89:19, 89:20, 89:24, 89:25, 90:1, 90:20, 98:23, 102:8, 102:25, 103:3, 103:16, 109:24, 118:1, 119:1
**Defendants** [1] - 2:5
**defense** [9] - 3:10, 7:7, 11:6, 19:23, 23:25, 30:20, 116:3, 116:7, 119:15
**defenses** [2] - 8:1, 8:2
**Deferred** [4] - 6:9, 24:14, 25:9, 29:4
**definitely** [1] - 9:1
**delay** [3] - 26:14, 34:25, 99:10
**delightful** [1] - 117:4
**demanding** [1] - 11:16
**demonstrate** [1] - 106:11
**demonstrates** [2] - 79:17, 106:7
**denials** [1] - 66:15
**deposed** [2] - 67:15, 107:1
**depositions** [7] - 47:19, 47:20, 69:17, 69:18, 73:12, 101:23
**derivative** [48] - 6:6, 7:17, 16:21, 18:2, 20:5, 20:15, 22:25, 24:10, 27:9, 28:25, 33:12, 33:13, 38:21, 45:18, 45:19, 56:4, 56:8, 56:11, 57:5, 66:25, 67:1, 68:21, 69:10, 71:20, 73:24, 74:2, 79:18, 81:9, 81:13, 84:17, 85:4, 86:11, 90:10, 96:10, 96:11, 101:1, 102:21, 113:25,

114:3, 114:7, 114:10, 114:11, 114:13, 114:14, 114:23, 115:2, 115:6, 115:9

**Derivative** [2] - 1:16, 2:2

**derivatives** [3] - 18:4, 74:3, 75:7

**describe** - 18:16

**described** [3] - 60:14, 81:11, 107:3

**deserving** [1] - 98:1

**Design** [1] - 75:18

**desk** [3] - 23:13, 36:1, 113:6

**despite** [2] - 3:13, 18:20

**detail** [4] - 7:2, 27:12, 99:20, 103:9

**detailed** - 6:19, 6:23, 7:11, 11:11, 14:20, 14:23, 24:11, 25:16, 29:22, 103:7, 103:23

**details** [3] - 25:22, 27:19, 112:9

**Deutsche** [8] - 1:18, 2:7, 43:5, 43:8, 43:19, 46:15, 48:12, 48:18

**develop** [1] - 27:15

**developed** [2] - 76:22, 103:11

**developments** [2] - 74:14

**devoted** [1] - 64:1

**dice** - 92:15

**dicing** [1] - 92:16

**Dick** [1] - 64:2

**difference** [4] - 56:13, 76:19, 101:20, 118:2

**different** [16] - 3:20, 12:8, 12:19, 21:25, 23:3, 35:4, 35:11, 38:5, 50:11, 51:9, 66:11, 66:15, 80:22, 96:4

**differently** [1] - 5:4

**difficult** [13] - 4:19, 20:21, 20:25, 32:17, 32:18, 57:2, 95:9, 95:10, 95:14, 95:17, 99:6, 109:25, 118:21

**difficulties** [4] - 10:16, 21:2, 86:17, 88:16

**difficulty** [2] - 10:18, 82:15, 86:20

**digits** [1] - 89:8

**diligence** [1] - 4:24

**dilution** [6] - 16:8, 37:6, 56:25, 76:11, 79:9, 88:15

**diminishment** [1] - 79:15

**Dinsick** [1] - 92:12

**direct** [4] - 68:6, 70:23, 105:8, 110:21

**directly** [9] - 43:15, 51:2, 57:11, 57:21, 58:6, 82:9, 108:4, 110:11, 110:16

**disclose** [1] - 8:4

**discovered** [1] - 83:10

**discovery** [8] - 7:5, 25:24, 40:8, 40:14, 46:5, 67:14, 77:10

**discrepancies** [1] - 58:24

**discrepancy** [1] - 48:1

**discuss** [3] - 4:14, 58:22, 58:23

**discussed** [7] - 18:5, 22:19, 29:14, 68:15, 87:23, 90:9, 104:8

**discussion** [2] - 23:16, 24:3, 94:7

**Dismiss** [10] - 7:4, 25:23, 40:21, 40:22, 41:22, 49:17, 53:4, 54:7, 68:3

**dismissed** [4] - 41:23, 56:9, 70:10, 79:20

**dismissing** [1] - 41:7

**disposes** [1] - 112:21

**dispute** [1] - 5:2

**disputed** [1] - 49:25

**disputes** [1] - 8:7

**disputing** [2] - 61:16, 61:18

**distribute** [5] - 6:20, 25:17, 29:7, 38:2, 42:14

**distributed** [16] - 16:4, 16:6, 16:7, 27:6, 42:5, 51:10, 72:5, 78:20, 81:18, 82:6, 90:18, 90:21, 109:11, 109:12, 109:13, 109:15

**distributing** [3] - 67:6, 90:19, 103:3

**distribution** [20] - 15:15, 15:16, 15:18, 15:23, 15:25, 16:2, 23:2, 36:14, 44:5, 44:9, 82:7, 84:25, 85:6, 90:11, 90:21, 105:7, 105:8, 105:12, 107:22, 109:9

**distributions** [7] - 11:8, 17:17, 36:13, 42:22, 52:4, 81:11, 90:14

**DISTRICT** [2] - 1:1, 1:1

**district** [2] - 3:17, 79:11

**ditto** [1] - 65:14

**divided** [1] - 78:11

**DIVISION** [1] - 1:2

**docket** [2] - 11:24, 12:2

**document** [5] - 31:3, 40:8, 62:18, 62:25, 67:16

**Document** [1] - 31:3

**documentation** [22] - 12:18, 13:14, 34:6, 34:8, 34:10, 34:14, 42:7, 50:17, 59:20, 63:9, 64:18, 68:14, 91:4, 91:9, 91:18, 101:10, 101:23, 105:10, 105:15

**documents** [7] - 11:19, 62:11, 63:8, 69:18, 73:14, 104:1, 107:2

**dollar** [10] - 49:12, 49:13, 86:19, 88:13, 88:24, 89:1, 89:6, 92:13, 96:1, 103:5

**dollars** [29] - 4:13, 6:17, 29:6, 40:2, 40:25, 49:18, 50:6, 50:14, 50:18, 68:23, 71:17, 76:6, 76:12, 76:17, 76:18, 77:11, 77:19, 78:11, 81:4, 81:16, 82:13, 84:19, 86:19, 90:1, 90:5, 90:19, 103:1, 103:4, 109:10

**done** [24] - 13:25, 34:23, 38:19, 42:12, 42:18, 51:5, 51:12, 57:6, 57:24, 61:8, 61:14, 72:5, 77:6, 78:16, 82:17, 83:21, 89:4, 91:6, 94:22, 95:19, 99:17, 100:22, 112:10

**Donna** [1] - 101:25

**Dorf** [3] - 6:9, 7:20, 29:5

**doubt** [1] - 62:3

**down** [6] - 16:14, 20:16, 23:13, 39:14, 47:13, 69:16

**Dr** [2] - 69:11, 69:12

**draft** [1] - 41:10

**dramatically** [2] - 91:16, 98:10

**Dresdner** [3] - 1:24, 110:5, 110:11

**due** [1] - 47:5

**Dunn** [1] - 115:8

**duration** [1] - 38:13

**during** [4] - 12:22, 55:18, 77:17, 104:5

**duty** [2] - 8:3, 24:25

## E

**e-file** [1] - 65:17

**e-filed** [1] - 115:24

**e-filing** [1] - 65:21

**e-mails** [1] - 17:21

**earliest** [1] - 82:16

**early** [5] - 76:24, 95:8, 117:20, 119:3

**earned** [1] - 90:4

**ease** [1] - 31:9

**easier** [4] - 23:25, 39:12, 95:12, 113:5

**easiest** [2] - 23:24, 39:9

**easy** [5] - 8:21, 11:15, 31:5, 34:18, 34:21

**eat** [1] - 84:23

**eaten** [1] - 86:1

**echo** [1] - 119:8

**economically** [3] - 36:15, 85:2, 109:13

**educated** [1] - 25:6

**effect** [1] - 61:17

**effective** [5] - 15:24, 16:1, 16:3, 16:14, 42:23

**effectively** [2] - 81:18, 82:18

**efficacy** [1] - 31:9

**efficient** [6] - 22:14, 22:17, 27:19, 82:2, 85:3, 105:16

**efficiently** [1] - 82:18

**effort** [4] - 13:20, 49:21, 102:1, 110:1

**efforts** [3] - 13:17, 15:17, 15:21

**eight** [2] - 49:11, 49:13

**either** [9] - 14:7, 38:10, 53:2, 56:18, 58:5, 58:14, 65:17, 80:6, 115:3

**electronic** [2] - 4:3, 24:1

**electronically** [1] - 115:24

**eligible** [1] - 105:11

**eloquence** [1] - 23:8

**elsewhere** [3] - 14:24, 17:3, 27:5

**emceeing** [1] - 113:20

**Emerging** [1] - 105:7

**employees** [1] - 46:23

**Employees** [2] - 24:14, 25:8

**enabled** [1] - 75:23

**enabling** [1] - 118:5

**end** [10] - 14:19, 17:2, 31:7, 36:4, 45:24, 50:20, 52:13, 52:23, 69:24, 77:3

**endorse** [1] - 98:6

**enhancements** [1] - 49:22

**enjoyed** [2] - 31:16, 31:18

**enormous** [3] - 82:16, 105:20, 105:21

**entered** [1] - 70:20

**entering** [1] - 23:11

**enterprise** [2] - 3:13, 118:12

**entire** [2] - 17:15, 23:18, 105:18

**entirely** [3] - 30:11, 66:11, 85:1

**entitled** [4] - 44:10, 63:13, 65:12, 66:6

**entity** [3] - 41:21, 41:23

**equal** [1] - 68:21

**equals** [1] - 78:21

**equitable** [1] - 51:24

**equity** [2] - 32:10, 114:20

**equivalent** [1] - 105:2

**ERISA** [21] - 6:6, 7:16, 16:20, 18:3, 24:11, 27:10, 28:25, 29:1, 45:18, 56:5, 57:5, 79:18, 82:24, 83:8, 84:18, 86:11, 96:12, 101:2, 102:21, 107:17, 108:17

**error** [1] - 57:19

**escape** [1] - 62:1

**especially** [2] - 9:19, 105:19

**Esquire** [22] - 1:14, 1:15, 1:16, 1:17, 1:18, 1:19, 1:20, 1:21, 1:22, 1:23, 1:24, 2:2, 2:3, 2:4, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13

**essentially** [6] - 7:24, 21:15, 46:20, 50:11, 65:2, 115:4

**establish** [1] - 8:3

**established** [1] - 91:2

**establishing** [4] - 7:24, 8:6, 26:7

**eternal** [1] - 26:14

**evaluation** [1] - 7:13

**event** [1] - 106:15

**eventually** [1] - 84:23

**exactly** [5] - 7:18, 16:12, 70:2, 80:25, 104:25

**examiner** [1] - 72:6

**example** [6] - 11:23, 29:16, 31:2, 46:23, 47:21, 58:2

**examples** [1] - 12:20

**exceedingly** [1] - 80:1

**excellent** [4] - 47:7, 56:24, 84:12, 84:15

**Excelsior** [1] - 1:17, 33:5, 33:12, 33:19, 34:2, 39:1, 91:12, 97:2

**except** [1] - 102:8

**exceptional** [2] - 97:24, 97:25

**excess** [5] - 54:4, 77:17, 77:19, 77:24, 79:23

**exclude** [3] - 40:17, 92:2, 101:9

**Exclude** [1] - 103:14

**excluded** [4] - 92:3, 101:11, 101:13, 104:24

**exclusion** [6] - 9:13, 48:16, 48:19, 71:10, 71:11, 111:21

**exclusions** [9] - 36:24, 37:18, 78:8, 91:23, 91:24, 101:5, 104:12, 104:13

**excuse** [4] - 22:23, 40:21, 83:12, 100:11

**existed** [1] - 87:25

**expand** [3] - 87:3, 87:9, 88:20

**expanded** [2] - 49:24, 87:5

**expect** [1] - 29:20

**expenditure** [1] - 109:25

**expense** [18] - 16:17, 19:8, 27:7, 27:23, 30:1, 30:17, 43:3, 45:16, 51:22, 71:7, 71:8, 73:3, 73:19, 97:21, 106:9, 106:17, 107:11

**expense-wise** [1] - 51:22

**expenses** [18] - 16:22, 39:15, 45:7, 47:12, 47:24, 47:25, 51:18, 54:13, 60:24, 60:25, 72:23, 73:6, 79:4, 80:16, 93:2, 101:19, 106:19, 106:25

**experience** [7] - 7:13, 7:14, 9:20, 11:4, 11:6, 45:8

**experienced** [1] - 32:19

**expert** [11] - 16:9, 37:5, 40:14, 40:18, 46:5, 57:1, 67:14, 69:11, 73:12, 88:14, 106:19

**expert's** [2] - 36:16, 90:16

**experts** [17] - 38:2, 40:18, 49:15, 61:21, 76:21, 77:10, 77:15, 87:9, 93:3, 93:5, 93:7, 93:9, 93:10, 101:14, 103:14, 106:21

**expire** [1] - 35:22

**explained** [2] - 67:20,

78:13

**explaining** [1] - 77:6

**expressed** [1] - 93:17

**extensions** [1] - 99:5

**extensive** [4] - 7:10, 26:1, 45:8, 77:23

**extent** [8] - 8:7, 12:15, 12:25, 21:10, 36:9, 52:7, 93:17, 111:18

**extraordinarily** [5] - 7:6, 8:12, 8:23, 9:4, 117:4

**extraordinary** [4] - 89:11, 95:6, 99:4, 118:17

**extremely** [1] - 82:2

## F

**face** [1] - 80:19

**faced** [1] - 103:12

**fact** [42] - 7:5, 9:6, 9:17, 10:3, 11:11, 11:21, 14:16, 18:20, 25:24, 26:12, 29:15, 32:17, 38:14, 40:13, 41:9, 44:2, 46:5, 46:10, 53:1, 61:3, 61:12, 61:16, 62:24, 63:11, 63:25, 67:12, 73:12, 83:14, 86:17, 88:16, 91:17, 92:5, 94:9, 95:6, 95:10, 95:15, 95:17, 107:25, 109:7, 112:2, 119:9

**factor** [2] - 96:6, 96:12

**factors** [2] - 29:10, 89:13

**facts** [4] - 9:23, 25:21, 25:22, 95:22

**factual** [3] - 12:4, 67:14, 103:12

**failed** [1] - 101:1

**failsafe** [2] - 80:21, 81:2

**fair** [19] - 16:25, 21:6, 30:5, 38:4, 38:15, 55:13, 60:23, 61:2, 67:21, 72:13, 72:21, 73:18, 92:21, 94:11, 94:12, 96:1, 96:3, 108:1

**Fair** [9] - 11:8, 42:9, 50:9, 77:2, 78:20, 79:7, 81:14, 81:16, 107:22

**fairly** [3] - 3:20, 61:12, 100:5

**fairness** [6] - 7:1, 7:2, 7:13, 103:8, 112:3, 112:15

**fall** [1] - 109:15

**falls** [1] - 109:5

**familiar** [4] - 35:3,

69:23, 103:18, 103:20

**families** [7] - 13:1, 46:16, 46:18, 46:19, 75:24, 76:8, 76:9

**family** [5] - 46:15, 46:16, 75:25, 117:16, 119:17

**far** [18] - 3:9, 7:2, 7:22, 8:24, 11:16, 26:5, 30:1, 32:14, 35:19, 55:3, 57:20, 57:21, 58:4, 77:16, 83:18, 85:14, 101:4

**fault** [1] - 97:8

**favor** [1] - 6:14

**feasible** [2] - 36:15, 109:14

**Federal** [1] - 4:1

**Federated** [19] - 1:19, 2:8, 49:3, 49:8, 49:12, 49:17, 50:1, 50:7, 51:13, 51:25, 52:3, 52:5, 52:25, 53:5, 53:6, 54:2, 54:4, 54:13, 55:6

**Federated's** [3] - 49:15, 52:6, 54:9

**fee** [55] - 16:17, 16:22, 16:23, 16:25, 17:6, 18:1, 19:8, 27:7, 27:23, 30:1, 30:3, 30:17, 32:13, 36:5, 38:7, 38:11, 45:16, 45:20, 45:23, 46:9, 47:4, 47:8, 59:2, 59:3, 64:8, 71:7, 71:8, 71:15, 73:10, 79:12, 85:12, 88:10, 94:10, 94:23, 95:5, 96:7, 96:8, 96:13, 97:18, 97:20, 98:1, 98:7, 99:11, 101:16, 107:7, 107:10, 107:16, 108:8, 108:21, 108:24, 110:24, 112:4, 112:10, 112:24

**fees** [31] - 17:3, 28:14, 36:22, 43:3, 45:6, 47:12, 51:18, 54:1, 54:25, 60:14, 60:22, 62:10, 64:18, 66:10, 68:18, 68:19, 69:11, 79:3, 79:17, 80:11, 80:25, 81:17, 92:9, 93:25, 94:4, 94:7, 97:23, 104:8, 105:17, 119:13

**fell** [1] - 81:10

**felt** [4] - 42:9, 42:16, 60:23, 81:1

**few** [5] - 3:4, 6:25, 30:9, 31:15, 42:25, 67:13, 108:6, 112:2, 112:18, 113:21, 116:10

**Fidelity** [3] - 104:14,

104:19

**Fidelity's** [1] - 105:3

**fiduciaries** [1] - 108:15

**fiduciary** [1] - 79:19

**fielded** [2] - 50:25, 53:16

**fielding** [1] - 17:21

**fifth** [1] - 96:14

**fight** [1] - 113:3

**fights** [1] - 8:6

**figure** [4] - 57:4, 66:5, 66:6, 86:1

**figures** [1] - 106:16

**figuring** [4] - 39:15, 85:25, 98:24, 99:7

**file** [6] - 57:14, 59:24, 60:11, 65:17, 108:5, 117:18

**filed** [19] - 3:24, 11:24, 12:11, 15:19, 31:3, 36:25, 40:17, 40:20, 41:18, 44:16, 48:2, 49:11, 53:11, 59:15, 71:9, 85:10, 92:24, 108:23, 115:24

**files** [1] - 116:20

**filing** [3] - 48:2, 65:21, 117:24

**filings** [1] - 60:3

**fill** [9] - 11:1, 14:5, 31:5, 36:2, 36:3, 39:5, 39:12, 115:20

**filled** [4] - 12:14, 13:6, 13:16, 23:16

**filling** [5] - 13:3, 13:10, 42:7, 42:15, 91:10

**final** [17] - 4:11, 6:2, 22:9, 23:19, 24:9, 42:25, 49:2, 49:9, 64:22, 65:16, 73:1, 77:7, 84:6, 95:16, 97:14, 115:12, 116:14

**finally** [4] - 36:3, 48:5, 80:13, 118:7

**financial** [1] - 15:4

**findings** [2] - 23:22, 107:24

**fine** [8] - 11:25, 20:18, 25:3, 62:14, 74:20, 86:19, 88:24, 100:7

**fingertips** [1] - 34:20

**finish** [1] - 17:15

**finished** [2] - 98:19, 99:22

**firm** [26] - 5:23, 7:14, 7:15, 16:20, 18:6, 27:9, 28:4, 33:7, 35:2, 39:22, 49:5, 55:23, 58:6, 58:23, 64:9, 65:6, 67:9, 68:22, 69:11, 70:4, 75:13, 75:17, 77:14, 86:7, 97:2,

110:6

**firms** [4] - 11:7, 60:15, 60:18, 60:21

**first** [11] - 5:22, 31:1, 40:11, 45:11, 46:2, 46:4, 58:3, 59:10, 81:24, 82:11, 116:7

**five** [12] - 33:19, 37:6, 40:1, 41:1, 58:15, 59:4, 71:17, 82:13, 90:24, 95:2, 97:15, 99:16

**five-fold** [1] - 95:2

**Fleet** [2] - 108:16

**flight** [1] - 68:1

**focus** [1] - 11:1

**focused** [1] - 111:5

**focusing** [2] - 62:4, 119:12

**fold** [4] - 57:4, 95:2

**folks** [3] - 12:21, 13:14, 103:9

**follow** [1] - 63:14

**followed** [1] - 5:9

**following** [3] - 13:22, 15:16, 70:12

**FOR** [1] - 1:1

**forefront** [1] - 67:24

**foregoing** [1] - 120:7

**forever** [1] - 31:13

**forget** [2] - 99:20, 114:17

**forgotten** [1] - 5:21

**form** [17] - 11:2, 11:18, 12:7, 12:9, 12:11, 13:3, 13:6, 13:11, 13:12, 13:16, 14:5, 22:15, 23:19, 29:15, 31:3, 31:4, 31:11, 34:15, 40:8, 44:2, 50:23, 57:15, 59:25, 60:11, 72:4, 72:15, 112:1

**formal** [2] - 44:16, 85:9

**formally** [5] - 19:10, 23:22, 84:3, 111:4, 111:7

**format** [1] - 12:8

**former** [1] - 111:11

**forms** [15] - 9:18, 10:19, 14:4, 14:11, 31:6, 33:23, 34:5, 42:7, 42:16, 50:14, 57:23, 63:7, 68:10, 78:19, 105:11

**forth** [7] - 10:19, 35:8, 47:14, 49:9, 52:18, 70:21, 72:12

**forward** [8] - 9:16, 14:16, 37:8, 51:25, 67:2, 78:17, 80:10, 86:8

**forwarded** [2] - 12:1, 13:8

**fought** [6] - 4:19, 7:9, 26:1, 41:1, 66:14

**four** [6] - 40:11, 40:13, 68:11, 77:12, 99:15, 107:1
**Fourth** [5] - 4:5, 53:11, 70:13, 114:8, 114:22
**frame** [1] - 87:10
**framework** [1] - 81:10
**Fran** [1] - 118:8
**Franklin** [6] - 113:1, 114:6, 115:1, 115:6, 115:7, 115:15
**frankly** [2] - 27:12, 66:5
**fraud** [1] - 79:18
**Frederick** [1] - 1:10
**free** [3] - 9:8, 26:17, 52:5
**freely** [1] - 92:8
**frequently** [2] - 9:6, 104:2
**frequently-asked** [1] - 104:2
**Friday** [3] - 74:17, 74:18, 74:20
**frivolous** [1] - 14:21
**front** [1] - 23:12
**full** [7] - 3:8, 19:6, 40:14, 40:15, 40:22, 46:5, 103:11
**fully** [16] - 40:12, 45:13, 47:4, 47:8, 60:19, 70:10, 73:8, 83:8, 98:12, 103:11, 103:12, 103:18, 103:19, 105:20, 109:8
**function** [1] - 46:4
**Fund** [13] - 1:16, 2:2, 11:8, 21:25, 42:9, 50:9, 72:25, 75:13, 76:23, 77:2, 79:7, 105:7, 107:22
**fund** [50] - 12:23, 13:1, 16:1, 20:5, 22:25, 36:16, 42:5, 45:20, 45:22, 46:15, 46:16, 46:18, 46:19, 49:12, 49:13, 50:11, 56:19, 57:18, 58:13, 61:17, 62:8, 71:20, 75:17, 75:22, 75:24, 76:1, 76:2, 76:7, 76:9, 81:9, 84:21, 85:6, 86:16, 87:12, 87:15, 87:17, 87:18, 89:16, 90:1, 90:4, 90:6, 90:23, 93:4, 104:16, 109:12, 114:13, 114:23, 115:2
**Fund/Bank** [1] - 75:8
**funds** [65] - 8:16, 12:16, 15:9, 15:10, 15:25, 16:3, 16:5, 16:8, 16:11, 21:9, 21:15, 21:17, 29:24, 29:25, 32:8, 35:5, 35:13, 35:16, 36:11, 36:16,

38:5, 42:23, 51:11, 51:16, 51:19, 51:23, 53:12, 54:20, 56:6, 56:14, 63:19, 67:10, 72:7, 72:9, 72:10, 78:10, 78:25, 81:18, 81:19, 82:3, 82:8, 82:9, 86:3, 87:1, 87:3, 87:4, 87:10, 90:10, 90:11, 90:15, 90:16, 90:23, 92:7, 97:16, 104:16, 109:9, 109:11, 109:16, 111:19, 114:11, 114:12, 114:14
**FUNDS** [1] - 1:4
**Funds** [5] - 76:1, 78:21, 81:14, 81:16, 120:5
**furthermore** [1] - 111:21
**future** [1] - 112:7

## G

**Gaffney** [1] - 101:25
**gain** [1] - 91:17
**gallery** [1] - 48:14
**game** [1] - 83:10
**Garden** [3] - 17:23, 60:8, 71:3
**garnered** [1] - 53:18
**gather** [3] - 20:22, 21:20, 28:2
**General** [3] - 29:8, 67:7, 73:4
**general** [7] - 13:20, 45:5, 45:7, 64:16, 84:21, 92:12, 96:17
**General's** [8] - 6:21, 25:9, 25:12, 25:18, 26:3, 27:13, 71:24, 103:6
**generally** [1] - 108:10
**George** [2] - 2:12, 115:8
**Gerald** [1] - 101:25
**get-go** [1] - 21:7
**Gibson** [3] - 115:8, 117:14, 117:22
**given** [13] - 31:15, 49:20, 50:9, 50:12, 52:20, 54:17, 61:2, 63:13, 74:13, 77:1, 83:14, 116:6, 116:13
**glad** [5] - 21:18, 32:4, 33:3, 83:4, 99:9
**Glen** [3] - 1:18, 39:22, 39:23
**global** [6] - 35:1, 35:2, 35:6, 36:23, 52:22
**goal** [1] - 98:18
**Goldstein** [1] - 63:21
**GOLDSTEIN** [1] - 63:22

**Goodstein** [1] - 1:20, 55:23, 56:2, 60:6, 83:23, 84:1, 107:13, 109:6
**GOODSTEIN** [16] - 56:1, 57:10, 57:12, 58:21, 59:7, 60:7, 65:15, 65:22, 83:25, 84:8, 84:11, 84:15, 85:21, 86:5, 107:14, 110:2
**governance** [1] - 80:15
**government** [11] - 60:21, 61:3, 61:11, 61:23, 63:24, 76:5, 80:20, 81:22, 87:1, 88:23, 95:11
**government's** [1] - 66:9
**governmental** [1] - 80:19
**grand** [1] - 24:24
**granted** [1] - 108:9
**grateful** [6] - 4:17, 21:1, 22:20, 26:18, 47:7, 116:12
**great** [9] - 7:2, 10:13, 25:7, 39:17, 80:18, 83:15, 90:3, 90:4, 117:9
**greatest** [1] - 82:1
**greeted** [3] - 3:8, 19:20, 25:1
**Grossman** [1] - 5:23
**Group** [2] - 60:8, 102:18
**group** [3] - 17:23, 23:4, 116:5
**groups** [1] - 52:14
**Growth** [1] - 105:7
**guess** [4] - 30:23, 69:1, 99:2, 100:7
**Gunja** [1] - 116:23

## H

**half** [9] - 3:6, 46:10, 58:8, 61:6, 82:13, 83:11, 87:2, 89:22, 99:1
**halfway** [2] - 60:20, 99:13
**Hamermesh** [1] - 76:24, 77:5, 77:11, 77:17, 77:20, 80:6, 80:22, 81:3, 81:13, 81:15, 82:7
**hand** [1] - 65:17
**handled** [3] - 4:18, 17:23, 31:20
**handling** [1] - 8:16
**handwrite** [1] - 39:7
**happy** [8] - 20:16, 23:20, 23:23, 31:23, 52:8, 54:21, 55:6, 113:10

**hard** [13] - 4:18, 7:8, 7:9, 17:17, 18:24, 25:25, 41:1, 49:19, 66:14, 99:11, 116:16, 117:11, 119:15
**Hartley** [1] - 45:4
**hatches** [1] - 62:1
**Haudek** [1] - 73:24
**Health** [2] - 45:1, 45:11
**hear** [8] - 15:11, 18:14, 19:22, 63:4, 64:25, 75:7, 85:21, 99:23
**heard** [24] - 19:23, 26:11, 26:12, 28:10, 30:20, 39:1, 43:6, 48:11, 59:11, 59:13, 69:20, 73:20, 73:22, 75:1, 81:6, 85:16, 94:1, 94:8, 98:7, 100:10, 102:5, 107:6, 108:25
**hearing** [2] - 22:13, 22:14, 28:12, 32:1, 56:17, 100:5, 104:6, 112:15, 116:8
**hearings** [3] - 3:25, 113:20, 118:9
**heavily** [1] - 106:19
**held** [9] - 12:16, 41:3, 57:11, 57:22, 67:17, 92:7, 97:16, 108:4, 111:18
**Helen** [1] - 92:25
**hello** [1] - 30:21
**help** [9] - 3:16, 10:18, 13:21, 31:15, 52:1, 62:25, 70:13, 105:20, 118:14
**helped** [2] - 70:14, 117:18
**helpful** [5] - 23:17, 55:13, 73:9, 77:7, 104:22
**helping** [1] - 17:11
**hereby** [1] - 120:3
**hereunto** [1] - 120:10
**high** [7] - 37:11, 45:24, 54:15, 56:25, 82:15, 103:16, 118:20
**higher** [1] - 98:11
**highest** [1] - 46:3
**highlight** [2] - 6:25, 41:15
**highlighted** [1] - 97:12
**highly** [1] - 73:11
**himself** [2] - 77:5, 101:9, 101:13
**hired** [2] - 76:21, 93:5
**history** [2] - 58:23, 87:19
**hits** [3] - 9:7, 34:1, 35:18

**Hoffman** [1] - 45:5
**hold** [1] - 57:21
**holders** [2] - 56:19, 58:13
**holding** [1] - 11:19
**holdings** [3] - 14:19, 14:20, 44:7
**holds** [1] - 30:3
**hollow** [1] - 96:20
**home** [3] - 60:10, 60:21, 115:19
**Honor** [70] - 5:16, 5:22, 10:9, 10:20, 11:3, 19:20, 19:24, 20:9, 20:19, 22:24, 23:23, 24:22, 28:15, 28:21, 31:25, 32:22, 33:4, 36:13, 41:11, 41:23, 43:17, 44:24, 47:3, 47:18, 48:13, 49:3, 55:14, 55:17, 55:22, 56:16, 63:22, 64:8, 65:13, 65:22, 66:20, 68:2, 69:5, 74:5, 75:5, 75:8, 81:5, 83:13, 83:22, 83:23, 84:8, 86:5, 86:6, 94:5, 98:14, 99:12, 99:25, 102:7, 102:8, 102:14, 105:1, 110:2, 110:12, 111:12, 112:9, 112:17, 113:1, 113:9, 113:11, 113:14, 113:16, 114:12, 114:18, 114:25, 115:17, 118:12
**honor** [1] - 32:23
**Honorable** [2] - 1:10, 1:10
**Honors** [27] - 3:2, 3:7, 4:17, 4:24, 5:3, 20:4, 22:22, 30:21, 39:23, 49:7, 56:1, 67:23, 70:3, 70:6, 73:15, 75:12, 81:8, 82:22, 83:25, 99:15, 102:9, 102:16, 107:8, 110:7, 115:24, 116:2, 116:14
**hope** [2] - 65:4, 66:3
**hopefully** [2] - 31:24, 53:12
**hostility** [1] - 108:9
**hosting** [1] - 31:24
**hot** [1] - 9:9
**hotels** [2] - 47:14, 53:2
**hotly** [1] - 103:13
**hours** [6] - 46:2, 46:12, 51:13, 54:7, 68:24, 79:24
**housekeeping** [1] - 84:1
**huge** [4] - 29:16, 51:9, 90:22, 91:1

**hundred** [5] - 33:19, 51:1, 53:16, 71:17, 88:24
**hundreds** [6] - 3:17, 3:24, 67:9, 67:17, 73:13
**hurt** [1] - 51:11

**I**

**IDC** [7] - 42:9, 76:16, 76:17, 76:24, 81:20, 82:7, 105:7
**idea** [2] - 80:23, 99:8
**identical** [3] - 22:3, 22:4, 42:19
**identify** [2] - 12:16, 30:23
**identifying** [2] - 12:13, 13:5
**ignored** [1] - 99:1
**illustrates** [1] - 14:17
**immediately** [2] - 34:20, 89:16
**immense** [1] - 66:17
**impact** [1] - 86:2
**implicit** [1] - 27:25
**important** [8] - 32:6, 34:22, 35:14, 89:13, 89:18, 94:16, 97:12, 100:14
**importantly** [2] - 78:9, 79:6
**imposing** [1] - 13:21
**improper** [1] - 18:21
**IN** [2] - 1:1, 1:4
**inability** [1] - 101:8
**incentive** [1] - 15:5
**inception** [1] - 67:12
**incidents** [1] - 75:22
**include** [5] - 12:19, 54:12, 68:20, 69:10, 105:25
**included** [6] - 8:1, 35:7, 72:3, 103:9, 103:25, 105:19
**includes** [5] - 38:20, 40:24, 41:16, 73:3, 107:11
**including** [6] - 9:14, 28:13, 34:24, 66:15, 111:10, 119:17
**inconsistency** [1] - 72:24
**increase** [5] - 55:12, 80:20, 91:16, 91:21, 97:9
**incredible** [3] - 92:18, 109:20, 118:10
**incredibly** [3] - 81:21, 82:15, 109:25
**indeed** [2] - 17:1,

103:10
**independent** [10] - 16:9, 51:13, 51:16, 51:20, 54:9, 54:19, 72:5, 76:22, 108:15, 108:18
**indicate** [3] - 5:4, 63:6, 84:3
**indicated** [12] - 20:10, 20:16, 31:19, 44:11, 63:23, 71:6, 72:11, 72:15, 72:24, 73:10, 88:12, 95:13
**indicating** [1] - 43:22
**indirectly** [1] - 51:2
**individual** [24] - 4:9, 10:17, 13:16, 36:25, 41:18, 41:25, 50:12, 51:5, 64:11, 67:9, 70:23, 71:13, 75:16, 92:2, 92:11, 92:19, 95:23, 101:21, 105:2, 107:1, 108:12, 109:20, 117:25
**individually** [1] - 57:16
**individuals** [7] - 37:24, 37:25, 78:1, 92:7, 97:16, 101:6, 104:13
**Industries** [1] - 48:17
**inevitable** [1] - 47:15
**informal** [3] - 44:13, 72:16, 93:13
**information** [20] - 7:12, 11:10, 11:12, 11:19, 12:13, 13:2, 13:5, 13:8, 13:11, 14:20, 14:23, 26:2, 34:20, 42:10, 42:17, 42:18, 43:24, 44:3, 44:7, 111:3
**informed** [1] - 60:10
**informing** [1] - 44:1, 44:5
**initial** [9] - 15:15, 15:16, 15:23, 41:22, 48:1, 49:24, 93:14, 108:14, 109:9
**injury** [1] - 118:23
**innovative** [1] - 81:21
**inquiries** [2] - 17:13, 91:2
**insensitive** [1] - 66:13
**instance** [1] - 12:22
**instances** [2] - 107:22, 107:23
**instead** [2] - 11:21, 15:14
**institution** [1] - 45:13
**institutional** [8] - 7:18, 10:2, 45:2, 45:3, 75:18, 104:23, 108:13, 111:13
**institutions** [3] - 10:7, 37:23, 92:1, 92:7, 92:10,

97:17, 101:6
**Insurance** [2] - 45:1, 45:11
**insure** [1] - 77:22
**integrity** [1] - 83:20
**intend** [4] - 6:20, 29:7, 84:6, 84:9
**intended** [1] - 25:17
**intent** [1] - 84:3
**interacting** [1] - 31:16
**interest** [17] - 6:18, 6:21, 16:5, 25:16, 25:18, 29:7, 29:8, 40:3, 50:6, 51:8, 59:4, 90:3, 90:5, 93:18, 107:19, 111:22
**interesting** [3] - 49:10, 86:13, 94:6
**interests** [4] - 10:4, 14:15, 14:25, 58:25
**interim** [1] - 22:16
**internet** [1] - 63:6
**Internet** [6] - 14:6, 35:8, 35:9, 62:6, 63:15, 110:23
**interrogatories** [2] - 67:16, 101:24
**interviewed** [1] - 58:10
**interviews** [1] - 40:8
**introduce** [4] - 5:19, 5:22, 33:6, 55:23
**introduced** [1] - 8:13
**introductory** [1] - 3:4
**inure** [1] - 51:25
**invaluable** [2] - 65:8, 98:4
**Invesco** [12] - 1:15, 2:5, 5:24, 6:2, 6:5, 7:12, 10:24, 12:9, 14:10, 14:17, 25:20, 29:4
**invest** [1] - 35:5
**investigation** [3] - 7:10, 26:1, 86:18
**investigators** [1] - 87:8
**Investment** [2] - 104:19, 120:5
**investment** [5] - 37:2, 37:3, 52:16, 67:8, 81:17
**INVESTMENT** [1] - 1:4
**investments** [1] - 12:12
**Investments** [2] - 104:14
**investor** [22] - 6:6, 6:7, 7:18, 8:24, 9:1, 9:24, 16:20, 18:3, 24:10, 28:24, 29:3, 33:13, 39:24, 45:2, 45:3, 66:24, 75:18, 86:11, 101:2, 102:20, 104:23, 105:2
**Investors** [1] - 32:8
**investors** [17] - 10:2, 10:4, 16:5, 16:10, 18:1,

21:10, 28:23, 32:5, 32:9, 32:16, 49:20, 51:1, 55:10, 76:1, 76:2, 114:13, 114:20
**investors'** [1] - 114:23
**invitation** [1] - 52:7
**involve** [2] - 24:11, 107:17
**involved** [17] - 4:19, 6:11, 7:20, 12:3, 24:10, 26:17, 32:5, 46:23, 51:6, 59:11, 66:16, 69:12, 69:18, 70:9, 70:16, 109:21
**involvement** [2] - 19:6, 107:3
**involves** [1] - 28:24
**involving** [1] - 9:14
**ISBISTER** [32] - 3:2, 5:16, 19:20, 24:22, 31:24, 33:4, 39:20, 49:3, 55:17, 55:22, 64:8, 65:13, 66:18, 70:3, 75:8, 83:23, 86:6, 99:15, 99:25, 102:14, 105:24, 106:1, 106:3, 107:9, 107:12, 110:5, 113:16, 114:4, 114:7, 115:17, 116:14, 117:15
**Isbister** [12] - 1:14, 3:3, 19:17, 24:2, 38:9, 39:10, 45:21, 47:6, 54:14, 65:5, 65:20, 98:2
**Isbister's** [8] - 18:6, 28:4, 30:3, 47:4, 65:2, 73:8, 99:3, 105:19
**issue** [25] - 4:25, 20:21, 20:25, 21:6, 22:18, 24:4, 43:5, 43:6, 43:8, 43:14, 43:16, 43:19, 51:11, 51:22, 59:2, 59:14, 65:15, 66:6, 76:6, 83:9, 88:7, 89:3, 95:8, 113:25
**issued** [4] - 3:25, 41:6, 69:23, 70:20
**issues** [34] - 3:21, 4:19, 4:20, 8:12, 8:13, 18:16, 19:12, 21:4, 25:24, 30:13, 31:19, 32:19, 44:14, 59:20, 62:11, 64:17, 64:19, 65:24, 66:1, 66:16, 67:24, 68:1, 69:13, 69:14, 69:23, 83:5, 87:21, 99:6, 104:10, 109:21, 111:23, 115:18, 118:21
**itself** [15] - 8:15, 43:5, 43:15, 51:10, 88:8, 88:11, 92:5, 92:21, 93:21, 94:2, 94:14, 95:4,

95:22, 97:15, 108:21

**J**

**Jack** [2] - 2:9, 55:5
**James** [1] - 92:12
**January** [3] - 74:17, 74:18, 74:20, 75:7, 110:19, 112:18, 114:1
**Janus** [19] - 1:21, 2:12, 41:6, 66:19, 66:22, 67:3, 67:10, 67:17, 67:23, 68:3, 69:13, 69:20, 103:21, 114:7, 114:10, 114:17, 114:19, 115:3
**Jerry** [1] - 17:19
**Jessica** [1] - 116:23
**job** [2] - 70:14, 80:18
**John** [2] - 1:14, 3:2
**JOHNSON** [23] - 5:25, 10:8, 10:20, 12:7, 16:12, 16:16, 17:16, 18:3, 18:13, 20:3, 23:7, 23:10, 23:20, 23:23, 24:2, 24:7, 25:8, 26:23, 28:5, 28:7, 28:15, 28:21, 32:22
**Johnson** [7] - 1:15, 5:22, 6:1, 31:1, 33:21, 34:24, 38:1
**Johnston** [1] - 116:22
**join** [1] - 82:19
**Journal** [3] - 52:22, 52:24, 70:25
**Judge** [31] - 1:10, 1:10, 3:7, 3:12, 5:25, 11:3, 18:10, 19:11, 33:5, 33:10, 35:14, 39:4, 41:5, 66:12, 76:25, 79:11, 84:2, 91:25, 93:10, 95:7, 97:3, 98:21, 100:8, 100:12, 109:17, 113:7, 117:7, 119:8
**JUDGE** [183] - 10:5, 10:10, 12:6, 16:10, 16:15, 17:14, 17:25, 18:11, 19:9, 19:17, 19:22, 20:2, 20:12, 20:18, 20:20, 20:24, 21:5, 21:20, 21:23, 22:5, 22:6, 22:12, 22:21, 22:23, 23:6, 23:8, 23:14, 23:21, 23:24, 24:6, 24:16, 25:3, 26:11, 27:25, 28:6, 28:9, 28:12, 28:17, 30:19, 30:23, 31:18, 31:22, 32:1, 33:2, 33:3, 33:9, 34:16, 35:7, 36:7, 36:21, 37:17, 37:20, 37:22, 38:16, 38:22, 38:25, 39:9,

39:14, 39:19, 41:9,
41:12, 41:13, 42:20,
43:12, 44:22, 45:15,
46:25, 47:10, 47:22,
48:4, 48:10, 48:22, 49:1,
50:22, 53:8, 53:25, 55:2,
55:8, 55:15, 55:16,
55:19, 55:21, 55:25,
57:7, 57:11, 58:18, 59:6,
59:10, 59:17, 59:22,
59:24, 60:5, 60:12, 61:5,
61:9, 62:4, 62:21, 63:3,
63:5, 63:10, 63:17,
63:21, 64:6, 64:16,
65:14, 65:19, 65:23,
69:1, 69:20, 70:2, 70:18,
71:25, 73:20, 74:6,
74:11, 74:16, 74:21,
75:1, 75:6, 81:6, 82:21,
83:2, 83:4, 83:14, 84:5,
84:9, 84:13, 85:16,
85:19, 85:22, 87:12,
87:15, 87:17, 87:19,
87:22, 88:2, 93:7, 93:16,
94:1, 94:4, 98:7, 98:10,
98:15, 99:13, 99:19,
100:7, 102:5, 102:11,
103:18, 105:22, 105:25,
106:2, 106:4, 106:10,
106:14, 106:22, 107:6,
107:10, 108:25, 109:2,
109:4, 109:17, 110:3,
110:14, 112:12, 112:20,
113:5, 113:10, 113:13,
113:15, 113:22, 114:5,
114:10, 114:16, 114:21,
114:24, 115:7, 115:10,
115:14, 117:12, 118:16,
119:8, 119:20
**jUDGE** [1] - 104:22
**judges** [1] - 96:16
**judges'** [1] - 116:25
**judgment** [9] - 40:14,
41:6, 41:7, 46:6, 47:6,
68:4, 103:17, 113:12,
115:3
**Judgment** [3] - 70:11,
103:13, 115:16
**Julianne** [1] - 116:22
**jurisdictions** [1] - 96:4
**juror** [1] - 24:24
**jury** [1] - 24:23
**justifies** [1] - 99:11
**justify** [2] - 60:15, 60:22

## K

**Karen** [1] - 6:9
**keep** [3] - 47:13, 47:16,
69:16

**kept** [1] - 41:24, 54:17
**Kessler** [1] - 118:8
**key** [1] - 103:25
**Kim** [1] - 104:4
**kind** [4] - 53:8, 65:6,
113:16, 113:17
**knowing** [1] - 38:18
**known** [1] - 18:7
**knows** [5] - 5:20, 53:4,
77:25, 110:12, 118:24
**Koch** [2] - 48:16, 48:20,
111:14, 111:16, 111:18,
111:19, 111:21
**KOCH** [2] - 48:17,
111:16
**Krouse** [1] - 102:17

## L

**Labaton** [1] - 75:12
**labored** [1] - 116:16
**labyrinth** [1] - 54:10
**lack** [3] - 8:4, 19:2,
73:16
**lady** [1] - 24:23
**Lampke** [1] - 25:11
**landscape** [1] - 50:3
**large** [10] - 3:13, 10:1,
10:6, 21:10, 24:14,
37:23, 41:7, 58:12,
60:16, 118:12
**larger** [1] - 45:3
**last** [14] - 13:7, 16:18,
31:3, 31:12, 31:15,
39:15, 44:12, 48:15,
59:2, 83:16, 107:15,
110:8, 113:18, 116:9
**late** [9] - 35:25, 48:18,
50:8, 52:1, 83:10, 87:4,
87:11, 109:19, 118:8
**Laughter** [1] - 74:10
**law** [16] - 9:24, 15:2,
30:11, 38:11, 38:12,
93:5, 95:22, 96:6, 96:20,
99:7, 116:25, 117:8,
117:9, 118:5, 118:17,
118:18
**lawsuit** [1] - 90:10
**lawsuits** [1] - 70:23
**lawyer** [1] - 116:7
**lawyering** [6] - 66:5,
95:18, 95:20, 98:22,
98:25, 109:22
**lawyers** [20] - 3:8, 3:9,
3:10, 3:13, 15:6, 17:20,
52:6, 66:8, 76:10, 95:18,
96:11, 96:15, 96:18,
97:8, 116:3, 117:4,
117:17, 118:10, 118:22,

119:2
**lead** [34] - 5:8, 5:23, 6:8,
7:17, 16:20, 16:24, 18:7,
19:6, 24:13, 26:2, 27:22,
28:23, 29:3, 30:4, 30:16,
32:15, 33:7, 44:25,
45:10, 45:12, 48:6, 49:5,
52:16, 66:21, 70:8,
73:17, 87:12, 87:13,
97:2, 102:17, 104:5,
107:1, 119:1, 119:3
**lead-up** [1] - 104:5
**leading** [1] - 7:19
**leads** [2] - 50:4, 53:1
**League** [1] - 31:23
**learned** [1] - 62:19
**leases** [1] - 78:4
**least** [13] - 6:25, 8:3,
13:25, 15:12, 26:25,
32:10, 34:9, 76:17, 80:5,
81:2, 81:4, 92:16, 94:16
**leave** [1] - 74:6
**leaving** [1] - 84:14
**left** [6] - 78:7, 82:6,
90:15, 99:16, 107:25,
113:23
**leftover** [2] - 15:9,
15:10
**leg** [1] - 85:14
**Legacy** [1] - 108:16
**legal** [3] - 60:14, 62:1,
62:10
**Legg** [1] - 117:7
**legitimate** [1] - 93:18
**length** [2] - 79:5, 99:5
**less** [4] - 11:16, 47:24,
93:1, 100:14
**letter** [8] - 43:25, 44:13,
60:14, 72:16, 74:21,
74:24, 93:13, 111:15
**letters** [2] - 43:21, 78:1
**level** [5] - 10:17, 11:22,
12:4, 47:16
**levels** [2] - 66:15, 66:16
**liability** [7] - 7:24, 8:3,
26:7, 37:9, 40:18, 41:25,
94:17
**liable** [1] - 66:5
**liaison** [4] - 38:9, 45:21,
60:25, 65:2
**Liaison** [1] - 1:14
**Liebhard** [1] - 49:4
**life** [2] - 32:9, 32:11
**light** [7] - 9:23, 16:18,
30:12, 61:3, 78:15,
84:12, 84:15
**likely** [1] - 62:9
**limine** [2] - 40:17, 46:7
**limited** [3] - 87:1, 111:6,
118:6

**line** [3] - 9:9, 46:10,
55:18
**lineup** [1] - 39:20
**Lipton** [1] - 77:14
**list** [2] - 63:2, 95:25
**listed** [3] - 2:15, 47:25,
95:24
**listen** [3] - 10:13, 25:2,
25:6
**literature** [1] - 80:24
**litigate** [1] - 95:13
**litigated** [15] - 26:19,
26:20, 40:12, 60:19,
61:7, 67:22, 68:2, 69:19,
70:10, 103:11, 103:19,
103:20, 105:20, 106:18
**litigating** [4] - 46:20,
74:11, 97:6, 102:2
**Litigation** [2] - 72:25,
120:5
**litigation** [19] - 3:15,
8:19, 16:22, 26:13,
29:11, 32:17, 32:18,
32:25, 38:13, 41:1,
45:13, 48:7, 52:17,
56:24, 69:7, 78:23,
89:19, 93:6, 107:2
**LITIGATION** [1] - 1:4
**Litowitz** [2] - 5:23, 6:1
**LLP** [2] - 56:2, 84:1
**Lo** [1] - 2:3
**load** [1] - 4:22
**local** [2] - 58:10, 62:7
**locate** [1] - 60:2
**located** [1] - 69:13
**lodestar** [20] - 17:4,
17:7, 30:7, 32:4, 38:14,
38:18, 46:2, 54:4, 59:9,
68:22, 68:23, 68:25,
79:16, 79:24, 82:12,
88:4, 94:12, 106:6
**Lombard** [1] - 2:21
**LoMonte** [3] - 59:22,
60:2, 60:9
**lone** [1] - 113:4
**look** [14] - 37:15, 46:11,
48:22, 54:5, 63:14,
74:22, 79:24, 80:3, 89:1,
92:14, 95:23, 109:18,
119:1
**looked** [6] - 23:15,
29:15, 37:5, 38:16,
43:12, 61:10, 62:9,
76:14, 99:21
**looking** [5] - 10:3,
11:23, 60:17, 61:13,
63:15
**looks** [2] - 104:22,
112:13
**lose** [2] - 74:19, 96:19

**losing** [1] - 97:11
**loss** [2] - 71:12, 71:14
**losses** [2] - 16:8, 72:9
**lost** [2] - 72:7, 75:25
**loud** [1] - 97:24
**low** [2] - 17:2, 92:14
**lower** [1] - 60:23
**lucky** [2] - 62:19,
118:19
**Lurie** [1] - 102:17

## M

**magazine** [3] - 35:10,
35:13, 70:25
**mail** [2] - 58:14, 68:6
**mailed** [3] - 4:10,
110:10, 110:16
**mailings** [1] - 110:17
**mails** [1] - 17:21
**main** [1] - 62:12
**maintained** [3] -
103:25, 104:18, 104:19
**maintains** [1] - 104:15
**major** [2] - 34:17,
104:23
**majority** [1] - 69:11
**Malone** [4] - 66:22,
67:8, 67:11, 67:14
**manageability** [1] -
8:16
**manageable** [1] - 14:13
**managed** [2] - 10:11,
78:3
**Management** [1] -
75:18
**manner** [2] - 4:17,
120:9
**mark** [2] - 20:4, 81:8
**Mark** [6] - 1:16, 1:21,
2:13, 66:19, 66:21,
114:18
**market** [14] - 7:25,
20:24, 21:14, 41:19,
46:22, 46:23, 52:1,
61:17, 76:2, 76:11, 87:4,
87:10, 107:23, 109:19
**Mary** [3] - 2:20, 120:3,
120:15
**MARYLAND** [1] - 1:1
**Maryland** [2] - 1:8, 2:22
**massive** [1] - 67:17
**match** [1] - 57:18
**Mathews** [3] - 2:3,
22:24, 114:25
**MATHEWS** [2] - 22:24,
114:25
**matter** [17] - 6:14,
20:20, 21:9, 25:4, 25:13,

26:12, 32:17, 36:5, 38:9, 74:12, 74:15, 83:14, 84:2, 84:22, 111:18, 120:4, 120:9

**matters** [3] - 40:23, 75:19, 116:11

**Matthew** [1] - 25:11

**maximum** [1] - 98:19

**McCarthy** [1] - 66:21

**MDL** [7] - 1:7, 3:8, 3:12, 72:25, 85:25, 118:20, 120:5

**MDL's** [2] - 98:18, 118:19

**mean** [12] - 6:24, 12:18, 20:12, 27:18, 32:6, 40:12, 47:14, 65:24, 83:7, 92:21, 99:3, 110:14

**meaning** [1] - 16:19

**meant** [3] - 20:10, 110:14, 110:15

**measured** [1] - 17:4

**mechanically** [1] - 115:17

**mechanism** [1] - 82:1

**mechanisms** [1] - 56:7

**media** [2] - 4:3, 62:7

**mediation** [1] - 41:3

**mediator** [1] - 70:13

**meet** [1] - 76:25

**meetings** [2] - 22:13, 76:23

**meets** [1] - 7:1

**member** [18] - 11:24, 12:10, 12:14, 12:16, 36:25, 43:7, 43:22, 44:2, 44:10, 44:16, 48:20, 57:14, 62:15, 91:7, 92:19, 104:4, 110:23, 111:2

**members** [36] - 4:10, 9:3, 9:9, 9:16, 11:1, 11:10, 11:15, 12:25, 13:21, 13:23, 14:23, 15:22, 17:12, 21:14, 21:15, 34:3, 35:5, 42:11, 42:14, 51:3, 61:1, 62:13, 68:7, 68:12, 69:25, 89:2, 90:8, 90:25, 92:12, 103:24, 105:9, 109:12, 110:11, 110:18, 111:9, 112:3

**mention** [11] - 21:5, 32:3, 47:10, 83:4, 94:15, 98:2, 98:3, 101:1, 103:10, 112:23, 118:20

**mentioned** [14] - 23:2, 36:9, 38:7, 40:22, 44:14, 60:19, 64:9, 94:5, 94:14, 97:14, 99:9, 103:10,

109:6, 109:24

**mere** [1] - 65:11

**merged** [1] - 46:18

**merit** [5] - 19:2, 43:10, 43:13, 44:20, 72:18

**meritless** [1] - 37:15

**merits** [5] - 4:14, 19:3, 43:19, 44:17, 58:25

**met** [2] - 24:22, 76:10, 76:22

**MFS** [17] - 1:15, 2:6, 6:3, 12:8, 12:11, 13:9, 14:11, 28:16, 28:20, 28:21, 28:24, 29:15, 29:19, 30:25, 31:2, 31:4

**Michael** [5] - 1:17, 33:6, 33:11, 86:9, 116:24

**mid** [2] - 75:7, 114:1

**mid-January** [2] - 75:7, 114:1

**middle** [1] - 46:17

**might** [18] - 3:16, 10:10, 11:22, 12:4, 22:15, 23:17, 24:18, 32:2, 39:10, 47:10, 60:15, 61:9, 61:12, 64:3, 64:17, 82:23, 106:21

**Milberg** [3] - 55:23, 56:2, 84:1

**million** [79] - 4:9, 4:13, 6:17, 9:2, 9:15, 25:17, 29:6, 29:8, 29:16, 29:17, 33:19, 37:7, 40:2, 40:25, 43:1, 49:11, 49:13, 49:18, 50:5, 50:6, 54:3, 58:8, 59:4, 64:10, 67:5, 68:6, 68:11, 68:22, 71:16, 76:6, 76:12, 76:17, 76:18, 76:20, 77:11, 77:19, 77:22, 78:11, 79:4, 79:24, 80:4, 80:5, 81:1, 81:4, 81:16, 82:13, 83:11, 84:19, 86:19, 88:13, 88:15, 88:23, 88:24, 88:25, 89:1, 89:6, 90:1, 90:5, 90:6, 90:7, 90:19, 90:24, 94:21, 94:24, 96:1, 97:15, 102:25, 103:2, 103:4, 103:5, 107:18, 109:10, 110:10, 110:15, 110:21, 111:10

**Milwaukee** [4] - 56:19, 58:10, 58:12, 63:16

**mind** [3] - 23:9, 99:10, 113:5

**mindful** [2] - 105:14, 113:18

**minimis** [1] - 16:4

**minor** [2] - 23:4, 65:16

**minus** [1] - 51:18

**minute** [2] - 31:2, 83:16

**minutes** [2] - 3:4, 99:16

**misheard** [1] - 106:14

**misplaced** [1] - 19:4

**misread** [1] - 59:5

**miss** [1] - 102:11

**modest** [8] - 17:1, 17:4, 30:7, 30:12, 32:14, 106:25, 110:25, 112:5

**MOLUMPHY** [3] - 66:20, 69:3, 69:24

**Molumphy** [3] - 1:21, 66:19, 66:21

**Mom** [2] - 35:15, 97:16

**moment** [2] - 6:12, 90:12

**Monaghan** [2] - 2:6, 19:24

**MONAGHAN** [1] - 19:24

**monetary** [2] - 52:3, 80:14

**money** [31] - 27:4, 36:10, 36:13, 36:15, 38:3, 42:14, 50:13, 50:17, 51:5, 51:10, 51:21, 54:2, 62:13, 63:24, 72:4, 72:7, 72:25, 76:9, 78:3, 78:9, 78:12, 81:18, 82:2, 82:5, 88:18, 88:19, 96:18, 96:19, 97:11

**monies** [3] - 90:15, 90:17, 93:4

**Montague** [2] - 39:22, 39:24

**Monte** [1] - 2:3

**months** [3] - 68:11, 110:9, 112:8

**moot** [2] - 101:8, 101:12

**Mora** [2] - 2:6, 19:24

**moreover** [1] - 111:9

**Morin** [1] - 101:25

**morning** [14] - 3:2, 5:25, 20:4, 22:24, 33:10, 39:23, 49:7, 56:1, 56:23, 59:14, 66:20, 75:11, 78:22, 84:14

**mortgage** [1] - 43:14

**most** [15] - 35:24, 47:19, 50:11, 56:14, 56:22, 59:19, 62:9, 86:15, 92:2, 93:1, 93:11, 96:9, 103:25, 105:16, 116:3

**Motion** [6] - 25:23, 41:22, 53:4, 68:3, 70:10, 115:15

**motion** [5] - 7:5, 25:23, 46:6, 103:17, 115:4

**motions** [6] - 40:17, 41:7, 113:12, 117:25, 118:1

**Motions** [8] - 7:3, 40:20, 40:21, 49:17, 54:7, 103:12, 103:14

**MOTZ** [118] - 10:5, 12:6, 17:25, 18:11, 19:9, 19:17, 19:22, 20:2, 20:12, 20:18, 20:20, 20:24, 21:5, 21:20, 21:23, 22:5, 22:12, 22:21, 22:23, 23:6, 23:8, 23:24, 24:16, 25:3, 26:11, 27:25, 28:6, 28:9, 28:12, 28:17, 30:19, 30:23, 31:18, 31:22, 32:1, 33:2, 39:9, 41:12, 53:25, 55:16, 55:19, 63:5, 65:14, 65:23, 69:1, 69:20, 70:2, 70:18, 71:25, 73:20, 74:6, 74:11, 74:16, 74:21, 75:1, 75:6, 81:6, 82:21, 83:2, 83:4, 83:14, 84:9, 84:13, 85:16, 85:19, 85:22, 87:12, 87:15, 87:17, 87:19, 87:22, 88:2, 93:7, 93:16, 94:1, 94:4, 98:7, 98:10, 98:15, 99:13, 99:19, 100:7, 102:5, 102:11, 103:18, 104:22, 105:22, 105:25, 106:2, 106:4, 106:10, 106:14, 106:22, 107:6, 107:10, 108:25, 109:2, 109:4, 109:17, 110:3, 110:14, 112:12, 112:20, 113:5, 113:13, 113:15, 113:22, 114:5, 114:10, 114:16, 114:21, 114:24, 115:7, 115:10, 115:14, 117:12, 118:16, 119:20

**Motz** [11] - 1:10, 3:12, 5:25, 11:4, 18:10, 33:10, 35:15, 91:25, 95:7, 100:12, 119:8

**Motz's** [1] - 41:5

**MOU** [1] - 90:2

**move** [4] - 20:17, 24:7, 28:15, 93:25

**moving** [3] - 9:16, 33:4, 73:9

**MR** [190] - 3:2, 5:16, 5:25, 10:8, 10:20, 12:7, 16:12, 16:16, 17:16, 18:3, 18:13, 19:20, 20:3, 20:4, 20:13, 20:19, 20:23, 21:1, 21:12, 21:22, 21:24, 22:18,

22:22, 22:24, 23:7, 23:10, 23:20, 23:23, 24:2, 24:7, 24:22, 25:8, 26:23, 28:5, 28:7, 28:15, 28:21, 30:21, 30:25, 31:21, 31:24, 32:22, 33:4, 33:10, 34:24, 35:9, 36:12, 36:22, 37:19, 37:21, 37:24, 38:20, 38:23, 39:4, 39:12, 39:17, 39:20, 39:23, 41:11, 41:15, 42:21, 43:17, 44:24, 45:16, 47:3, 47:18, 47:23, 48:5, 48:12, 49:3, 49:7, 50:25, 53:10, 54:1, 55:5, 55:14, 55:17, 55:22, 56:1, 57:10, 57:12, 58:21, 59:7, 59:14, 59:18, 59:23, 60:1, 60:7, 60:13, 61:8, 61:15, 62:6, 62:22, 63:6, 63:11, 63:18, 63:22, 64:8, 65:13, 65:15, 65:22, 66:18, 66:20, 69:3, 69:24, 70:3, 70:6, 70:19, 72:2, 73:23, 74:5, 74:8, 74:12, 74:20, 74:25, 75:3, 75:8, 75:11, 81:8, 82:22, 82:23, 83:3, 83:13, 83:22, 83:23, 83:25, 84:8, 84:11, 84:15, 85:21, 86:5, 86:6, 86:9, 87:13, 87:16, 87:18, 87:20, 87:23, 88:6, 93:9, 93:20, 94:5, 98:14, 99:12, 99:15, 99:18, 99:25, 100:12, 102:7, 102:13, 102:14, 102:16, 103:22, 104:25, 105:24, 106:1, 106:3, 106:5, 106:13, 106:16, 106:24, 107:8, 107:9, 107:12, 107:14, 109:1, 109:3, 109:5, 110:2, 110:5, 110:7, 110:16, 112:16, 112:21, 113:9, 113:11, 113:14, 113:16, 114:4, 114:7, 114:12, 114:18, 114:22, 114:25, 115:8, 115:12, 115:17, 116:2, 116:14, 117:15

**MS** [1] - 19:24

**multiple** [10] - 3:19, 17:10, 40:20, 42:22, 76:23, 85:15, 90:23, 95:24, 96:3

**multiplier** [28] - 17:7, 27:14, 27:15, 30:7, 30:12, 32:3, 32:21, 38:8, 46:8, 46:9, 54:13, 54:16, 59:8, 79:25, 80:1, 85:13,

88:5, 94:9, 94:12, 96:2, 96:25, 97:1, 97:9, 98:11, 101:18
**Mushtaq** [1] - 116:23
**must** [1] - 63:8
**MUTUAL** [1] - 1:4
**Mutual** [1] - 120:4
mutual [19] - 8:16, 12:23, 32:8, 35:5, 35:13, 35:15, 46:15, 46:16, 46:18, 61:17, 75:22, 75:24, 76:1, 76:2, 76:7, 76:9, 86:16, 111:19
**myriad** [1] - 98:24

**N**

**name** [3] - 57:25, 58:1, 58:3
**named** [4] - 41:20, 41:23, 42:1, 75:21
names [4] - 5:21, 116:21, 116:22, 117:1
nations [1] - 21:24
**Nations** [13] - 75:8, 75:13, 76:1, 76:17, 76:19, 76:23, 77:12, 78:3, 78:5, 78:10, 78:25, 81:17, 84:10
**Nations/Bank** [1] - 1:19
**nature** [5] - 44:7, 47:5, 96:15, 104:10, 112:24
**nearly** [1] - 91:11
**nears** [1] - 91:21
**necessarily** [2] - 8:22, 50:8
**necessary** [3] - 29:22, 46:12, 106:22
**need** [11] - 19:22, 57:14, 62:24, 63:8, 74:23, 77:21, 78:19, 94:15, 95:25, 108:4, 119:10
**needed** [8] - 47:1, 63:23, 66:5, 71:9, 78:23, 82:17, 86:22
**negative** [16] - 17:7, 27:14, 38:8, 38:14, 46:9, 53:19, 54:13, 54:16, 54:22, 59:8, 68:25, 85:13, 97:1, 101:18
**negotiated** [7] - 16:24, 27:12, 50:3, 54:20, 79:5, 81:12, 81:13
**negotiating** [4] - 41:2, 69:8
**negotiation** [1] - 89:20
**negotiations** [2] - 7:9, 26:1

**neighbor** [1] - 28:18
**neighborhood** [1] - 28:17
**net** [3] - 15:25, 42:5, 60:24
**New** [8] - 6:21, 25:18, 29:8, 35:10, 67:6, 70:24, 71:23, 103:5
**new** [4] - 63:24, 110:17, 115:23
**news** [1] - 63:15
**newspapers** [2] - 35:11, 110:22
**Newswire** [1] - 71:1
**next** [12] - 31:22, 33:4, 39:20, 49:3, 66:18, 70:3, 75:8, 83:23, 86:6, 89:21, 102:14, 117:15
**nobody** [1] - 97:23
**non** [3] - 80:14, 81:24, 82:11
**non-monetary** [1] - 80:14
**none** [5] - 4:7, 19:21, 68:13, 78:1, 92:1
**North** [1] - 83:2
**north** [1] - 80:17
**NORTHERN** [1] - 1:2
**notably** [1] - 52:2
**note** [18] - 10:1, 14:3, 14:4, 18:4, 18:14, 23:10, 23:12, 33:24, 47:8, 47:19, 47:25, 48:15, 55:17, 68:13, 70:25, 82:23, 115:1, 116:14
**NOTE** [1] - 2:15
**noted** [8] - 8:15, 9:12, 9:14, 9:15, 47:16, 79:13, 106:20, 108:13
**notes** [1] - 24:3
**nothing** [7] - 12:8, 38:23, 38:25, 53:6, 55:6, 102:8, 107:5
**notice** [50] - 8:25, 9:4, 31:9, 31:10, 33:22, 33:23, 35:6, 35:17, 35:20, 44:3, 47:25, 50:12, 50:22, 51:6, 52:19, 53:11, 53:15, 57:13, 58:7, 58:14, 60:9, 60:10, 62:11, 63:13, 64:18, 68:6, 68:9, 70:20, 70:22, 70:23, 71:3, 71:4, 71:6, 71:17, 71:18, 72:3, 77:23, 78:13, 79:1, 83:10, 84:22, 85:8, 90:22, 97:22, 100:21, 100:22, 103:22, 103:24, 111:17
**noticed** [1] - 64:10

**notices** [22] - 4:9, 9:3, 9:15, 29:17, 33:24, 35:20, 36:23, 43:1, 51:2, 62:25, 64:11, 64:12, 77:25, 90:24, 97:15, 99:20, 100:25, 110:10, 110:13, 110:22
**noting** [2] - 30:9, 110:9
**notwithstanding** [2] - 80:20, 91:16
**novel** [1] - 4:19
**number** [20] - 12:17, 12:25, 15:20, 23:8, 31:11, 34:5, 34:7, 57:8, 57:16, 58:5, 86:14, 87:3, 88:6, 91:8, 91:20, 94:13, 96:5, 104:16, 118:6, 118:10
**Number(s** [1] - 120:5
**numbers** [6] - 3:16, 23:16, 44:4, 89:1, 91:16, 92:15
**numerous** [2] - 41:2, 52:21

**O**

**OAG** [1] - 90:19
**object** [9] - 53:3, 54:21, 61:18, 79:22, 92:8, 97:18, 99:23, 100:3, 112:8
**objected** [4] - 80:11, 108:8, 110:23, 111:2
**objecting** [3] - 60:14, 97:23, 101:8
**objection** [32] - 28:3, 28:12, 32:2, 36:25, 37:13, 43:1, 43:2, 43:3, 43:10, 43:11, 44:16, 44:21, 64:12, 68:18, 73:16, 78:2, 78:16, 82:24, 85:9, 92:23, 93:12, 100:6, 100:10, 101:6, 101:7, 101:12, 104:4, 104:6, 104:11, 108:7, 110:18, 111:5
**objections** [54] - 9:11, 9:12, 10:1, 10:16, 10:22, 10:25, 14:16, 15:4, 18:15, 18:16, 18:17, 18:19, 19:2, 19:4, 27:17, 29:21, 38:6, 38:10, 38:11, 53:14, 58:15, 59:15, 59:19, 60:13, 62:14, 63:19, 68:12, 68:13, 71:6, 71:8, 71:15, 72:15, 73:10, 79:2, 85:9, 91:23, 92:1, 92:4, 92:6, 92:9, 92:11, 93:1, 93:12,

93:23, 97:20, 99:24, 105:13, 108:7, 108:23, 110:20, 112:3, 112:7, 113:24, 115:22
**objector** [5] - 18:23, 43:4, 68:19, 111:5, 111:11
**objectors** [12] - 5:10, 5:13, 14:18, 19:15, 19:18, 19:21, 24:18, 25:2, 28:9, 30:19, 39:2, 48:23
**objects** [1] - 112:19
**obligations** [1] - 108:17
**obtain** [2] - 91:9, 100:17
**obtained** [7] - 6:21, 15:8, 16:19, 25:18, 29:8, 30:12, 90:18
**obtaining** [1] - 8:14
**obvious** [1] - 112:25
**obviously** [14] - 19:10, 20:13, 22:9, 23:14, 23:24, 26:17, 33:15, 34:10, 35:21, 37:2, 37:3, 38:16, 39:8, 43:12, 68:8, 68:10, 68:16, 69:3, 69:4, 69:22, 86:14, 86:21, 87:20, 87:22, 87:24, 89:10, 89:20, 90:8, 90:23, 91:14, 91:20, 92:19, 93:4, 93:6, 93:14, 95:4, 96:4, 98:2, 98:5, 99:10, 98:19, 112:17, 119:8
**occurred** [1] - 109:23
**October** [4] - 1:7, 48:3, 91:19, 120:5
**OF** [1] - 1:1
**office** [6] - 6:11, 7:20, 17:11, 28:18, 73:8, 117:22, 117:24, 118:5
**Office** [8] - 6:21, 25:9, 25:12, 25:18, 26:3, 27:13, 103:6, 117:14
**official** [1] - 120:8
**Official** [1] - 120:16
**offs** [2] - 8:10, 14:14
**often** [2] - 53:9, 118:17
**Ohio** [9] - 24:13, 25:8, 25:9, 25:12, 26:3, 27:12, 70:8, 73:4
**old** [3] - 59:21, 62:17, 87:19
**omnibus** [5] - 57:22, 104:15, 105:4, 117:25
**once** [1] - 77:20
**one** [103] - 3:20, 4:5, 5:5, 5:17, 6:12, 8:17, 10:3, 12:18, 13:17, 14:12, 14:16, 14:18,

18:5, 19:10, 20:16, 21:8, 21:17, 22:19, 23:4, 23:8, 24:16, 26:4, 27:14, 28:23, 35:14, 36:7, 36:24, 40:18, 41:15, 42:12, 43:1, 46:12, 46:18, 47:10, 47:20, 48:15, 50:5, 50:13, 50:21, 52:9, 57:24, 58:10, 62:7, 62:19, 63:2, 65:15, 67:13, 67:21, 68:18, 68:19, 69:17, 70:24, 71:12, 75:13, 75:24, 77:5, 78:2, 79:21, 80:9, 81:9, 82:23, 83:2, 84:10, 86:14, 86:15, 86:17, 87:20, 88:4, 88:17, 89:13, 91:25, 92:12, 92:23, 94:13, 95:8, 97:14, 98:15, 98:21, 100:16, 101:6, 101:11, 101:17, 103:11, 103:20, 104:3, 104:14, 109:5, 110:3, 111:2, 111:11, 111:13, 112:23, 115:1, 115:4, 115:11, 116:9, 117:3, 117:16, 118:18, 119:2
**one's** [2] - 78:15, 83:5
**OneGroup** [4] - 1:20, 83:24, 84:11, 85:1
**ones** [2] - 54:19, 62:19
**ongoing** [3] - 17:8, 27:16, 30:10
**online** [1] - 57:15
**onward** [1] - 46:19
**open** [2] - 55:18, 115:18
**opening** [1] - 5:8
**operator** [1] - 31:11
**opinion** [2] - 41:6, 61:9
**opinions** [2] - 69:23, 80:24
**opportunities** [1] - 26:14
**opportunity** [6] - 57:15, 63:13, 105:6, 116:8, 117:5, 117:6
**opposed** [4] - 89:17, 100:3, 107:23, 108:10
**oppositions** [1] - 118:1
**opt** [15] - 10:1, 10:6, 37:17, 50:21, 71:14, 104:17, 110:18, 111:3, 111:4, 111:6, 111:10, 111:13, 111:24, 112:2
**opt-out** [4] - 50:21, 110:18, 111:3, 111:6
**opt-outs** [7] - 10:1, 10:6, 37:17, 71:14, 111:4, 111:13, 112:2

**opted** [1] - 111:14
**order** [14] - 5:6, 8:22, 23:21, 24:20, 39:16, 49:2, 65:16, 66:18, 70:20, 82:17, 84:6, 88:18, 100:5, 111:4
**orders** [4] - 23:11, 39:5, 115:20, 115:23
**organized** [1] - 3:19
**original** [2] - 41:20, 92:24
**originally** [1] - 111:2
**otherwise** [1] - 48:20
**OTTA** [1] - 73:6
**Ottensoser** [6] - 1:19, 49:4, 49:8, 60:18, 75:9, 81:11
**OTTENSOSER** [10] - 49:7, 50:25, 53:10, 54:1, 55:14, 75:11, 82:23, 83:3, 83:13, 83:22
**ought** [2] - 24:17, 83:20
**ourselves** [2] - 42:14, 53:16, 105:9
**outcome** [1] - 62:10
**outliers** [1] - 79:21
**outs** [7] - 10:1, 10:6, 37:17, 71:14, 111:4, 111:13, 112:2
**outset** [1] - 76:4
**outside** [3] - 51:14, 81:10, 109:6
**overall** [1] - 54:24
**overlap** [3] - 3:22, 46:21
**overlapped** [2] - 4:20, 88:7
**overlapping** [1] - 19:12
**overrule** [2] - 43:11, 44:21
**overseeing** [7] - 6:11, 7:20, 17:9, 17:22, 25:10, 45:13, 52:17
**overseen** [2] - 10:3, 24:14
**oversight** [1] - 26:2
**overstate** [1] - 16:12
**overwhelmingly** [1] - 68:8
**own** [13] - 4:16, 12:23, 35:12, 35:15, 53:4, 53:5, 67:10, 75:20, 76:9, 76:21, 76:22, 116:3, 118:5
**owned** [2] - 75:16, 111:18
**owns** [1] - 114:17

**P**

**p.m** [1] - 119:21
**page** [3] - 13:7, 31:3, 103:23
**Pages** [1] - 12:15
**pages** [1] - 120:7
**paid** [13] - 50:7, 54:3, 77:22, 77:24, 79:7, 79:8, 80:9, 81:17, 82:8, 86:18, 86:22, 88:18, 88:24
**PAINE** [3] - 30:21, 30:25, 31:21
**paine** [1] - 116:2
**Paine** [2] - 2:7, 30:25
**painfully** [1] - 113:13
**paper** [2] - 14:6, 118:2
**papers** [50] - 3:23, 6:19, 6:23, 18:22, 19:3, 21:13, 24:12, 25:17, 29:12, 29:23, 30:15, 33:15, 44:18, 47:19, 48:2, 48:9, 49:10, 50:6, 52:18, 56:22, 58:17, 58:20, 58:22, 60:7, 60:17, 61:5, 64:13, 70:21, 71:12, 72:3, 72:11, 73:1, 80:16, 81:15, 86:25, 88:13, 89:3, 89:9, 92:24, 92:25, 93:12, 94:22, 95:24, 101:15, 103:7, 108:14, 108:19, 112:13, 117:19, 117:23
**paperwork** [2] - 62:16, 62:20
**parent** [6] - 41:21, 41:23, 114:3, 114:4, 114:20, 115:9
**parents** [1] - 114:11
**part** [24] - 7:13, 8:17, 10:2, 13:3, 18:8, 24:15, 29:12, 30:13, 32:12, 41:8, 53:12, 56:11, 64:4, 81:20, 85:5, 85:24, 86:12, 90:21, 91:3, 93:1, 93:11, 108:13, 108:17, 118:13
**partial** [1] - 113:12
**Partial** [1] - 115:15
**participate** [9] - 11:15, 13:13, 13:21, 21:19, 43:23, 43:24, 44:10, 63:14, 111:20
**participated** [3] - 2:15, 67:15, 67:18
**particular** [12] - 12:19, 20:15, 46:13, 47:9, 47:13, 59:22, 64:25, 75:25, 104:19, 116:15,

117:5, 119:9
**particularly** [13] - 38:17, 57:2, 58:12, 61:3, 61:23, 63:15, 65:6, 103:16, 103:20, 103:22, 117:14, 117:23, 118:20
**parties** [3] - 3:19, 3:21, 4:22, 25:21, 40:9, 81:12
**partnership** [1] - 52:16
**parts** [1] - 76:8
**pass** [1] - 24:24
**passage** [2] - 116:18, 116:21
**past** [2] - 113:20, 118:19
**Patrick** [2] - 2:8, 48:12
**Paul** [1] - 116:22
**pay** [3] - 76:17, 86:22, 115:14
**paying** [2] - 71:18, 113:3
**payment** [3] - 40:6, 73:3, 79:13
**payments** [1] - 8:10
**Peisch** [1] - 116:22
**pending** [7] - 4:6, 23:16, 49:17, 101:12, 102:21, 113:12, 115:2
**Pension** [4] - 45:3, 45:8, 45:9, 108:16
**pension** [2] - 45:4, 75:19
**penultimate** [2] - 107:9, 107:12
**people** [43] - 3:11, 10:12, 10:16, 10:18, 13:17, 15:19, 17:11, 19:20, 21:11, 21:13, 24:18, 24:22, 25:1, 31:5, 32:9, 34:21, 35:12, 36:1, 52:7, 53:1, 58:5, 58:8, 59:21, 62:22, 63:12, 83:11, 83:17, 91:4, 92:2, 108:4, 116:16, 116:25, 117:4, 117:13, 117:22, 117:23, 118:3, 118:4, 118:6, 118:23, 119:3
**People** [3] - 35:10, 35:13, 70:25
**percentage** [13] - 17:2, 27:8, 30:2, 35:21, 35:25, 51:22, 54:15, 60:16, 60:23, 60:24, 80:7, 89:7, 106:5
**percentage-wise** [1] - 51:22
**percentages** [3] - 23:17, 37:11, 94:25
**perfectly** [2] - 10:21, 11:25

**perform** [1] - 117:10
**perhaps** [5] - 10:2, 11:22, 22:12, 56:18, 65:23
**period** [10] - 12:23, 21:3, 31:17, 36:4, 46:17, 57:13, 87:1, 87:2, 87:5, 87:6
**periodicals** [1] - 110:22
**permission** [1] - 48:13
**permitted** [1] - 76:20
**Perry** [7] - 2:13, 4:6, 67:15, 113:19, 113:22, 114:18, 116:1
**PERRY** [4] - 114:12, 114:18, 114:22, 116:2
**Perry's** [2] - 114:2, 119:10
**person** [6] - 13:2, 13:9, 35:14, 41:25, 78:2, 118:9
**personal** [1] - 118:23
**personally** [3] - 31:14, 40:12, 43:6
**persuade** [1] - 46:25
**persuaded** [1] - 98:12
**pertaining** [1] - 9:24
**pertains** [1] - 9:24
**Pete** [1] - 118:4
**Peter** [2] - 2:10, 75:3
**petition** [1] - 116:21
**phenomenal** [2] - 37:11, 92:5
**Phillip** [1] - 116:22
**phone** [6] - 9:10, 31:10, 34:12, 44:3, 50:25, 51:1, 53:16, 53:18, 55:17, 58:9, 113:2
**phoned** [1] - 13:9
**picking** [1] - 119:9
**picture** [1] - 37:15
**pie** [2] - 37:2, 92:20
**piece** [2] - 37:2, 92:20
**Pilgrim** [8] - 1:15, 6:3, 12:9, 14:10, 24:7, 24:8, 27:2, 29:1
**Pineau** [1] - 116:22
**Pitre** [1] - 66:21
**place** [7] - 9:5, 9:8, 49:19, 58:3, 89:21, 90:13
**placed** [1] - 4:22
**places** [1] - 61:16
**Plaintiff** [1] - 2:3
**plaintiff** [22] - 6:8, 7:17, 16:24, 18:7, 19:6, 24:13, 26:3, 28:23, 29:3, 30:4, 30:16, 44:25, 45:10, 45:12, 51:6, 52:16, 66:22, 70:8, 73:17, 75:16, 87:12, 102:17
**plaintiff's** [5] - 27:22,

33:7, 48:6, 111:1, 112:5
**plaintiffs** [26] - 7:16, 7:17, 20:5, 21:6, 21:19, 23:1, 32:15, 33:11, 39:21, 42:1, 49:8, 50:16, 55:24, 70:5, 70:23, 71:20, 73:24, 81:9, 81:12, 81:13, 82:20, 87:14, 101:21, 101:22, 102:24, 107:1
**Plaintiffs** [4] - 1:13, 1:14, 1:16, 2:2
**plaintiffs'** [18] - 3:3, 16:6, 16:19, 17:7, 19:25, 27:5, 29:23, 30:7, 40:17, 45:17, 45:19, 45:21, 47:21, 49:5, 82:12, 115:18, 119:12
**plan** [32] - 5:3, 5:8, 15:14, 19:7, 27:3, 27:22, 29:21, 30:17, 31:10, 38:1, 38:3, 38:6, 43:4, 44:8, 45:4, 56:9, 63:25, 72:2, 76:6, 85:6, 93:22, 93:24, 93:25, 101:14, 104:21, 105:5, 105:13, 105:15, 107:16, 108:21, 110:24, 112:5
**Plan** [6] - 6:9, 24:14, 25:9, 29:4, 45:1, 45:3, 45:8, 45:9, 45:11, 108:16
**planned** [1] - 25:4
**plans** [1] - 75:19
**player** [1] - 100:18
**playoffs** [1] - 31:23
**pleadings** [1] - 3:23
**pleased** [6] - 66:23, 82:19, 83:7, 100:19, 102:19, 118:13
**pleasure** [2] - 20:6, 113:20
**pledge** [1] - 81:1
**plenty** [2] - 35:23, 50:25
**plus** [20] - 6:18, 6:20, 16:18, 17:15, 25:15, 25:17, 25:18, 29:6, 29:8, 40:3, 50:6, 51:8, 59:4, 71:17, 71:22, 86:19, 101:19, 107:18
**point** [51] - 5:12, 10:19, 11:2, 12:2, 13:20, 14:22, 16:2, 16:14, 18:22, 21:12, 23:11, 26:16, 30:3, 31:1, 32:23, 40:4, 41:4, 41:16, 42:2, 46:1, 46:18, 46:20, 47:4, 47:13, 49:19, 50:19, 50:21, 54:6, 55:9, 65:2, 65:4, 77:5, 80:24, 81:1, 81:15, 81:25, 82:4,

82:10, 93:18, 93:24,
95:19, 95:21, 96:14,
100:17, 105:1, 106:8,
109:14, 109:15, 112:13,
112:23
  **pointed** [1] - 84:2
  **points** [12] - 6:25,
26:24, 27:3, 27:17,
29:22, 33:17, 33:21,
42:4, 42:25, 88:6, 88:9,
94:10
  **Pomerantz** [1] - 73:24
  **Popper** [1] - 110:6
  **Pops** [2] - 35:15, 97:16
  **population** [1] - 34:4
  **portal** [4] - 91:7, 91:11,
91:17, 100:23
  **portion** [2] - 32:10,
58:12
  **position** [3] - 43:19,
49:23, 93:14
  **positive** [13] - 9:1, 9:25,
16:19, 28:22, 32:3,
49:22, 68:8, 80:1, 88:5,
91:21, 96:25, 104:3
  **possible** [5] - 20:8,
34:18, 41:17, 44:8,
105:16
  **Post** [2] - 44:25, 45:10
  **posted** [1] - 62:7
  **postings** [1] - 63:6
  **posture** [2] - 7:3, 25:20
  **potential** [11] - 27:4,
88:25, 89:10, 90:25,
92:17, 94:17, 94:25,
95:1, 103:24, 110:18,
111:4
  **potentially** [1] - 111:9
  **power** [1] - 13:19
  **Powers** [4] - 66:22,
67:8, 67:11, 67:15
  **PR** [1] - 71:1
  **practical** [2] - 20:20,
21:9
  **practically** [1] - 86:4
  **practice** [4] - 7:5, 25:23,
99:7, 118:5
  **pragmatism** [1] - 5:1
  **pre** [1] - 22:13
  **pre-meetings** [1] -
22:13
  **precedent** [1] - 95:23
  **precedential** [2] - 96:5,
96:6
  **precise** [1] - 10:24
  **precisely** [1] - 67:5
  **predict** [1] - 17:17
  **prefer** [2] - 14:7, 65:18
  **preliminary** [8] - 22:8,
22:13, 49:9, 52:18,

56:16, 68:23, 70:19,
89:17
  **prepare** [1] - 115:20
  **prepared** [5] - 5:6, 5:18,
31:7, 101:22, 101:23
  **prepares** [1] - 31:4
  **present** [12] - 5:5, 5:8,
26:4, 26:6, 26:9, 48:24,
56:2, 75:14, 96:19, 97:4,
97:25, 102:19
  **presentation** [2] -
19:25, 97:4, 107:12
  **presentations** [5] -
5:18, 56:23, 64:10, 77:9,
77:18
  **presented** [8] - 4:21,
4:25, 5:7, 9:11, 29:5,
77:13, 97:3, 97:10
  **presenting** [3] - 8:18,
28:22, 51:15
  **preserve** [1] - 83:17
  **preserved** [1] - 83:8
  **preside** [1] - 117:7
  **presided** [1] - 4:18
  **press** [1] - 58:9
  **pressed** [1] - 64:24
  **presumably** [1] - 16:4
  **pretrial** [1] - 3:18
  **pretty** [3] - 35:21,
61:24, 77:15
  **prevail** [1] - 8:2
  **prevent** [1] - 52:1
  **preview** [1] - 21:24
  **previously** [2] - 44:15,
68:15
  **prisoners** [2] - 53:3,
53:13
  **prisons** [2] - 53:2, 53:6
  **privacy** [1] - 118:5
  **privilege** [2] - 110:8,
117:2
  **pro** [3] - 15:16, 72:7,
78:20
  **problem** [3] - 32:20,
59:20, 85:3
  **problematic** [2] - 59:16,
59:17
  **problems** [7] - 28:20,
53:5, 78:4, 94:18, 98:24,
115:25
  **procedure** [2] - 12:24,
111:3
  **proceed** [1] - 60:13
  **proceeded** [2] - 67:13,
104:7
  **proceeding** [4] - 23:18,
103:15, 105:15, 113:17
  **proceedings** [9] - 3:1,
3:18, 69:4, 98:17, 99:21,
100:3, 115:18, 120:4,

120:8
  **Proceedings** [1] -
119:21
  **process** [36] - 9:17,
10:23, 10:25, 13:7,
13:15, 13:22, 14:1,
14:10, 14:12, 15:5,
17:10, 17:11, 17:22,
22:17, 26:24, 27:1,
29:14, 34:18, 42:19,
44:5, 50:12, 50:16,
50:20, 51:4, 51:12,
57:18, 70:22, 72:8,
81:20, 83:6, 83:15, 88:8,
90:12, 90:21, 100:1
  **produced** [1] - 107:1
  **professional** [6] - 7:9,
8:7, 118:25, 119:5,
119:11, 119:15
  **professionally** [1] -
26:20
  **professionals** [1] -
17:20
  **Professor** [10] - 72:6,
76:24, 77:11, 77:17,
77:20, 80:6, 80:22, 81:3,
81:15, 82:7
  **program** [16] - 9:4,
9:14, 31:9, 33:22, 33:23,
35:17, 35:20, 50:10,
52:19, 53:5, 53:16,
77:23, 90:22, 97:22,
100:21, 103:22
  **promise** [1] - 107:14
  **pronounce** [1] - 111:16
  **pronounced** [1] -
111:14
  **proof** [15] - 33:23,
35:19, 35:22, 36:4, 57:8,
57:15, 57:23, 59:24,
60:11, 84:25, 91:10,
91:13, 91:20, 101:3,
101:4
  **proof-of-claim** [1] -
84:25
  **proofs** [2] - 42:7, 108:5
  **properly** [1] - 101:13
  **proportion** [2] - 16:8,
56:25
  **proposed** [5] - 20:11,
21:18, 40:17, 51:15,
73:25
  **proposing** [2] - 22:10,
50:4
  **prosecute** [1] - 82:17
  **prosecution** [2] - 6:12,
25:10
  **protected** [1] - 32:12
  **protracted** [2] - 7:8,
25:25

  **proud** [2] - 6:1, 95:20
  **prove** [3] - 63:7, 84:9,
86:20
  **proverbial** [1] - 49:19
  **proves** [1] - 69:21
  **provide** [11] - 11:10,
11:11, 12:17, 13:2, 13:4,
13:11, 17:6, 62:20,
62:23, 67:4, 74:16
  **provided** [3] - 47:6,
65:7, 82:2
  **provision** [1] - 82:4
  **prudential** [1] - 71:21
  **Prussin** [2] - 2:2, 73:23
  **PRUSSIN** [5] - 73:23,
74:8, 74:12, 74:20, 74:25
  **PSLRA** [1] - 71:5
  **Public** [2] - 24:14, 25:8
  **public** [3] - 56:18,
93:18, 117:9
  **publication** [12] - 9:4,
35:1, 35:2, 36:23, 52:23,
58:14, 64:11, 68:9,
70:24, 71:3, 100:22
  **publications** [1] - 35:4,
35:6, 52:23, 58:11
  **published** [2] - 52:21,
110:22
  **purported** [2] - 18:16,
44:21
  **purporting** [1] - 44:13
  **purposes** [1] - 111:7
  **pursuant** [1] - 112:16
  **pursue** [2] - 40:9,
74:22, 111:25
  **pursued** [1] - 69:5
  **pursuing** [1] - 111:22
  **pursuit** [1] - 18:22
  **put** [17] - 9:1, 9:5,
14:16, 16:17, 18:6,
23:12, 36:1, 47:1, 50:13,
50:16, 50:20, 53:12,
91:7, 99:25, 104:9,
108:14
  **Putnam** [7] - 1:22, 2:9,
41:6, 70:3, 70:7, 75:4,
113:25
  **Putnam's** [1] - 71:18
  **putting** [3] - 71:18,
88:23, 94:17

**Q**

  **quarreling** [1] - 118:23
  **quasi** [1] - 85:9
  **questions** [17] - 5:17,
10:22, 20:1, 20:14,
34:11, 38:24, 44:4, 48:8,
55:1, 55:7, 59:9, 64:14,

68:17, 72:12, 102:4,
104:2, 108:20
  **quick** [2] - 10:10, 48:15
  **quickly** [1] - 3:20
  **quite** [4] - 9:6, 26:15,
44:8
  **quote** [1] - 53:22

**R**

  **radar** [1] - 64:3
  **raise** [5] - 22:16, 44:13,
64:17, 65:4, 65:24
  **raised** [3] - 10:22, 15:4,
59:19
  **range** [5] - 17:2, 45:24,
94:25, 95:1, 95:3
  **rata** [2] - 15:16, 72:7,
78:20
  **rates** [1] - 90:3
  **rather** [5] - 9:18, 25:3,
64:3, 68:14, 113:3
  **RDAP** [1] - 53:5
  **RDM** [1] - 75:18
  **Re** [1] - 120:4
  **RE** [1] - 1:4
  **reach** [1] - 13:17
  **reached** [5] - 41:1,
45:14, 66:24, 76:5, 76:18
  **reaction** [3] - 8:24, 9:1,
9:24, 9:25, 68:7
  **read** [3] - 53:1, 58:18,
111:15
  **ready** [1] - 98:18
  **real** [5] - 8:14, 17:10,
60:15, 60:20, 86:20
  **realistic** [1] - 13:20
  **reality** [1] - 8:19
  **realize** [3] - 59:18,
105:22, 118:20
  **realized** [1] - 99:5
  **realizing** [1] - 91:1
  **really** [13] - 31:13,
31:16, 43:2, 43:16,
53:13, 69:22, 96:23,
98:25, 104:6, 104:24,
105:1, 111:6, 118:21
  **reason** [10] - 19:12,
26:24, 27:18, 46:13,
55:11, 64:21, 92:3, 94:6,
99:10, 111:24
  **reasonable** [22] - 12:17,
15:17, 17:1, 21:17, 30:6,
38:4, 38:15, 38:19,
47:16, 65:12, 69:15,
72:13, 72:22, 73:18,
79:17, 92:22, 94:12,
96:2, 96:3, 98:12,
106:15, 119:19

**reasonableness** [3] - 106:7, 106:11, 112:4
**reasons** [8] - 15:20, 45:25, 46:12, 67:20, 80:10, 86:14, 96:5, 98:21
**receipt** [1] - 111:17
**receive** [5] - 13:15, 13:16, 34:12, 44:9, 105:11
**received** [26] - 9:9, 38:10, 38:11, 40:7, 43:1, 43:2, 44:13, 48:16, 51:1, 68:9, 71:10, 72:16, 90:20, 91:19, 91:24, 92:6, 92:9, 92:11, 93:13, 93:23, 101:4, 101:5, 101:6, 104:3, 104:8, 105:13
**recently** [1] - 4:9
**recess** [2] - 55:16, 55:20
**recognition** [1] - 63:11
**recognize** [4] - 34:19, 45:23, 59:14, 105:20
**recognized** [3] - 18:23, 61:25, 74:1
**recognizing** [1] - 29:12
**recommend** [2] - 54:24, 76:16
**record** [20] - 5:16, 10:12, 18:1, 18:12, 19:9, 22:6, 22:12, 23:1, 29:13, 30:15, 30:24, 35:7, 36:8, 43:18, 44:6, 47:25, 99:25, 103:12, 104:23, 118:8
**record's** [1] - 18:24
**recorded** [1] - 120:3
**records** [11] - 44:1, 57:12, 57:14, 57:18, 58:3, 59:21, 60:2, 60:9, 62:18, 85:1, 108:5
**recover** [5] - 51:18, 56:11, 66:6, 107:25, 108:1
**recoverable** [1] - 89:7
**recovered** [1] - 56:11
**recovering** [1] - 98:23
**recovery** [31] - 6:17, 6:19, 25:15, 25:16, 29:6, 37:10, 37:14, 56:11, 61:2, 64:1, 64:3, 64:5, 65:12, 69:25, 81:14, 81:16, 84:17, 85:4, 85:10, 89:2, 92:17, 93:8, 94:13, 94:16, 94:20, 94:25, 95:6, 96:1, 97:9, 105:8
**reduce** [2] - 88:22, 105:14

**reduction** [1] - 62:10
**Reed** [1] - 55:5
**refer** [1] - 40:12
**referenced** [1] - 111:18
**refile** [1] - 23:25
**reflect** [8] - 5:16, 10:12, 18:12, 19:9, 22:6, 22:12, 86:25, 88:13
**reflected** [1] - 89:9
**reflection** [2] - 10:2, 116:15
**reflective** [1] - 85:23
**reflects** [3] - 82:13, 88:22, 89:1
**regard** [39] - 10:22, 33:22, 36:5, 37:25, 38:7, 39:5, 47:12, 48:11, 86:22, 86:24, 88:1, 88:8, 88:11, 89:5, 90:9, 90:10, 90:22, 91:10, 91:23, 92:4, 92:8, 93:1, 93:2, 93:21, 93:23, 94:11, 94:14, 94:23, 95:4, 96:9, 96:13, 96:14, 97:14, 100:19, 100:23, 101:14, 101:16, 102:2, 105:5
**regarding** [10] - 7:5, 7:25, 14:20, 25:24, 39:1, 56:23, 57:23, 64:7, 64:25, 108:20
**regular** [1] - 114:14
**regulators** [1] - 49:18
**regulatory** [2] - 8:11, 42:13, 49:25
**rehash** [1] - 93:20
**rehashing** [1] - 87:19
**reimbursed** [1] - 93:3
**reimbursement** [12] - 16:17, 16:22, 27:7, 27:23, 30:1, 30:17, 45:7, 48:6, 69:9, 106:9, 106:17, 106:25
**rejected** [1] - 53:12
**relate** [2] - 68:13, 69:11
**related** [4] - 6:14, 7:24, 26:8, 108:8
**relates** [2] - 10:25, 112:23
**relating** [6] - 8:3, 26:6, 29:10, 43:13, 70:21, 111:3
**relation** [1] - 37:3
**relative** [2] - 31:9, 54:15
**relatively** [2] - 56:25, 104:12
**release** [1] - 82:25
**relevant** [3] - 7:14, 12:23, 40:8
**reliable** [1] - 11:13
**relief** [4] - 6:15, 25:14,

51:24, 55:13
**relying** [1] - 108:5
**remain** [3] - 29:22, 55:18, 114:19
**remainder** [8] - 21:16, 42:23, 56:13, 56:15, 82:6, 82:8, 85:5, 109:14
**remaining** [4] - 15:25, 16:3, 40:10, 67:1
**remains** [1] - 20:21
**remarkably** [1] - 110:21
**remarks** [2] - 3:4, 5:8
**remedy** [1] - 107:22
**remember** [2] - 28:20, 117:24
**remembrance** [1] - 118:8
**remind** [1] - 77:14
**repeat** [4] - 6:24, 26:23, 56:22, 103:8
**repeating** [1] - 30:14
**replies** [1] - 118:2
**reply** [3] - 60:7, 72:17, 108:14
**report** [4] - 66:23, 72:5, 74:17, 114:1
**Reported** [1] - 2:20
**reported** [3] - 4:1, 4:2, 77:4
**reporter** [2] - 48:17, 119:17
**Reporter** [2] - 4:1, 120:16
**REPORTER'S** [1] - 120:1
**reports** [2] - 49:15, 62:7
**represent** [4] - 32:24, 72:19, 73:24, 119:5
**representation** [3] - 52:14, 52:15, 119:11
**representative** [2] - 44:25, 67:14
**representatives** [5] - 13:1, 13:9, 28:1, 44:23, 52:10
**represented** [1] - 75:16
**representing** [2] - 52:11, 85:12
**represents** [2] - 58:24, 59:8, 75:17
**request** [56] - 5:3, 16:17, 16:25, 18:6, 27:7, 27:11, 27:13, 27:21, 28:13, 30:3, 30:6, 30:15, 30:17, 31:4, 36:5, 36:24, 38:7, 38:11, 43:3, 45:16, 45:23, 46:9, 48:1, 48:15, 48:19, 71:8, 71:15, 72:23, 73:7, 73:11, 73:15, 73:19, 85:12,

94:10, 94:23, 95:5, 96:7, 96:8, 96:13, 97:21, 98:3, 98:6, 98:8, 99:3, 99:11, 101:16, 105:19, 106:6, 106:8, 106:17, 106:18, 107:10, 107:11, 108:22
**requested** [2] - 17:6, 34:13, 45:24, 47:4, 66:10, 71:8, 105:17, 106:25
**requesting** [6] - 19:5, 36:6, 38:8, 38:9, 47:23, 48:6
**requests** [15] - 9:13, 19:8, 22:7, 27:23, 28:3, 30:1, 32:13, 67:16, 71:7, 71:9, 71:10, 97:18, 101:5, 107:7, 111:20
**require** [2] - 14:23, 32:19
**required** [7] - 11:12, 11:16, 12:14, 32:19, 105:10, 109:21, 109:25
**requirement** [3] - 11:1, 42:6, 42:15
**requirements** [4] - 11:14, 68:15, 111:6, 111:7
**requires** [1] - 11:18
**residual** [1] - 90:10
**resolution** [2] - 115:2, 115:13
**resolve** [6] - 6:5, 21:3, 28:25, 66:24, 70:13, 95:14
**resolved** [3] - 70:15, 82:25, 115:5
**resolving** [1] - 85:3
**respect** [11] - 27:20, 40:22, 44:18, 58:23, 67:2, 68:5, 72:23, 80:13, 106:17, 110:17, 115:19
**respectful** [1] - 32:15
**respectfully** [9] - 6:23, 6:25, 9:24, 16:25, 19:3, 19:5, 27:21, 30:5, 30:15
**respective** [1] - 107:4
**respond** [4] - 11:2, 15:3, 19:3, 64:13
**responded** [5] - 5:17, 72:17, 92:24, 93:12, 93:14
**responding** [3] - 17:21, 67:16, 91:2
**response** [14] - 5:15, 19:16, 19:19, 28:11, 39:3, 48:25, 65:1, 85:18, 91:3, 91:22, 94:3, 97:24, 98:9, 104:3
**responsive** [1] - 17:12

**rest** [4] - 64:14, 104:18, 105:3
**restitution** [2] - 49:12, 49:13
**resubmit** [2] - 39:6, 39:13
**result** [4] - 7:8, 30:6, 92:18, 108:6
**results** [2] - 16:19, 30:12
**retained** [2] - 38:2, 93:5
**retirement** [4] - 75:19, 104:16, 104:18
**Retirement** [2] - 45:1, 45:10
**return** [2] - 37:4, 81:17
**Revaul** [1] - 43:6
**reversions** [1] - 21:9
**revert** [2] - 15:10, 36:15
**review** [4] - 7:11, 26:1, 108:13, 108:17
**reviewed** [4] - 73:14, 101:24, 108:19
**reward** [1] - 15:6
**Richard** [4] - 1:22, 1:23, 102:15, 102:16
**Rick** [2] - 70:4, 70:6
**RICO** [1] - 79:20
**RIFKIN** [15] - 20:4, 20:13, 20:19, 20:23, 21:1, 21:12, 21:22, 21:24, 22:18, 22:22, 81:8, 82:22, 109:1, 109:3, 109:5
**Rifkin** [6] - 1:16, 20:5, 23:2, 81:9, 82:21, 85:17
**Rifkin's** [1] - 23:8
**rights** [1] - 83:8
**Rinando** [1] - 37:1
**Rinando's** [1] - 37:13
**rings** [1] - 116:19
**risk** [10] - 26:6, 60:15, 61:22, 69:21, 70:16, 73:16, 82:1, 82:15, 87:22, 103:15
**risks** [13] - 7:23, 8:5, 8:14, 26:6, 26:7, 26:8, 26:14, 26:22, 56:23, 87:24, 87:25
**risky** [2] - 96:16, 96:17
**robust** [4] - 9:4, 35:17, 70:22, 103:23
**rock** [1] - 49:19
**role** [1] - 67:12
**room** [2] - 3:8, 3:14
**Room** [1] - 2:21
**roughly** [1] - 73:4
**routine** [1] - 109:6
**row** [1] - 28:19
**RPR** [1] - 2:20

**RS** [8] - 1:23, 102:14,
102:18, 102:19, 102:23,
103:4, 105:6, 105:8
**Rule** [1] - 71:4
**ruled** [2] - 7:4, 96:3
**rulings** [2] - 25:23,
41:10
**run** [1] - 95:25
**running** [1] - 54:18

**S**

**Sallahuddin** [1] -
116:23
**Salleela** [1] - 116:22
**sat** [1] - 101:22
**satisfied** [2] - 51:17,
108:22
**savings** [2] - 32:10,
32:11
**saw** [2] - 12:1, 116:21
**scale** [1] - 3:15
**scenario** [1] - 37:8
**schedule** [4] - 24:18,
25:4, 112:14
**scheduling** [1] - 74:23
**scheme** [2] - 8:3,
100:19
**Schieren** [2] - 2:12,
115:8
**SCHIEREN** [2] - 115:8,
115:12
**Schwab** [1] - 58:2
**science** [1] - 80:24
**scienter** [2] - 8:4, 8:8
**scrambling** [1] - 76:8
**Scudder** [14] - 1:18,
39:25, 40:11, 40:16,
40:19, 42:6, 42:8, 44:15,
44:18, 45:19, 46:2,
46:13, 46:15, 48:23
**Scudder/Deutsche** [5] -
39:21, 40:25, 41:5,
41:20, 46:14
**Sean** [1] - 116:23
**seat** [1] - 3:10
**seated** [1] - 55:21
**seats** [1] - 116:4
**SEC** [12] - 11:8, 21:15,
42:9, 42:12, 64:3, 68:1,
84:16, 86:18, 105:8,
107:22, 107:23, 109:7
**SEC's** [1] - 69:4
**second** [7] - 31:12,
36:14, 41:18, 41:22,
74:18, 74:20
**secondly** [1] - 95:7
**section** [1] - 104:2
**Section** [1] - 25:12

**secure** [1] - 89:15
**securities** [10] - 11:9,
11:20, 45:9, 75:17,
79:18, 89:12, 96:9,
96:17, 97:6, 111:19
**Security** [1] - 91:8
**see** [15] - 12:13, 15:21,
36:3, 37:11, 53:9, 59:10,
62:15, 62:18, 80:3,
84:13, 96:9, 97:5,
112:18, 116:18, 118:21
**seeing** [2] - 29:17,
113:22
**seek** [7] - 6:2, 6:15,
14:15, 16:21, 24:9,
25:14, 51:21
**seeking** [16] - 27:8,
30:2, 40:1, 45:20, 45:21,
54:1, 54:14, 54:21, 64:9,
68:20, 69:9, 79:3, 80:13,
94:9, 96:25, 97:1
**seem** [3] - 10:18, 43:14,
111:24
**send** [2] - 50:23, 97:22
**sending** [2] - 44:2,
57:13
**sense** [3] - 51:9, 52:20,
85:23
**sensibly** [1] - 85:2
**sent** [15] - 9:3, 9:15,
33:24, 33:25, 43:1,
43:21, 50:22, 58:7, 60:9,
63:8, 77:24, 79:1, 97:15,
100:24, 103:23
**sentiment** [1] - 53:19
**separate** [16] - 3:23,
8:16, 34:5, 34:7, 43:8,
43:16, 46:16, 46:17,
46:19, 65:7, 105:23,
105:24, 106:1, 114:19,
118:1
**separately** [6] - 52:24,
54:3, 54:17, 79:8, 80:7,
80:9
**September** [3] - 31:7,
48:2, 71:9
**serial** [1] - 18:23
**serious** [3] - 78:2,
78:16, 88:2
**served** [1] - 85:8
**service** [5] - 56:18,
65:8, 105:21, 117:9,
117:10
**services** [1] - 65:2
**sessions** [1] - 41:2
**set** [17] - 3:4, 8:10,
12:23, 12:24, 33:25,
34:5, 49:9, 49:12, 50:16,
51:4, 52:18, 68:1, 70:20,
72:12, 74:23, 80:15, 85:5

**set-off** [1] - 68:1
**set-offs** [1] - 8:10
**Seth** [3] - 1:19, 49:4,
49:7
**sets** [3] - 46:23, 96:11,
117:25
**settle** [2] - 82:11, 89:23
**settled** [11] - 26:9,
40:19, 49:18, 62:3,
65:25, 66:4, 71:22, 74:3,
86:18, 89:19
**settlement** [191] - 4:12,
6:2, 6:5, 6:14, 6:16,
6:22, 7:1, 7:8, 7:16,
8:17, 9:5, 9:7, 11:15,
11:17, 13:13, 15:25,
19:7, 19:14, 20:10,
21:10, 24:9, 25:14,
25:19, 25:20, 27:22,
28:13, 29:9, 30:16,
33:15, 33:18, 37:16,
40:2, 40:6, 40:24, 41:4,
41:15, 41:16, 42:3, 42:5,
42:25, 43:2, 43:3, 43:15,
43:23, 43:25, 44:9,
44:11, 44:12, 44:14,
45:6, 45:20, 45:22,
48:16, 49:6, 53:3, 53:20,
53:22, 54:2, 54:5, 54:18,
54:25, 55:9, 56:3, 56:8,
56:25, 57:2, 57:4, 59:3,
60:17, 64:1, 67:4, 67:7,
68:14, 71:1, 71:7, 71:15,
71:16, 71:19, 71:20,
71:21, 72:13, 72:21,
73:16, 73:17, 73:18,
73:25, 74:8, 75:4, 75:6,
75:9, 76:4, 76:7, 76:15,
76:20, 77:2, 78:11,
78:13, 78:16, 78:19,
78:22, 79:6, 79:14,
79:17, 81:25, 82:5,
82:20, 82:24, 84:4,
84:11, 84:12, 84:15,
84:17, 84:18, 84:21,
84:24, 84:25, 85:11,
85:15, 86:10, 86:12,
86:15, 86:16, 86:23,
86:24, 86:25, 87:3, 88:8,
88:11, 88:12, 88:13,
88:22, 88:23, 88:25,
89:1, 89:10, 89:13,
89:14, 89:15, 89:16,
89:23, 90:17, 90:24,
91:22, 92:5, 92:9, 92:21,
93:21, 93:22, 93:24,
94:1, 94:14, 94:20,
94:24, 95:4, 95:11,
95:20, 97:15, 97:25,
98:1, 100:15, 100:16,

102:19, 102:22, 102:23,
102:25, 103:5, 103:8,
103:16, 104:17, 105:18,
107:7, 107:16, 107:18,
108:2, 108:13, 108:18,
108:21, 108:23, 109:7,
109:10, 109:11, 110:24,
111:1, 111:14, 111:17,
111:20, 112:1, 112:4,
112:10
**settlements** [39] - 4:8,
4:10, 4:12, 4:14, 5:7,
9:25, 11:20, 20:11,
20:12, 20:22, 21:3, 21:7,
21:21, 28:22, 37:25,
40:1, 40:5, 42:13, 45:14,
49:25, 50:5, 52:25,
61:19, 61:23, 66:10,
66:23, 67:4, 67:19,
67:21, 68:5, 69:4, 69:8,
83:18, 86:15, 89:5, 89:6,
90:18, 94:23, 115:19
**settling** [3] - 40:7,
42:23, 82:16
**setup** [1] - 70:24
**seven** [5] - 94:10, 95:2,
95:15, 103:23, 104:12
**seven-fold** [1] - 95:2
**seven-page** [1] - 103:23
**several** [5] - 45:25,
46:4, 50:5, 53:16, 67:24
**shades** [1] - 3:21
**shape** [1] - 112:1
**share** [1] - 51:4
**shareholder** [1] - 72:20
**shareholders** [21] -
21:13, 31:5, 34:2, 50:4,
50:7, 50:10, 50:12,
51:25, 52:11, 52:12,
71:11, 76:18, 77:12,
78:10, 78:18, 79:8,
79:10, 80:10, 81:19,
81:20, 82:9
**shareholding** [1] -
11:10
**shares** [8] - 12:16,
12:17, 12:23, 67:11,
67:17, 92:6, 104:18,
105:1
**short** [6] - 8:22, 11:18,
55:16, 74:24, 99:18,
100:5
**shortly** [1] - 4:14
**shout** [1] - 118:7
**shout-out** [1] - 118:7
**show** [5] - 12:3, 76:11,
96:20, 96:23, 111:4
**showed** [2] - 31:2,
76:11
**shows** [2] - 70:16,

100:2
**shuffle** [1] - 75:25
**side** [2] - 21:19, 47:21,
54:13, 70:24, 81:22,
83:16, 83:17, 99:7
**sides** [3] - 26:18, 26:22,
119:11
**sign** [1] - 13:4
**signature** [1] - 120:11
**signed** [4] - 18:7, 30:4,
62:2, 90:2
**significant** [20] - 7:23,
8:5, 9:18, 29:18, 59:8,
68:25, 69:15, 80:14,
85:13, 86:15, 88:4,
88:18, 88:19, 90:2, 90:7,
90:8, 97:22, 100:16,
100:17, 105:2
**significantly** [1] - 88:21
**similar** [8] - 10:15, 27:6,
29:11, 29:23, 33:23,
40:4, 42:12, 79:12
**similarly** [2] - 25:20,
106:8
**simple** [2] - 54:5, 54:6
**simplified** [2] - 11:14,
13:12
**simply** [5] - 12:14, 20:9,
66:8, 83:18, 85:5
**SIMSHAUSER** [1] -
75:3
**Simshauser** [2] - 2:10,
75:3
**single** [4] - 43:21, 89:8,
108:7, 110:23
**sit** [1] - 20:16
**site** [12] - 9:5, 9:7,
33:25, 34:1, 35:19, 44:3,
58:8, 62:6, 62:9, 91:7,
100:23, 103:25
**sitting** [2] - 24:24, 113:6
**situation** [5] - 43:9,
46:22, 65:6, 85:2, 103:23
**situations** [2] - 57:7,
80:2
**six** [15] - 3:6, 16:18,
36:24, 37:17, 37:19,
37:20, 37:21, 37:22,
48:7, 61:6, 89:21, 94:10,
99:1, 104:13, 107:18
**size** [6] - 8:25, 16:13,
17:18, 17:24, 44:7, 50:9
**Skadden** [1] - 75:3
**skill** [1] - 110:1
**skip** [1] - 27:18
**slice** [1] - 92:15
**slicing** [1] - 92:16
**slightly** [2] - 59:3, 81:10
**small** [13] - 37:2, 37:3,
37:4, 37:14, 39:15, 45:1,

71:11, 71:13, 92:20, 100:18, 101:21, 104:13, 104:16

**smaller** [4] - 84:21, 85:13, 100:24

**Smith** [1] - 55:5

**smoothly** [2] - 17:12, 118:11

**Social** [1] - 91:8

**solution** [1] - 20:24

**someone** [4] - 52:11, 52:12, 78:4, 95:13

**sometime** [2] - 9:8, 50:20

**sometimes** [3] - 15:19, 83:16, 96:20

**somewhat** [3] - 37:4, 88:2, 94:9

**sophisticated** [8] - 7:6, 7:18, 25:25, 28:1, 32:4, 32:9, 32:19, 45:12

**sorry** [9] - 33:24, 37:19, 73:21, 82:23, 85:21, 87:16, 106:5, 106:10, 114:18

**sort** [7] - 20:21, 21:16, 31:12, 35:14, 39:5, 75:25, 97:8

**sought** [2] - 14:25, 111:10

**sources** [3] - 6:18, 25:16, 63:24

**spaces** [1] - 39:6

**spared** [1] - 41:12

**speaking** [5] - 15:12, 22:1, 39:21, 58:22, 83:24

**speaks** [2] - 5:19, 108:1, 112:3

**spearheaded** [1] - 35:2

**special** [1] - 118:7

**specific** [5] - 13:19, 88:9, 89:4, 107:23, 108:11

**specifically** [4] - 44:18, 64:10, 88:17, 97:1

**specified** [1] - 57:16

**spelled** [1] - 111:16

**spend** [1] - 68:22

**spent** [5] - 51:13, 54:7, 54:16, 102:1, 107:3

**sponte** [1] - 53:11

**staffs** [1] - 4:23

**stage** [3] - 3:4, 68:23, 95:16

**stages** [3] - 32:7, 77:4, 115:12

**stake** [1] - 19:1

**stakes** [1] - 118:20

**Stamp** [1] - 3:7

**stand** [3] - 74:19, 95:19,

119:20

**standards** [2] - 7:1, 72:12

**standing** [17] - 7:5, 8:4, 18:16, 20:21, 25:24, 40:22, 44:19, 59:15, 63:18, 65:24, 66:6, 72:19, 93:11, 93:15, 93:17, 94:18, 106:21

**stands** [1] - 53:10

**start** [4] - 5:18, 33:5, 110:9, 113:3

**state** [1] - 77:14

**State** [1] - 71:23

**statements** [2] - 60:4, 100:8

**STATES** [1] - 1:1

**status** [1] - 74:17

**stay** [4] - 25:5, 25:6, 105:3, 115:5

**stayed** [2] - 115:2, 116:4

**staying** [1] - 104:20

**Stearns** [3] - 33:20, 102:24, 103:2

**Steelworkers** [2] - 45:3, 45:9

**steelworkers** [1] - 45:8

**stenographically** [1] - 120:4

**step** [2] - 28:23, 86:8

**Stephanie** [1] - 54:8

**Stewart** [2] - 2:11, 102:7

**stick** [3] - 24:17, 24:21, 25:3

**still** [13] - 13:4, 13:22, 19:15, 21:15, 38:19, 82:12, 106:4, 110:19, 113:4, 114:5, 115:9

**stipend** [1] - 101:21

**stipulation's** [1] - 83:1

**stock** [1] - 53:5

**stories** [1] - 63:15

**Strauss** [2] - 70:4, 70:7

**Street** [4] - 2:21, 52:21, 52:24, 70:25

**stress** [1] - 97:7

**strike** [2] - 14:15, 15:1

**strong** [1] - 57:12

**Strong** [10] - 1:20, 18:18, 23:4, 55:24, 56:2, 56:6, 56:19, 57:3, 57:11, 57:17, 57:22, 58:12, 60:5, 62:4, 62:8, 64:2, 64:7, 84:3, 108:3

**structure** [2] - 21:7, 57:2

**structured** [1] - 84:24

**structuring** [1] - 85:15

**studied** [1] - 61:6

**studies** [2] - 89:4, 94:22

**study** [1] - 22:10

**sua** [1] - 53:11

**sub** [1] - 52:14

**sub-groups** [1] - 52:14

**subclass** [2] - 51:7, 79:19

**subclasses** [1] - 52:10

**subject** [5] - 50:8, 56:15, 64:2, 84:6, 100:9

**submission** [2] - 35:22, 42:6

**submit** [20] - 6:23, 6:25, 9:25, 16:25, 17:5, 18:21, 19:4, 23:19, 30:5, 34:4, 34:15, 34:21, 37:10, 48:8, 57:8, 68:7, 89:11, 101:12, 105:10

**submitted** [22] - 6:13, 9:18, 14:4, 14:12, 15:6, 18:17, 19:8, 25:13, 27:2, 29:19, 45:5, 60:7, 65:17, 68:12, 68:19, 70:21, 71:2, 79:16, 79:23, 83:1, 84:7, 103:7

**submitting** [1] - 105:15

**subsequent** [1] - 17:17

**subset** [1] - 96:22

**substantial** [1] - 55:11

**substantive** [2] - 65:9, 79:5

**subtrack** [88] - 5:7, 5:9, 5:10, 5:18, 5:24, 6:3, 6:7, 6:16, 7:12, 8:17, 9:2, 9:17, 10:15, 10:23, 10:24, 12:8, 12:9, 12:10, 12:11, 14:3, 14:17, 18:4, 18:15, 18:18, 18:20, 18:25, 19:1, 19:23, 20:11, 24:8, 24:9, 24:10, 24:13, 26:6, 26:21, 26:22, 27:2, 28:9, 28:24, 29:2, 29:19, 30:19, 33:6, 33:8, 33:12, 39:25, 40:16, 45:19, 46:3, 47:2, 48:23, 49:4, 49:8, 55:24, 59:11, 63:4, 64:13, 66:18, 69:21, 70:3, 70:7, 81:7, 83:6, 83:24, 86:7, 86:10, 91:5, 91:13, 91:24, 97:3, 98:4, 99:17, 100:4, 100:13, 100:14, 100:24, 102:6, 102:14, 102:18, 102:20, 102:21, 102:23, 103:4, 107:13, 110:5, 110:12

**Subtrack** [13] - 1:18, 1:21, 1:22, 1:23, 1:24, 2:5, 2:6, 2:7, 2:8, 2:9,

2:10, 2:11, 2:12

**subtracks** [29] - 3:20, 4:12, 4:13, 5:5, 6:4, 10:5, 10:6, 14:1, 15:11, 15:12, 18:19, 19:10, 26:25, 32:14, 33:5, 36:9, 36:18, 46:10, 46:11, 47:11, 65:7, 65:10, 91:6, 91:25, 95:8, 98:5, 98:11, 99:16

**Subtracks** [4] - 1:15, 1:17, 1:19, 1:20

**succeeded** [1] - 69:7

**successful** [6] - 35:3, 35:18, 58:4, 65:10, 70:12, 119:19

**successfully** [1] - 57:6

**Sucharow** [2] - 75:13, 75:14

**Sucharow's** [1] - 75:17

**sudden** [1] - 36:2

**sue** [2] - 52:3, 52:5

**suffered** [2] - 72:10, 76:2

**suggest** [1] - 89:5

**suggests** [1] - 18:18

**sum** [1] - 19:5

**summary** [11] - 40:14, 41:6, 41:7, 46:6, 47:6, 68:4, 103:17, 110:10, 110:13, 113:12, 115:3

**Summary** [2] - 70:10, 103:12, 115:16

**summer** [1] - 117:8

**Sun** [1] - 53:21

**supplemental** [2] - 48:2, 92:25

**supplied** [2] - 85:1, 108:6

**support** [13] - 19:6, 27:13, 27:22, 30:16, 45:6, 47:4, 47:8, 73:8, 75:4, 82:20, 96:7, 98:3, 116:20

**supported** [3] - 16:23, 27:11, 94:22

**supporting** [2] - 25:13

**supports** [4] - 7:15, 45:13, 93:5, 99:2

**supposed** [1] - 115:10

**Supreme** [5] - 4:6, 114:3, 114:16, 114:19, 114:22

**surely** [1] - 117:21

**survived** [1] - 41:21

**swearing** [1] - 117:8

**sympathize** [1] - 43:9

**T**

**Taft** [1] - 45:4

**Taft-Hartley** [1] - 45:4

**talents** [1] - 106:20

**target** [1] - 35:12

**task** [1] - 109:25

**tax** [2] - 60:3, 62:17

**taxed** [1] - 117:21

**technical** [1] - 118:4

**teleconference** [2] - 3:11, 10:11

**teleconferences** [1] - 3:24

**telephone** [3] - 9:8, 100:5, 108:19

**temperament** [1] - 5:1

**Templeton** [4] - 113:2, 114:6, 115:7, 115:15

**ten** [1] - 87:1

**tend** [2] - 10:25, 32:8

**tens** [1] - 67:10

**term** [1] - 32:7

**terms** [21] - 37:7, 37:9, 37:17, 51:4, 54:1, 54:12, 72:2, 73:9, 74:6, 74:11, 79:5, 81:11, 82:24, 83:6, 85:25, 86:3, 87:9, 91:2, 91:4, 91:22, 98:23

**Terrell** [2] - 43:22, 44:1

**terrific** [1] - 29:20

**testament** [1] - 95:16

**tested** [1] - 11:12

**THE** [2] - 1:1, 1:1

**themselves** [7] - 5:20, 16:5, 44:20, 68:5, 76:2, 81:19, 92:2

**Theodore** [2] - 2:4, 18:17

**theoretical** [3] - 37:7, 37:10, 88:14

**theoretically** [1] - 14:13

**theories** [1] - 69:6

**theory** [1] - 107:24

**therefore** [4] - 44:8, 44:20, 101:11, 111:20

**they've** [5] - 24:23, 45:11, 53:17, 57:24, 62:24

**third** [1] - 95:21

**Thompson** [1] - 118:4

**thoroughly** [1] - 22:7

**thousand** [2] - 50:14, 50:17

**thousands** [2] - 67:10, 73:13

**three** [23] - 4:1, 4:4, 14:1, 14:11, 26:25, 32:14, 33:19, 40:17,

40:19, 59:4, 71:16, 81:12, 86:12, 87:2, 89:23, 90:5, 95:2, 96:11, 98:19, 110:9, 112:8, 117:25

**Three** [1] - 12:15
**three-fold** [1] - 95:2
**three-million-five-hundred** [1] - 33:19
**throughout** [9] - 20:14, 26:25, 35:11, 52:15, 69:4, 69:12, 87:25, 107:2, 118:17
**throw** [1] - 24:17
**Thursday** [1] - 1:7
**tied** [1] - 8:9
**Tikellis** [2] - 22:25, 115:1
**Tillman** [1] - 53:17
**Tim** [2] - 22:24, 114:25
**timers** [2] - 67:25, 75:23
**timing** [17] - 8:1, 21:14, 41:19, 46:22, 46:24, 52:1, 61:17, 64:2, 64:4, 75:22, 76:2, 76:11, 87:4, 87:11, 107:23, 109:19
**Timothy** [1] - 2:3
**Tobin** [1] - 116:23
**today** [32] - 3:5, 3:9, 4:8, 4:10, 5:3, 5:14, 6:9, 15:12, 18:5, 20:7, 22:11, 25:11, 40:1, 42:5, 50:4, 53:10, 54:11, 75:14, 78:6, 83:5, 93:11, 94:8, 95:6, 95:19, 97:10, 97:13, 99:20, 103:10, 106:21, 113:17, 116:4, 116:9
**Today** [3] - 52:21, 52:25, 53:2
**together** [4] - 19:11, 79:21, 116:11
**toll** [1] - 9:8
**toll-free** [1] - 9:8
**Tom** [1] - 70:14
**tomorrow** [6] - 99:21, 100:2, 100:9, 113:24, 115:22, 115:23
**Tonolli** [1] - 116:23
**took** [7] - 49:10, 69:17, 69:22, 89:21, 95:15, 114:7, 116:3
**Topaz** [4] - 33:7, 33:11, 86:7, 86:10
**total** [12] - 4:12, 6:16, 17:7, 29:6, 30:7, 40:2, 59:3, 71:16, 80:16, 84:18, 102:25, 107:17
**totaling** [1] - 40:2
**totals** [2] - 25:15,

105:18
**touch** [2] - 99:2, 100:4
**touched** [2] - 34:25, 38:1
**toward** [2] - 64:1, 108:9
**towards** [3] - 54:23, 66:9, 106:19
**track** [16] - 31:4, 39:21, 60:3, 66:22, 67:24, 68:3, 69:14, 71:19, 74:19, 81:24, 82:11, 87:5, 88:1, 88:4, 97:2, 109:24
**tracks** [6] - 24:3, 35:1, 42:19, 42:21, 97:1, 118:1
**trade** [1] - 14:14
**trade-offs** [1] - 14:14
**trading** [12] - 14:14, 50:8, 52:1, 57:12, 57:14, 58:2, 76:3, 85:1, 87:4, 87:11, 108:5, 109:19
**transaction** [1] - 11:19
**transactional** [1] - 42:10
**transcribed** [1] - 120:8
**transcript** [1] - 120:8
**transfer** [1] - 105:6
**transferred** [1] - 3:17
**transparency** [1] - 83:6
**travel** [1] - 47:14
**treated** [1] - 14:7
**tree** [2] - 116:18, 116:19
**tremendous** [4] - 4:22, 83:20, 118:2
**trial** [2] - 26:10, 98:18
**trickier** [1] - 107:20
**tried** [4] - 13:19, 18:24, 35:11, 56:9
**Troy** [2] - 70:4, 70:7
**true** [10] - 3:15, 10:5, 10:6, 10:8, 10:9, 21:20, 32:23, 36:18, 37:9, 47:11
**truly** [3] - 118:2, 118:9, 118:12
**trunk** [1] - 116:19
**Trust** [5] - 34:3, 34:4, 45:1, 45:11, 70:9
**trustee** [2] - 51:16, 51:21
**trustees** [5] - 51:13, 51:14, 54:9, 54:19, 76:22
**try** [6] - 10:18, 20:7, 22:14, 50:17, 60:3, 62:16
**trying** [2] - 95:13, 99:6
**Tufano** [1] - 72:6
**Tuition** [1] - 70:8
**turn** [3] - 8:22, 22:2, 31:25
**turning** [1] - 45:16
**turns** [1] - 49:10
**twelve** [1] - 107:18

**twelve-six** [1] - 107:18
**twenty** [1] - 71:17
**Two** [1] - 12:15
**two** [40] - 10:10, 17:20, 21:22, 21:23, 23:2, 31:1, 33:21, 36:18, 40:18, 41:2, 43:21, 46:16, 46:17, 46:19, 46:20, 46:22, 46:23, 52:23, 52:25, 57:7, 58:7, 68:6, 68:11, 70:21, 71:10, 71:14, 71:17, 83:5, 83:11, 87:2, 87:6, 87:13, 92:6, 92:11, 97:1, 101:21, 110:15, 114:18, 119:10
**two-day** [1] - 41:2
**two-hundred-twenty-five** [1] - 71:17
**type** [6] - 13:8, 33:23, 94:24, 97:22, 100:20, 100:21
**types** [7] - 7:19, 7:25, 12:19, 26:5, 35:12, 37:11, 70:17
**typical** [3] - 11:9, 11:11, 11:16
**typically** [1] - 17:3
**Tyson** [1] - 79:12

## U

**U.S** [3] - 2:21, 34:3, 34:4
**UBS** [5] - 41:17, 41:19, 41:21, 41:24
**UBS's** [1] - 41:23
**ultimate** [1] - 78:14
**ultimately** [11] - 8:2, 41:3, 49:16, 51:16, 51:17, 67:18, 76:15, 77:11, 77:13, 79:23, 90:14
**uncashed** [1] - 36:10
**unclaimed** [1] - 29:24
**under** [14] - 15:1, 15:8, 17:1, 30:11, 40:2, 50:14, 56:11, 64:3, 74:15, 78:11, 79:12, 79:20, 98:12, 108:17
**under-the-radar** [1] - 64:3
**underlying** [1] - 111:22
**undertaken** [2] - 7:10, 9:5
**undertaking** [2] - 8:21, 67:18
**undistributed** [2] - 15:9, 29:25

**unfair** [1] - 97:18
**unfamiliar** [1] - 26:13
**unfortunately** [1] - 90:4
**uniform** [1] - 117:21
**unique** [8] - 3:21, 4:21, 31:19, 52:19, 75:20, 80:2, 109:7
**UNITED** [1] - 1:1
**unless** [9] - 5:3, 5:17, 19:12, 26:23, 38:23, 48:8, 64:14, 72:11, 107:6
**unlike** [4] - 56:6, 60:18, 107:17, 107:21
**unnecessary** [1] - 64:18
**unprecedented** [2] - 7:25, 89:12
**unreasonable** [3] - 13:22, 38:17, 97:19
**unrelated** [4] - 43:4, 43:8, 43:13, 43:16
**unseen** [1] - 116:16
**untimely** [1] - 48:19
**unusual** [4] - 55:9, 84:20, 96:8
**up** [45] - 7:6, 12:23, 12:24, 19:5, 31:10, 33:25, 34:5, 39:10, 39:16, 46:19, 49:3, 49:12, 50:16, 50:17, 51:4, 52:2, 53:3, 57:18, 62:2, 63:14, 65:17, 73:1, 74:12, 76:19, 77:22, 78:12, 79:4, 79:14, 80:5, 80:22, 80:23, 82:1, 83:5, 83:9, 84:23, 86:1, 100:2, 104:5, 107:15, 112:17, 113:2, 116:10, 119:9
**upstairs** [1] - 113:6
**uptick** [1] - 36:4
**USA** [3] - 52:21, 52:25, 53:1
**useful** [1] - 93:6
**usual** [1] - 81:10

## V

**valid** [3] - 34:22, 78:8, 79:2
**validity** [1] - 63:19
**value** [7] - 4:12, 37:16, 61:13, 69:6, 71:16, 73:15, 89:7
**values** [3] - 80:22, 80:23, 89:6
**variations** [1] - 23:4
**various** [9] - 3:21, 32:7, 51:2, 52:9, 52:14, 62:1, 77:4, 78:1, 79:22

**vast** [1] - 69:10
**Vellrath** [2] - 69:11, 69:12
**verbally** [1] - 2:15
**verified** [1] - 64:5
**Vermont** [1] - 71:13
**versus** [1] - 67:25
**viable** [2] - 8:1, 8:2
**view** [4] - 32:15, 78:1, 79:2, 93:18
**Vincent** [1] - 36:25
**vis** [2] - 53:19
**vis-a-vis** [1] - 53:19
**volumes** [1] - 12:3
**voluminous** [3] - 7:11, 26:2, 33:15
**vouch** [1] - 117:3

## W

**Wachtell** [1] - 77:14
**Wagner** [2] - 100:1, 116:24
**wait** [1] - 112:18
**waiting** [2] - 89:17, 115:4
**waits** [1] - 24:24
**WALDMAN** [7] - 110:7, 110:16, 112:16, 112:21, 113:9, 113:11, 113:14
**Waldman** [2] - 1:24, 110:6
**walk** [2] - 76:20, 81:4
**walked** [1] - 24:18
**Wall** [3] - 52:21, 52:24, 70:25
**wants** [10] - 14:5, 19:23, 26:11, 26:16, 39:1, 55:3, 64:7, 99:23, 100:3, 107:6
**watch** [1] - 100:3
**watched** [1] - 107:2
**WAYNE** [4] - 70:6, 70:19, 72:2, 74:5
**Wayne** [3] - 1:22, 70:4, 70:6
**ways** [2] - 21:8, 63:7
**web** [13] - 9:5, 9:7, 33:25, 34:1, 35:18, 44:3, 58:8, 62:6, 62:9, 68:8, 91:7, 100:23, 103:25
**week** [2] - 74:18, 110:12
**weigh** [1] - 23:13
**weighted** [1] - 106:19
**Weiss** [1] - 102:17
**welcoming** [1] - 117:17
**West** [1] - 2:21
**whatsoever** [1] - 105:10
**whereas** [1] - 63:7
**Whereof** [1] - 120:10

**whichever** [2] - 39:9,
65:18
**whole** [4] - 25:5, 63:2,
72:14, 92:21
**William** [1] - 2:7
**Willner** [1] - 17:20
**Wilshire** [2] - 100:18,
100:20
**win** [1] - 112:25
**winners** [1] - 97:7
**wire** [1] - 39:14
**Wisconsin** [1] - 60:10
**wisdom** [2] - 4:24,
110:1
**wise** [2] - 51:22
**wish** [3] - 5:10, 63:4,
111:19
**wished** [2] - 5:9, 43:22
**wishes** [1] - 112:9
**withdraw** [1] - 104:11
**withdrawn** [4] - 83:3,
104:6, 111:5, 111:8
**Witness** [1] - 120:10
**Wolf** [1] - 110:6
**wonderful** [3] - 20:24,
118:9, 119:17
**Wood** [1] - 92:25
**word** [1] - 113:19
**works** [2] - 21:8, 68:24
**worry** [2] - 83:16, 119:2
**worth** [1] - 30:9
**written** [2] - 43:25,
78:15
**wrongdoing** [3] - 49:14,
66:4, 66:15
**wrote** [2] - 78:2, 78:4

## Y

**Yarnoff** [6] - 1:17, 33:6,
33:11, 86:7, 86:9, 106:20
**YARNOFF** [28] - 33:10,
34:24, 35:9, 36:12,
36:22, 37:19, 37:21,
37:24, 38:20, 38:23,
39:4, 39:12, 39:17, 86:9,
87:13, 87:16, 87:18,
87:20, 87:23, 88:6, 93:9,
93:20, 94:5, 98:14,
99:12, 99:18, 100:12,
102:13
**year** [6] - 14:19, 14:21,
17:15, 31:22, 79:13, 87:2
**yearly** [1] - 11:19
**years** [22] - 3:6, 7:14,
11:5, 16:18, 31:16, 41:1,
48:7, 59:21, 61:6, 87:6,
89:22, 89:23, 90:3,
95:16, 98:19, 99:1,

102:10, 113:21, 116:13,
117:2, 118:19, 119:14
**yesterday** [1] - 68:9
**York** [8] - 6:21, 25:18,
29:8, 35:10, 67:6, 70:25,
71:23, 103:5
**young** [2] - 24:23, 117:4
**yourself** [2] - 30:23,
34:20

## Z

**Zajac** [4] - 2:20, 5:20,
120:3, 120:15
**zero** [1] - 106:8
**zip** [1] - 91:8